UNITED STATES DISTRICT COURT
EASTERN DISTRICT MICHIGAN

RITA C. SIMPSON-VLACH,
ALAN SIMPSON-VLACH,
on behalf of A.S. and M.S., and
individually, KATHY BISHOP,
CHRISTOPHER PLACE,
on behalf of C.P. and H.P, and
individually,

|  |  |  |
|---|---|---|
| | Plaintiffs, | Civil Action No. 21-cv-11532 |
| v. | | Honorable |

MICHIGAN DEPARTMENT OF EDUCATION,
ANN ARBOR PUBLIC SCHOOLS,
WASHTENAW INTERMEDIATE SCHOOL DISTRICT,
DR. JEANICE SWIFT, in her official capacity,
DR. MARIANNE FIDISHIN, in her official capacity,
SCOTT MENZEL, in his official capacity,
NAOMI NORMAN, in her official capacity,
MICHAEL F. RICE, Ph.D., in his official capacity,

Defendants.
_____/

## PROPOSED CLASS ACTION COMPLAINT AND
## REQUEST FOR AUTOMATIC AND PRELIMINARY INJUNCTION

Plaintiffs, Rita C. Simpson-Vlach, Alan Simpson-Vlach, Kathy Bishop, and Christopher Place, individually and on behalf of their special needs children (collectively referred to as "Plaintiffs"), for their Proposed Class Action Complaint and Request for Automatic and Preliminary Injunction against the Michigan Department of Education ("MDE"), the Ann Arbor Public Schools ("AAPS"), the Washtenaw Intermediate School District ("WISD") and other similarly situated local education agencies ("LEAs") in Michigan, Dr. Jeanice Swift, Dr. Marianne Fidishin, Scott Menzel, Naomi Norman and Michael F. Rice, Ph. D. ("the individual RICO defendants or individual defendants") allege as follows:

PRELIMINARY STATEMENT

1.     This action is brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, *et seq* ("IDEA"), the Michigan Administrative Rules for Special Education, § 341.1717 *et seq.* ("MARSE"), Section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; 28 C.F.R. § 35.104, the Michigan Persons with Disabilities Civil Rights Act ("MPDCRA or the Michigan Act"), M.C.L. § 37.1101 *et seq.,* 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment, the Racketeer Influenced and Corrupt Organizations ("RICO") Act of 1970, 28 U.S.C. §§ 1961-1968 and the concomitant implementing regulations, case law and public policy.

2.     Plaintiffs are children with disabilities and the parents of those children, who were denied their rights under IDEA, MARSE, the ADA, § 504, the Michigan Act, the Equal Protection Clause of the Fourteenth Amendment and RICO for the 2019-2020 and 2020-2021 school years by defendants.  Plaintiffs seek declaratory and injunctive relief to enjoin defendants from violating their procedural and substantive rights under IDEA, MARSE, the ADA, § 504, the Michigan Act, the Equal Protection Clause of the Fourteenth Amendment and RICO.

JURISDICTION AND VENUE

3.     Jurisdiction of the United States District Court for the Eastern District of Michigan is invoked under 20 U.S.C. § 1415(i)(2) providing for jurisdiction and a right of action in this Court for parties aggrieved under IDEA.

4.     Jurisdiction of the United States District Court for the Eastern District of Michigan is also invoked under Section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a), and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132;

28 C.F.R. § 35.104.

5.      Jurisdiction is also invoked under 42 U.S.C. §1983.

6.      Jurisdiction is also invoked under the Racketeer Influenced and Corrupt Organizations Act of 1970 pursuant to 28 U.S.C. §§ 1961-1968 of RICO, in particular18 U.S.C. § 1964.

7.       Jurisdiction is also conferred by 28 U.S.C. § 1331, providing for jurisdiction of all civil actions arising under the laws of the United States.

8.      This Court may also order declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.      The Court also has pendent jurisdiction to adjudicate any state claims, which may arise out of the same facts as the federal claims asserted herein pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in the United States District Court for the Eastern District of Michigan, as authorized by 28 U.S.C. § 1391.

11.     Plaintiffs have not exhausted their administrative remedies under 20 U.S.C. § 1415(i)(2) because they fall within the exceptions to 20 U.S.C. §1415(i)(2), including 20 U.S.C. § 1415(j).

<u>THE PARTIES</u>

12.     Plaintiff A.S. was twelve years old in March of 2020 when AAPS ceased in-person instruction and services due to the COVID-19 pandemic, and therefore a minor during the 2019-2020 and 2020-2021 school years.  Exhibit A, 10/28/19 A.S. IEP.

13.     Plaintiff M.S. was nine years old in March of 2020 when AAPS ceased in-person instruction and services due to the COVID-19 pandemic, and therefore a minor during the 2019-2020 and 2020-2021 school years.  Exhibit B, 2/12/20 M.S. IEP.

14.     Plaintiffs Rita C. Simpson-Vlach and Alan Simpson-Vlach are the parents and natural guardians of A.S. and M.S.

15.     Plaintiff C.P. was ten years old in March of 2020 when AAPS ceased in-person instruction and services due to the COVID-19 pandemic, and therefore a minor during the 2019-2020 and 2020-2021 school years.  Exhibit C, C.P. 4/4/19 IEP.

16.     Plaintiff H.P. was seven years old in March of 2020 when AAPS ceased in-person instruction and services due to the COVID-19 pandemic, and therefore a minor during the 2019-2020 and 2020-2021 school years.  Exhibit D, H.P. 12/12/19 IEP.

17.     Plaintiffs Kathy Bishop and Christopher Place are the parents and natural guardians of C.P. and H.P.

18.     A.S., M.S., C.P. and H.P. are children with disabilities, as defined by 20 U.S.C. § 1401(3), and are entitled to receive a free and appropriate public education ("FAPE") and related services from the MDE, the WISD and AAPS.  Exhibits A-D.

19.     At all relevant times plaintiffs resided and continue to reside in Ann Arbor, Michigan.  *Id.*

20.     A.S., M.S., C.P. and H.P. are not expressly named within this complaint because of privacy provisions in IDEA as well as the Family Education Rights Privacy Act ("FERPA"), 20 U.S.C. §1232.

21.     Defendant Michigan Department of Education is, and was at all material times, a state educational agency ("SEA") that manages and controls the educational affairs of Michigan public schools.

22.     Defendant AAPS is a local education authority ("LEA") as defined by 14 U.S.C. §1401 and 34 C.F.R. § 300.28 responsible for providing A.S., M.S., C.P and H.P. with a FAPE.

23.     Defendant WISD is also a LEA as defined by as 14 U.S.C. §1401 and 34 C.F.R. § 300.28 responsible for providing A.S., M.S., C.P and H.P. with a FAPE.

24.     The MDE has established policies and procedures, both written and informal, concerning

the implementation of IDEA.

25.     The MDE receives funding pursuant to IDEA, 20 U.S.C. § 1412, the ADA, and § 504, and therefore must comply with the statutes' provisions.

26.     Defendant MDE's principal place of business is Lansing, Michigan.

27.     Defendant AAPS's primary place of business is Ann Arbor, Michigan.

28.     Defendant WISD's primary place of business is Ann Arbor, Michigan.

29.     Plaintiffs reside in the AAPS school district.  Exhibits A-D.

30.     The MDE is responsible for ensuring all LEAs, including AAPS and WISD, provide a FAPE to all Michigan students with disabilities pursuant to statutory rights arising under IDEA, MARSE, the ADA, § 504, the Michigan Act and § 1983 and their implementing regulations.

31.     Dr. Jeanice K. Swift is the Superintendent of AAPS.

32.     Dr. Marianne Fidishin is the Executive Director of Student Intervention and Support Services for AAPS.

33.     Defendant Scott Menzel is the former Interim Superintendent of WISD.

34.     Defendant Naomi Norman is the current Interim Superintendent of WISD.

35.     Defendant Michael F. Rice, Ph.D. is the State Superintendent for MDE.

<u>FACTUAL ALLEGATIONS</u>

36.     Plaintiffs bring this action under IDEA, MARSE, the ADA, § 504, the Michigan Act, § 1983 and RICO seeking declaratory and injunctive relief to enjoin the MDE, WISD, AAPS, and other similarly situated LEAs, from violating their procedural and substantive rights under IDEA, MARSE, the ADA, § 504, the Michigan Act and § 1983.

37.     The primary mechanism for insuring implementation of IDEA's mandate of a FAPE is the Individualized Education Plan ("IEP"), as defined by 20 U.S.C. §§1401 (14), 1414(d).

38.     An IEP is a written statement, prepared for every child with a disability, that sets forth the special education and related services, supplementary aids and services, and program modifications or supports to be provided to the child, or on behalf of the child, to enable that child to achieve a comprehensive set of annual goals and short-term objectives.

39.     On March 16, 2020, AAPS closed its schools and ceased all in-person instruction and services due to the COVID-19 pandemic.

40.     In response to the COVID-19 pandemic, the United States Department of Education ("U.S. DOE") published two guidance documents to school districts in March of 2020: a Supplemental Fact Sheet and a Questions and Answers document. Exhibit E, March 12, 2020 Supplemental Fact Sheet; Exhibit F, March 2020 Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak.

41.     The Fact Sheet stated: "To be clear: ensuring compliance with the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act (Section § 504), and Title II of the Americans with Disabilities Act should not prevent any school from offering educational programs through distance instruction." Exhibit E.

42.     The Questions and Answers sheet stated that each school would have to "make an individualized determination whether and to what extent compensatory services may be needed, consistent with applicable requirements, including to make up for any skills that may have been lost." Exhibit F.

43.     The U.S. DOE did not provide any waivers of IDEA to any state. Exhibit E.

44.     On April 10, 2020, MDE Office of Special Education (OSE) issued a memo titled "Guidance for Compliance with IDEA and MARSE During the COVID-19 Pandemic." Exhibit G: April 10, 2020 Memorandum, "Guidance for Compliance with IDEA and the MARSE During

the COVID-19 Pandemic."

45.    The Memo stated: "The MDE has requested flexibilities from U.S. Department of Education for certain requirements of the Individuals with Disabilities in Education Act pertaining to initial evaluation timelines, re-evaluation due dates, annual individualized education program (IEP) review timelines, state complaint timelines, and Part C and Part B transition timelines." *Id.*

46.    The MDE did not provide any more guidance to its LEAs regarding how to comply with IDEA, MARSE, § 504, the ADA or the Michigan Act through "distance" or virtual instruction.

47.    Prior to the closure of AAPS in-person instruction, on August 8, 2019, Michael F. Rice, Ph.D., State Superintendent for MDE sent all Michigan Intermediate School Districts and State Agency Directors of Special Education a Memo that provided "notice of grant awards to the Intermediate School Districts and State Agencies under the Individuals with Disabilities Education Act (IDEA), Part B, Section 611."  Exhibit H, August 8, 2019 Memo from MDE to SEAs.

48.    Exhibit A attached to the memo shows that MDE received over $377 million from the U.S. DOE. *Id*.

49.    Exhibit A also shows that the WISD received $10,813,290.00 "Flowthrough" IDEA for the 2019-2020 school year and $143,000.00 in "General Supervision" from the U.S. DOE.  *Id*.

50.    After the closure of in-person instruction at AAPS, on July 1, 2020, the U.S. DOE approved the MDE's "application for Federal Fiscal Year (FFY) funds under Part B of the Individuals with Disabilities Act (IDEA Part B)."  Exhibit I, July 1, 2020 Letter from U.S. DOE.

51.    Attached to the July 1, 2020, letter are the assurances made by the Michigan Department of Education regarding its "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."  *Id*.

52.    MDE assured the U.S. DOE that: "[c]hildren with disabilities and their parents are afforded

7

the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *Id*.

53.     MDE assured the U.S. DOE that "[t]he Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 § CFR 300.154 and the State education agency, in order to ensure that the services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, include the provision of such services during the *pendency* of any dispute under § 300.154(a)(3)." *Id*.

A.S.

54.     A.S. is eligible for special education from AAPS due to a specific learning disability. Exhibit A.

55.     As a result of A.S.'s specific learning disability, A.S. has global developmental impairments that adversely affect his educational abilities and performance.  *Id*.

56.     A.S. struggles with focus, generally, and math calculations, specifically, and requires a high degree of individualized attention and instruction.  *Id*.

57.     According to A.S.'s October 28, 2019 IEP, A.S. received between fifty-three minutes and an hour and six minutes of resource room instruction per week.  *Id*.

58.     A.S.'s October 28, 2019 IEP states that "the primary mode of service is directly working with the student."  *Id*.

59.     A.S.'s October 28, 2019 IEP does not state whether this mode will be in-person or virtual.

60.     A.S. requires direct resource room services to accommodate his disabilities so he can receive a FAPE.  *Id*.

61.     On March 16, 2020, AAPS ceased all in-person education due to the COVID-19 pandemic.

62.     As a result of the March 16, 2020 closure of AAPS schools, AAPS altered A.S.'s IEP for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or the proper participation of parents.

63.     The alterations and concomitant placement of A.S. at home receiving virtual instruction and services was procedurally defective because AAPS:

        a.      Altered A.S.'s IEP to complete virtual instruction without prior written notice or any written notice;

        b.      Altered A.S.'s IEP without the meaningful participation of his parents;

        c.      Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing A.S.'s placement from in-person instruction and services to home placement with virtual instruction and services;

        d.      Failed to ensure that A.S. could access a free and appropriate public education on the same level as his non-disabled peers.

64.     During the 2019-2020 school year, from March 16, 2020 through June 12, 2020, A.S. attended school at home with virtual instruction and services.

65.     During the 2020-2021 school year, A.S. attended school at home with virtual instruction until May of 2021 when AAPS offered a hybrid option.

66.     Plaintiff Rita C. Simpson-Vlach and Alan Simpson-Vlach filed an administrative due process complaint against defendants but did not exhaust their administrative due process remedies under 20 U.S.C. § 1415(i)(2), on behalf of A.S., because their claims fall within the exceptions specified by law.

67.     Plaintiffs have neither waived nor abandoned any claims or arguments under IDEA or state law.

9

M.S.

68.     M.S. is eligible for special education from AAPS due to a health impairment arising from her medical diagnosis of attention deficit hyperactivity disorder ("ADHD") and her "limited alertness to education." Exhibit B.

69.     As a result of M.S.'s health impairment, M.S. has global developmental impairments that adversely affect her educational abilities and performance. *Id.*

70.     M.S. struggles with focus, generally, and reading, specifically, and requires a high degree of individualized attention and instruction. *Id.*

71.     According to M.S.'s February 12, 2020, IEP, M.S. received twenty-thirty minutes of social work services three or four times a month, and one and a half to two and a half hours of resource room instruction for reading a week. *Id.*

72.     According to M.S.'s February 12, 2020 IEP, "the primary mode of service is directly working with the student." *Id.*

73.     M.S.'s February 12, 2020 IEP does not state whether this mode will be in-person or virtual.

74.     M.S. requires direct resource room services and direct social work services to accommodate her disability so she can receive a FAPE. *Id.*

75.     On March 16, 2020, AAPS ceased all in-person education due to the COVID-19 pandemic.

76.     As a result of the March 16, 2020 closure of AAPS schools, AAPS altered M.S.'s IEP for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or the proper participation of parents.

77.     The alterations and concomitant placement of M.S. at home receiving virtual instruction and services was procedurally defective because AAPS:

      a.     Altered M.S.'s IEP to complete virtual instruction without prior written notice, or

any written notice;

      b.     Altered M.S.'s IEP without the meaningful participation of her parents;

      c.     Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing M.S.'s placement from in-person instruction and services to home placement with virtual instruction and services;

      d.     Failed to ensure that M.S. could access a free and appropriate public education on the same level as her non-disabled peers.

78.    During the 2019-2020 school year, from March 16, 2020 through June 12, 2020, M.S. attended school at home receiving virtual instruction and services.

79.    During the 2020-2021 school year, M.S. attended school at home with virtual instruction and services until May of 2021 when AAPS offered a hybrid option.

80.    Plaintiff Rita C. Simpson-Vlach and Alan Simpson-Vlach filed an administrative due process complaint against defendants but did not exhaust their administrative due process remedies under 20 U.S.C. § 1415(i)(2), on behalf of M.S., because their claims fall within the exceptions specified by law.

81.    Plaintiffs have neither waived nor abandoned any claims or arguments under IDEA or state law.

C.P.

82.    C.P. is eligible for special education from AAPS due to a health impairment resulting in limited alertness to education.  Exhibit C.

83.    As a result of C.P.'s health impairment, C.P. has global developmental impairments that adversely affect his educational abilities and performance.  *Id.*

84.    C.P. struggles with reading, writing, perception, fine motor and gross motor skills,

mobility, visual motor integration, receptive and expressive speech, and anxiety.  *Id.*

85.    According to C.P.'s April 4, 2019 IEP, C.P. received three to four thirty-minute direct teacher consultant sessions a week, three thirty-minute direct occupational therapy sessions a month, three thirty-minute direct speech and language therapy sessions a month, and three thirty-minute direct social work sessions a month.  *Id.*

86.    According to C.P.'s April 4, 2019 IEP, "the primary mode of service is directly working with the student."  *Id.*

87.    C.P.'s April 4, 2019 IEP does not state whether this mode will be in-person or virtual.

88.    C.P.'s April 4, 2019 IEP requires direct teacher consultant services, occupational therapy, speech and language therapy, and social work services to accommodate his disability so he can receive a FAPE.  *Id.*

89.    On March 16, 2020, AAPS ceased all in-person education due to the COVID-19 pandemic.

90.    As a result of the March 16, 2020 closure of AAPS schools, AAPS altered C.P.'s IEP for the 2019-2020 school year to complete virtual instruction and services without prior written notice and/or the proper participation of parents.

91.    The alterations and concomitant placement of C.P. at home receiving virtual instruction and services was procedurally defective because AAPS:

a.    Altered C.P.'s IEP to complete virtual instruction without prior written notice or any written notice;

b.    Altered C.P.'s IEP without the meaningful participation of his parents;

c.    Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing C.P.'s placement from in-person instruction and services to home placement with virtual instruction and services;

12

d.      Failed to ensure that C.P. could access a free and appropriate public education on the same level as his non-disabled peers.

92.     During the 2019-2020 school year, from March 16, 2020 through June 12, 2020, C.P. attended school at home receiving virtual instruction and services.

93.     During the 2020-2021 school year, C.P. attended school at home receiving virtual instruction and services until May of 2021 when AAPS offered a hybrid option.

94.     Plaintiff Kathy Bishop and Christopher Place filed an administrative due process complaint against defendants but did not exhaust their administrative due process remedies under 20 U.S.C. § 1415(i)(2), on behalf of C.P., because their claims fall within the exceptions specified by law.

95.     Plaintiffs have neither waived nor abandoned any claims or arguments under the IDEA or state law.

H.P.

96.     H.P. is eligible for special education from AAPS due to a health impairment arising from her medical diagnosis of attention deficit hyperactivity disorder ("ADHD") and "limited alertness to education." Exhibit D.

97.     As a result of H.P.'s health impairment, H.P. has global developmental impairments that adversely affect her educational abilities and performance. *Id.*

98.     H.P. struggles with inattention, hyperactivity, impulsivity, learning and executive functioning problems, reading, writing, math, visual motor integration, social-emotional/behavioral skills, and sensory processing. *Id.*

99.     According to H.P.'s December 9, 2020 IEP, H.P. received three to four twenty-five-to-thirty-minute sessions of occupational therapy a month, three to four twenty-five-to-thirty-minute sessions of social work services a month, and seven and a half hours of resource room instruction

per week. *Id.*

100.    H.P.'s IEP states that the "primary mode of service is directly working with the student." *Id.*

101.    H.P.'s December 9, 2020 IEP does not state whether this mode will be in-person or virtual.

102.    H.P.'s December 9, 2020 IEP requires direct occupational therapy, direct social work services and direct resource room instruction to accommodate her disability so she can receive a FAPE. *Id.*

103.    On March 16, 2020, AAPS ceased all in-person education due to the COVID-19 pandemic.

104.    As a result of the March 16, 2020 closure of AAPS schools, AAPS altered H.P.'s IEP for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or participation of parents.

105.    The alterations and concomitant placement of H.P. at home receiving virtual instruction and services was procedurally defective because AAPS:

        a.    Altered H.P.'s IEP to complete virtual instruction without prior written notice or any written notice;

        b.    Altered H.P.'s IEP without the meaningful participation of her parents;

        c.    Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing H.P.'s placement from in-person instruction and services to home placement with virtual instruction and services;

        d.    Failed to ensure that H.P. could access a free and appropriate public education on the same level as her non-disabled peers.

106.    During the 2019-2020 school year, from March 16, 2020 through June 12, 2020, H.P. attended school at home receiving virtual instruction and services.

14

107.    During the 2020-2021 school year, H.P. attended school at home receiving virtual instruction and services until January of 2021 when her mother placed her in a private school.

108.    Plaintiffs Kathy Bishop and Christopher Place filed an administrative due process complaint against defendants but did not exhaust their administrative due process remedies under 20 U.S.C. § 1415(i)(2), on behalf of H.P., because their claims fall within the exceptions specified by law.

109.    Plaintiffs have neither waived nor abandoned any claims or arguments under the IDEA or state law.

CLASS ACTION ALLEGATIONS

General Class Action Allegations

110.    Plaintiffs bring this action on behalf of themselves and all other similarly situated school aged children with disabilities covered by IDEA in Michigan and their parents, for the purpose of asserting the claims alleged in this complaint on a common basis.

111.    A class action is a superior means, and the only practical means, by which plaintiffs and unknown class members can challenge the actions of the MDE, the WISD, AAPS, the individual defendants, and other similarly situated LEAs in Michigan, in restricting the rights of named plaintiffs, and similarly situated class members, under IDEA, MARSE, the ADA, § 504, the Michigan Act, § 1983 and RICO without providing them due process of law.

112.    The action is brought and may properly be maintained as a class action pursuant to the Federal Rule of Civil Procedure 23 (a) and 23(b)(2).

113.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(2), where applicable.

15

Rule 23(a)(1):  Numerosity

114.    The class is so numerous that joinder is impracticable.

115.    All the putative class members are children with disabilities under IDEA in Michigan and their parents.

116.    The total number of individuals denied the procedural safeguards under IDEA– either in the past, currently, or in the future – will likely number in the thousands.

Rule 23(b)(2):  Commonality

117.    Common questions of law and fact exist as to all members of the class.

118.    All class members seek relief on the common legal question of whether the MDE, the WISD, AAPS, the individual defendants and other similarly situated LEAs violated IDEA, MARSE, the ADA, § 504, the Michigan Act, § 1983 and RICO by altering plaintiffs' IEPS and changing their educational placement, without following the regulations promulgated under the statutes.

119.    All class members also present common factual questions regarding AAPS and similarly situated LEAs' closures of schools and the putative class members' concomitant educational placement.

120.    All class members also present common factual questions regarding MDE, WISD, AAPS, similarly situated LEAs, and individual defendants' assurances to the U.S. DOE regarding IDEA Part B funding.

121.    All class members also present common factual questions regarding whether the MDE failed to appropriately monitor AAPS and similarly situated LEAs in Michigan and provide the LEAs with the resources and expertise necessary to protect its disabled students' procedural safeguards guaranteed by IDEA.

122.     All class members seek injunctive relief requesting that the Court:  1)  Issue a declaratory judgment that the class members' pendency placement is in-person instruction and services; 2) Issue a declaratory judgment that AAPS and other similarly situated LEAs' unilateral change of placement of plaintiffs from in-person instruction and services to virtual instruction and services violated the procedural safeguards of IDEA and discriminated against plaintiffs under IDEA, MARSE, § 504, the ADA, the Michigan Act and § 1983; 3)  Issue a declaratory judgment that the MDE failed to monitor and provide proper oversight and resources to AAPS and similarly situated LEAs during the COVID-19 pandemic as required under IDEA and MARSE; 4)  Order the MDE and AAPS and other similarly situated LEAs to comply with the procedural safeguards guaranteed by IDEA for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers; 5) Assign a Special Monitor to:  a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEES;  b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents; 6)  Require the MDE, WISD, AAPS and other similarly situated LEAs to comply with IDEA, MARSE, the ADA, § 504, the Michigan Act and § 1983 in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers; and 7) Assign a RICO Special Monitor to:  a) oversee the completion of an independent audit of defendants' expenditures of their IDEA Part B Funds from March of 2020 to the present; b) oversee the defendants' expenditures of their IDEA Part B Funds for the 2021-2022 school year to ensure defendants spend IDEA Part B Funds for instruction and/or services for students with

disabilities under IDEA;  c) ensure any IDEA Part B Funds that defendants on items other than instruction and/or services for students with disabilities under IDEA from March of 2020 through the present are reimbursed to a monitored account to be spent only upon review and approval by the RICO Special Monitor.

<u>Rule 23(a)(3):  Typicality</u>

123.    Plaintiffs' claims are typical of the claims of other respective members of the class.

124.    Like all members of the class, plaintiffs are children with disabilities under IDEA in Michigan or their parents, who were denied the procedural due process or substantive rights provided by IDEA, MARSE, the ADA, § 504, the Michigan Act and § 1983.

125.    All members of the class claim that the MDE, the WISD, AAPS and similarly situated LEAs violated their procedural and substantive due process rights provided by IDEA, MARSE, the ADA, § 504, the Michigan Act and § 1983.

126.    All members of the class, including named plaintiffs, seek a declaratory judgment that the actions of defendants were unlawful and an injunction preventing defendants from committing such actions in the future.

127.    There is nothing distinctive about named plaintiffs' claims for declaratory, injunctive or pendency relief that would lead to a different result in their case than in any case involving other class members.

<u>Rule 23(a)(4):  Adequacy</u>

128.    Plaintiffs are adequate representatives of the class because their interest in the vindication of their rights is aligned with the interests of the other class members.

129.    Plaintiffs are members of the class, and their interests do not conflict with those of the other class members with respect to any claims.

130.    Plaintiffs are represented by attorneys from the Brain Injury Rights Group, who have experience litigating complex civil rights matters in federal court and have detailed knowledge of IDEA, MARSE, § 504, the ADA, the Michigan Act, § 1983, RICO and other relevant issues.

131.    Class counsel has developed and continues to develop relationships with plaintiffs and others similarly situated.

<u>Rule 23(b)(2):  Declaratory and Injunctive Relief Class</u>

132.    A class action is appropriate for declaratory and injunctive relief under Rule 23(b)(2) because defendants have acted on grounds that apply generally to the class – namely the unilateral change of placement in March of 2020, from in-person instruction and services to virtual instruction and services – without complying with plaintiffs' rights under IDEA, MARSE, § 504, the ADA, the Michigan Act and § 1983.

133.    The class seeks declaratory and injunctive relief to enjoin the MDE, the WISD, AAPS and similarly situated LEAs from denying the rights guaranteed under IDEA, MARSE, § 504, the ADA, the Michigan Act and § 1983 to all AAPS children with disabilities.

134.    Class status is particularly appropriate because there is a risk that any individual member's claim for declaratory or injunctive relief will become moot before the litigation is resolved.  There is a risk that a class member that is or was a senior during the 2019-2020 and 2020-2021 school years will lose eligibility for injunctive relief under IDEA.

<u>Rule 23(b)(3):  Damages Class</u>

135.    No class damages are sought at this time, but no claims for damages should be deemed to be waived by this lawsuit.

<u>CAUSES OF ACTION</u>

<u>COUNT ONE</u>
<u>SYSTEMIC VIOLATIONS OF THE INDIVIDUALS WITH DISABILITIES ACT</u>

19

<u>Systemic Violation 1:  Prior Written Notice</u>

136.    Plaintiffs reiterate, repeat, and affirm each allegation set forth above as if fully set forth herein.

137.    20 U.S.C. § 1415(c)(1) requires that a LEA give prior written notice of any action proposed by the LEA regarding the provision of a FAPE.

138.    The LEAs, including the WISD and AAPS, did not give plaintiffs prior written notice of their closure of schools and alteration of plaintiffs' IEPs and school placements from in-person instruction and services to virtual instruction or services.

139.    MDE failed to appropriately monitor and conduct oversight of its LEAs, including the WISD and AAPS, to ensure they complied with IDEA's procedural safeguards upon the March 2020 closing of its schools.

<u>Systemic Violation 2: Educational Placements</u>

140.    20 U.S.C. § 1414(e) states that each LEA and SEA "shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child."

141.    20 U.S.C. § 1415(j) states "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child."  20 U.S.C. § 1415(j).

142.    20 U.S.C. § 1415(j) obligates courts to implement pendency placement via an automatic injunction, without analysis of the traditional injunction elements.  *Ridley School Dist. v. M.R.*, 2015 WL 1619420, *4 (2015) (The U.S. Supreme Court "has emphasized that the provision's text is 'unequivocal' and 'states plainly' that the child 'shall' remain in his current educational

placement 'during the pendency of any proceedings initiated under the act.'").

143.    The LEAs, including the WISD and AAPS, did not ensure that the parents of each child with a disability were included as members of any IEP Team that made decisions on the educational placement of their children in March of 2020.

144.    The LEAs, including the WISD and AAPS, did not maintain plaintiffs' pendency placement through in-person instruction.

145.    MDE failed to appropriately monitor and conduct oversight of its LEAs, including the WISD and AAPS, to ensure they complied with IDEA's procedural safeguards upon the March 2020 closing of its schools.

146.    Plaintiffs are entitled to all appropriate relief available under IDEA, including injunctive relief declaring that the class members' pendency placement is in-person instruction and requiring the MDE and its LEAs to comply with IDEA in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers.

## Systemic Violation 3:  Failure to Reconvene IEP Meetings

147.    20 U.S.C. § 1414(d)(3)(F) states that an IEP may be amended by the entire IEP Team.

148.    AAPS did not reconvene IEP Team Meetings to change plaintiffs' IEPS to provide for complete virtual instruction and services.

149.    MDE failed to appropriately monitor and conduct oversight of its LEAs to ensure that they complied with IDEA's procedural safeguards upon the March 2020 closing of its schools.

## Systemic Violation 4:  Discrimination based on Disability and Denial of Access to Educational Services

150.    Defendant MDE must ensure that each LEA in Michigan, including AAPS and the WISD, takes steps to ensure that children with disabilities within their jurisdiction have access to the same educational opportunities as their non-disabled peers.  20 U.S.C. § 1412(a)(2); §1413(a)(1); 34

C.F.R. § 300.110.

151.    Defendants' systemic failure to ensure that children with disabilities had appropriate access to the same educational opportunities as their non-disabled peers is a violation of IDEA.

152.    Defendants' actions have caused plaintiffs' damages, including regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs.

COUNT TWO
VIOLATION OF MARSE § 300.324

153.    Plaintiffs reiterate, repeat, and reaffirm each allegation set forth above as if fully set forth herein.

154.    As described at length above, defendants failed to provide plaintiffs procedural safeguards upon the termination of in-person instruction in March of 2020.

155.    Defendants failed to comply with the procedural requirements for prior written notice, educational placements, pendency placements, IEP Team Meetings and equal access to instruction and services for plaintiffs in violation of § 300.518 of MARSE.

156.    Defendants' actions caused plaintiffs' damages, including regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs.

157.    All class members seek injunctive relief requesting that the Court:  1)  Issue a declaratory judgment that the class members' pendency placement is in-person instruction and services; 2) Issue a declaratory judgment that AAPS and other similarly situated LEAs' unilateral change of placement of plaintiffs from in-person instruction and services to virtual instruction and services violated the procedural safeguards of MARSE; 3)  Issue a declaratory judgment that the MDE failed to monitor and provide proper oversight and resources to AAPS and other similarly situated LEAs during the COVID-19 pandemic as required under IDEA and MARSE; 4)  Order the MDE

22

and AAPS and other similarly situated LEAs to comply with the procedural safeguards guaranteed by MARSE for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers; 5) Assign a Special Monitor to:  a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEEs;  b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents; and 6)  Require the MDE and AAPS and other similarly situated LEAs to comply with MARSE in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers.

COUNT THREE<br>VIOLATION OF THE REHABILITATION ACT, 29 U.S.C. § 794

158.    Plaintiffs reiterate, repeat, and reaffirm each allegation set forth above as if fully set forth herein.

159.    Section 504 of the Rehabilitation Act of 1973 and its implementing regulations provide, "no otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

160.    Among other requirements, entities subject to Section 504 must provide equal opportunity to qualified persons with disabilities to participate in or benefit from any aid, benefit, or service they make available.  34 C.F.R. § 104.4(b)(1)(ii).

161.    Entities subject to Section 504 must avoid otherwise limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.  34 C.F.R. § 104.4(b)(1)(vii).

162.    A person has a disability under Section 504 if they have a physical or mental impairment that substantially limits one or more of their major life activities.  42 U.S.C. § 12102(1).

163.    Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, and working.  42 U.S.C. § 12102(2)(A).

164.    A "qualified individual with a disability" is one who, with or without reasonable accommodations for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of federal financial assistance.  29 U.S.C. § 794(a).

165.    A "program or activity" includes local education agencies, public boards of education, and school systems.  29 U.S.C. § 794(b)(2)(B), 20 U.S.C. § 7801(26). A "recipient of federal financial assistance" is a public or private agency or other entity to which federal financial assistance is extended directly or through another recipient.  34 C.F.R. § 104.3(f).

166.    Student plaintiffs are individuals having impairments, including but not limited to, specific learning disorders and ADHD, that affect the major life activity of learning.

167.    Student plaintiffs are otherwise qualified individuals with disabilities who meet essential eligibility requirements to receive services from or participate in the programs or activities of the AAPS and other similarly situated LEAs.  42 U.S.C. § 12131(2); 29 U.S.C. § 794(a).

168.    The MDE and LEAs receive federal funds to comply with § 504.

169.    The MDE and LEAs are entities subject to the non-discrimination requirements of Section § 504.  29 U.S.C. § 794(a);  34 C.F.R. § 104.4.

170.    AAPS and other similarly situated LEAs' closure of in-person instruction in March of 2020 discriminated against plaintiffs as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource room services, by denying them equal access and otherwise limiting their access to education, programs, and services as compared to their non-disabled peers.  34 C.F.R. §§ 104.4(a), 104.4(b)(ii) and (iv).

171.    The LEAs' closure of in-person instruction in March of 2020 was illegal disability-based discrimination that violated Section 504 of the Rehabilitation Act of 1973.

172.    As a proximate cause of these violations of Section 504, plaintiffs have suffered harm as set forth above.

COUNT FOUR
VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101

173.    Plaintiffs incorporate all prior allegations.

174.    Title II of the ADA and its implementing regulations forbid public entities, including local educational agencies, to exclude or deny people with disabilities the benefits of its services, programs, or activities, or to discriminate based on disability.  42 U.S.C. § 12132; 28 C.F.R. § 35.104.

175.    Prohibited disability-based discrimination by public entities includes the failure to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from aids, benefits, or services or "otherwise limit" a qualified individual with a disability in the enjoyment of any right, privilege, aid, benefit, or service.  28 C.F.R. § 35.130(b)(1)(h) & (vii).  Prohibited

discrimination additionally includes the failure to make reasonable modifications as necessary to avoid discrimination against an individual based on their disability.  28 C.F.R. § 35.130(b)(7).

176.   An "individual with a disability" is one who has a physical or mental impairment that substantially limits one or more of their major life activities.  42 U.S.C. § 12102(1).

177.   Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, and working.   42 U.S.C. § 12102(2)(A).

178.   A "qualified individual with a disability" is one who, with or without reasonable accommodations for his or her disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of the public entity.  42 U.S.C. § 12131(2).

179.   Plaintiffs are individuals having impairments, including but not limited to, specific learning disorders and ADHD, that affect the major life activity of learning.

180.   Plaintiffs' impairments affect their major life activities including learning.  42 U.S.C. § 12102(2)(A).

181.   Plaintiffs are otherwise qualified individuals with disabilities who meet the essential eligibility requirements to receive services from or participate in the programs or activities of AAPS and other similarly situated LEAs.  42 U.S.C. § 12131(2).

182.   The MDE and its LEAs are public entities forbidden to discriminate based on disability. 42 U.S.C. § 12132.

183.   AAPS and other similarly situated LEAs' closure of in-person instruction in March of 2020 discriminated against plaintiffs as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource room services,

by denying them equal access and otherwise limiting their access to education, programs, and services as compared to their non-disabled peers.  34 C.F.R. §§ 104.4(a), 104.4(b)(ii) and (iv).

184.    As a proximate cause of these violations of Title II of the Americans with Disabilities Act, plaintiffs have suffered harm as set forth above.

COUNT FIVE<br>VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

185.    Plaintiffs incorporate all prior allegations.

186.    The Michigan Persons with Disabilities Civil Rights Act ("MPDCRA or the Michigan Act") prohibits educational institutions to exclude or deny people with disabilities the full benefits of their programs, activities, and facilities or to discriminate based on disability.  M.C.L. § 37.1101 *et seq.*

187.    The MDE and its LEAs are educational institutions as the term is defined in M.C.L. § 37.1401.

188.    Student plaintiffs are persons with disabilities as that term is defined in the Michigan Act because they have impairments, including but not limited to, specific learning disorders and ADHD, that affect the major life activity of learning.

189.    AAPS and other similarly situated LEAs closure of in-person instruction in March of 2020 discriminated against plaintiffs as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource room services, by denying them equal access and otherwise limiting their access to education, programs and services as compared to their non-disabled peers.  M.C.L. § 37.1402.

190.    As a proximate cause of these violations of the Michigan Persons with Disabilities Act, plaintiffs have suffered harm as set forth above.

COUNT SIX
VIOLATION OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
(42 U.S.C. §1983)

191.   Plaintiffs incorporate all prior allegations.

192.   Section 1 of the Fourteenth Amendment provides:

>   All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST., amend. XIV, § 1.

193.   In order to provide a remedy for violations of the Fourteenth Amendment, Congress has

enacted § 1983, which provides:

>   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

194.   Defendants deprived plaintiffs of their rights as guaranteed by the Fourteenth Amendment

to the United States Constitution, in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983,

when it closed its in-person instruction in March of 2020.

195.   Specifically, plaintiffs have been deprived of their right to equal protection under the

Fourteenth Amendment by the acts of defendants under the color of state authority.

28

196.    Defendants' closure of schools in March of 2020 resulted in a disparate impact on plaintiffs due to their disabilities in violation of the ADA and § 504.

197.    Student plaintiffs are all students with disabilities under the ADA and § 504.

198.    Defendants closed schools in March of 2020 in response to the COVID-19 Pandemic.

199.    As a direct and proximate result thereof, student plaintiffs suffered harm including significant regressions in skills and loss of competencies.

200.    Defendants rendered the student plaintiffs more vulnerable to harm by closing its schools.


## COUNT SEVEN
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. §1962(c)
### (Against Individual Defendants)

201.    Plaintiffs incorporate by reference all preceding paragraphs.

202.    This RICO cause of action arises from a scheme by individual defendants Swift, Fidishin, Menzel, Norman and Rice, in their official capacities, to fraudulently use their enterprises – AAPS, WISD and MDE respectively – to defraud plaintiffs, the beneficiaries of IDEA Part B, of millions of dollars by making false assurances that the MDE and its LEAs complied with IDEA during the COVID-19 pandemic.  Exhibits H and I.

203.    Each plaintiff is a person as defined in 18 U.S.C. §§ 1961(3) and 1964(c).

204.    Each individual defendant is a person as defined in 18 U.S.C. §§ 1961 (3) and 1964 (c).

### The Applicable Statutes

205.    Under 18 U.S.C. § 1962(c) it shall be unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."

29

206.    Under 18 U.S.C. § 1962(d), it is unlawful to conspire to violate any of the RICO substantive provisions, including § 1962(c).

207.    18 U.S.C. § 1964(a) creates a private cause of action to "prevent and restrain violations" of section 1962.

<u>The Enterprises – MDE, WISD and AAPS</u>

208.    The enterprises, as described in 18 U.S.C. § 1961(4), are the MDE, AAPS and WISD.  Each enterprise is an association in fact consisting of individuals who function together as a continuing unit with consensual decision-making authority.   Individual defendants herein conduct the affairs of their respective enterprise in part through predicate activity that defrauds plaintiffs through false assurances that the MDE, AAPS, WISD and similarly situated LEAs complied with IDEA during the COVID-19 pandemic.  Exhibits H and I.  For example, Dr. Jeanice K. Swift, in her official capacity as the Superintendent of AAPS, and Dr. Marianne Fidishin, in her official capacity as Executive Director of Student Intervention and Support Services of AAPS, are among the individuals who conduct the operation of the AAPS enterprise in part through racketeering activity, as described further below.

209.    MDE assured the U.S. DOE that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *Id*.

210.    MDE assured the U.S. DOE that "[t]he Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 § CFR 300.154 and the State education agency, in order to ensure that the services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, include the

provision of such services during the *pendency* of any dispute under § 300.154(a)(3)."   *Id*.

211.   Each individual defendant named herein conducted the affairs of his/her respective enterprise.

212.   Each enterprise operated as an ongoing organization separate and distinct from the individual defendants.

213.   Each enterprise has a structure separate and apart from the racketeering activity in which the individual defendants engaged.   Each enterprise is a governmental entity that consists of numerous different individuals who function together with consensual decision-making authority to conduct the management and operation of the particular governmental entity.

214.   Each enterprise had longevity sufficient to permit their respective individual RICO defendants to pursue the enterprise's purpose.

215.   The activities of each enterprise affected interstate commerce through mail and interstate wires to and from the U.S. DOE in Washington D.C.   Each enterprise affected interstate commerce through each individual defendant's unlawful transmission of assurances of compliance with IDEA via interstate electronic mail that was fraudulently prepared and submitted in furtherance of the racketeering scheme.   Each enterprise affected interstate commerce based on each individual defendant's collection of IDEA Part B funds wired to them through interstate banks from the U.S. DOE based on these fraudulent assurances.

<u>The Racketeering Violation</u>

216.   On or about March of 2020 and continuing up through the date of the filing of this complaint, each individual RICO defendant named herein, a person associated with or employed by their respective enterprise, did knowingly and unlawfully conduct, or participate, directly or indirectly, in each enterprise through a pattern of racketeering activity within the meaning of 18

U.S.C. §§1961(1) and 1961 (5), all in violation of 18 U.S.C.§ 1962(c).

217.    Each defendant engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity within 10 years of each individual act.

218.    Each individual defendant's actions violated the federal mail and wire fraud statutes, 18 U.S.C. § 1341 and 18 U.S.C. §§ 1343, predicate acts for purposes of racketeering.

219.    From March of 2020 through the present, each individual RICO defendant knowingly and intentionally engaged in an ongoing pattern of racketeering activity under 18 U.S.C. § 1962(c) by committing the predicate acts of wire fraud and mail fraud as set forth below.  The fraudulent schemes involved using the interstate wires to defraud plaintiffs, the beneficiaries of IDEA Part B Funds, of their procedural and substantive rights.

Predicate Acts by Officials of Each Enterprise

Dr. Jeanice Swift and Dr. Marianne Fidishin for AAPS

220.    Upon information and belief, Dr. Jeanice K. Swift, in her official capacity as the Superintendent of AAPS, assured the WISD, between January of 2019 and July of 2019, that AAPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."  Exhibit I.

221.    In addition, upon information and belief, Dr. Jeanice K. Swift, in her official capacity as the Superintendent of AAPS, assured the WISD, between January of 2019 and July of 2019, that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121."  *Id.*

222.    In addition, upon information and belief, Dr. Jeanice K. Swift, in her official capacity as the Superintendent of AAPS, and Dr. Marianne Fidishin, in her official capacity as Executive

Director of Student Intervention and Support Services of AAPS, made assurances to the WISD, between January of 2020 and July of 2020, that AAPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." *See id*.

223.    In addition, upon information and belief, Dr. Jeanice K. Swift, in her official capacity as the Superintendent of AAPS, and Dr. Marianne Fidishin, in her official capacity as Executive Director of Student Intervention and Support Services of AAPS, made assurances to the WISD, between January of 2020 and July of 2020 that:  "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *See id*.

224.    In furtherance of her scheme to defraud, and with the purpose of executing her scheme to defraud, Defendant Swift used interstate wires to defraud plaintiffs of their rights under IDEA. The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343.  Defendant Swift used the interstate wires in the years 2019 and 2020, and is continuing to use them, to further her objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by AAPS during its closure.

225.    In furtherance of her scheme to defraud, and with the purpose of executing her scheme to defraud, Defendant Fidishin herein, used interstate wires to defraud plaintiffs of their rights under IDEA.  The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343.  Defendant Fidishin used the interstate wires in 2020, and is continuing to use them, to further her objective to obtain federal funds under the false pretense that plaintiffs'

procedural and substantive rights under IDEA were protected by AAPS during its  closure.

<u>Defendant Scott Menzel and Naomi Norman for WISD</u>

226.    Upon information and belief, Defendant Scott Menzel, in his official capacity as former Interim Superintendent of WISD, made assurances to the MDE, between January of 2019 and July of 2019, that WISD had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."  Exhibit I.

227.    In addition, upon information and belief, Defendant Scott Menzel, in his official capacity as former Interim Superintendent of WISD, made assurances to the MDE, between January of 2019 and July of 2019, that:   "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121."  *Id.*

228.    In addition, upon information and belief, Defendant Naomi Norman, in her official capacity as current Interim Superintendent of WISD, made assurances to the MDE, between January of 2020 and July of 2020, that WISD had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."  *See id.*

229.    In addition, upon information and belief, Defendant Naomi Norman, in her official capacity as current Interim Superintendent of WISD, assured the MDE, between January of 2020 and July of 2020 that:  "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121."  *Id.*

230.    In furtherance of his scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Menzel used interstate wires to defraud plaintiffs of their rights under IDEA. The interstate wires consisted of electronic messages and the collection of federal funds through

the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343. Defendant Menzel used interstate wires in 2019 to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by WISD during the closure of AAPS.

231.    In furtherance of her scheme to defraud, and with the purpose of executing her scheme to defraud, Defendant Norman used interstate wires to defraud plaintiffs of their rights under IDEA. The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343. Defendant Norman used these interstate wires in 2020, and is continuing to use them, to further her objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by the WISD during the closure of AAPS.

<u>Defendant Michael F. Rice, Ph.D. for the MDE</u>

232.    Upon information and belief, Defendant Michael F. Rice, Ph.D., in his official capacity as State Superintendent for MDE, via mail fraud through interstate commerce, made assurances to the U.S. DOE, between January of 2019 and July of 2019, that MDE had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." Exhibit I.

233.    In addition, upon information and belief, Defendant Michael F. Rice, Ph.D., in his official capacity as State Superintendent for MDE, via mail fraud through interstate commerce, made assurances to the U.S. DOE, between January of 2019 and July of 2019, that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *Id*.

234.    In addition, upon information and belief, Defendant Michael F. Rice, Ph.D., in his official

capacity as State Superintendent for MDE, via mail fraud through interstate commerce, assured the U.S. DOE, between January of 2019 and July of 2019, that "[t]he Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR  § 300.154 and the State education agency, in order to ensure that the services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, include the provision of such services during the *pendency* of any dispute under § 300.154(a)(3)." *Id*.

235.    On August 8, 2019, Michael F. Rice, Ph.D., State Superintendent for MDE mailed and emailed all Michigan Intermediate School Districts and State Agency Directors of Special Education a Memo that provided "notice of grant awards to the Intermediate School Districts and State Agencies under the Individuals with Disabilities Education Act (IDEA), Part B, Section 611."  Exhibit H, August 8, 2019, Memo from MDE to LEAs.

236.    Upon information and belief, MDE collected IDEA Part B funds from the U.S. DOE via wire fraud through interstate commerce.  *See id*.

237.    Exhibit A attached to the memo shows that MDE received over $377 million from the U.S. DOE.  *Id*.

238.    Exhibit A also shows that the WISD received $10,813,290.00 "Flowthrough" IDEA for the 2019-2020 school year and $143,000.00 in "General Supervision" from the U.S. DOE.  *Id*.

239.    In addition, upon information and belief, Defendant Michael F. Rice, Ph.D., in his official capacity as State Superintendent for MDE, made assurances, via mail fraud through interstate commerce,  to the U.S. DOE, between January of 2020 and July of 2020, that MDE had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."

*See* Exhibit I.

240.    In addition, upon information and belief, Defendant Michael F. Rice, Ph.D., in his official capacity as State Superintendent for MDE, made assurances, via mail fraud through interstate commerce, to the U.S. DOE, between January of 2020 and July of 2020, that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *See id*.

241.    In addition, upon information and belief, Defendant Michael F. Rice, Ph.D., in his official capacity as State Superintendent for MDE, assured the U.S. DOE, via mail fraud through interstate commerce, between January of 2020 and July of 2020, that "[t]he Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 § CFR 300.154 and the State education agency, in order to ensure that the services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, include the provision of such services during the *pendency* of any dispute under § 300.154(a)(3)." *Id*.

242.    Upon information and belief, in August of 2020, Michael F. Rice, Ph.D., State Superintendent for MDE, mailed and e-mailed all Michigan Intermediate School Districts and State Agency Directors of Special Education a Memo that provided notice of grant awards to the Intermediate School Districts and State Agencies under the Individuals with Disabilities Education Act (IDEA), Part B, Section 611.

243.    Upon information and belief, MDE collected the IDEA Part B funds from the U.S. DOE via wire fraud through interstate commerce.

244.    Upon information and belief, MDE received IDEA Part B funds from the U.S. DOE, and

then distributed them to the WISD by wire.

245.    Upon information and belief, the WISD received the IDEA Part B funds from the MDE, and then distributed them to AAPS by wire.

246.    Upon information and belief, AAPS received the IDEA Part B funds from the WISD, and used them for unlawful purposes, including but not limited to purchasing personal protective equipment for all staff and students.

247.    In furtherance of his scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Rice used interstate wires to defraud plaintiffs of their rights under IDEA.  The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C.§ 1343.  These interstate wires were collected by Defendant Rice in the years 2019, 2020 and are continuing to be collected, to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by the MDE.

248.    Each use of wire communications in connection with the scheme to defraud constitutes the offense of wire fraud as prohibited by 18 U.S.C. § 1343.

249.    Contrary to the individual defendants' assurances, the MDE, the WISD and AAPS did not give plaintiffs prior written notice of its closure of schools and alteration of plaintiffs' IEPs and school placements from in-person instruction and services to virtual instruction or services during the COVID-19 pandemic.

250.    Contrary to the individual defendants' assurances, the MDE, the WISD and AAPS did not ensure that the parents of each child with a disability were included as members of any IEP Team that made decisions on the educational placement of their children during the COVID-19 pandemic.

251.    Contrary to the individual defendants' assurances, the MDE, the WISD and AAPS did not maintain plaintiffs' pendency placement through in-person instruction during the COVID-19 pandemic.

252.    Contrary to the individual defendants' assurances, the MDE, the WISD and AAPS did not reconvene IEP Team Meetings to change plaintiffs' IEPs to provide for complete virtual instruction and services during the COVID-19 pandemic.

Pattern of Racketeering Activity

253.    The course of conduct engaged in by each  individual RICO defendant constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

254.    The individual defendants' predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." *See id*.

255.    All predicate acts had the same purpose of defrauding plaintiffs of IDEA Funds.

256.    The continuity of the pattern of racketeering activity constitutes closed-ended continuity as it occurred over a substantial period, from about March 2020 to the present.

257.    There is a threat of continued activity as each individual defendant has repeatedly engaged in the illegal and illicit activities.  Engaging in the pattern of racketeering as set forth herein is the regular way the individual defendants conduct the affairs of their respective associated association in fact enterprises.  Because each enterprise has been in existence for many years, and the seeking of federal funding by these individual defendants on behalf of their associated association in fact enterprises will continue indefinitely, each individual defendant, through the operation of  his or her associated association in fact enterprise, remain a threat to others and their racketeering activity meets the open-ended continuity test.

Injury

258.    As a direct and proximate result of the individual defendants' predicate acts in furtherance of violating 18 U.S.C. § 1962(a), plaintiffs have been and are continuing to be deprived of their rights under IDEA, as set forth more fully above.

259.    As a direct and proximate result thereof, plaintiffs suffered harm including significant regressions in skills and loss of competencies.

COUNT EIGHT
VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
ACT ("RICO"), 18 U.S.C. §1962(d)
(Federal Civil RICO Conspiracy against Individual Defendants)

260.    Plaintiffs repeat each of the allegations contained in the paragraphs above as if set forth herein at length.

261.    In March 2020, each RICO defendant described above, conspired to violate § 1962(c), by agreeing that a co-conspirator would conduct or participate in the affairs of his or her respective enterprise through a pattern of racketeering, consisting of acts indictable under 18 U.S.C. § 1341, and 18 U.S.C. § 1343, as more fully described in Count Seven.

262.    The conspiratorial objective of that mutual agreement was intended to fraudulently obtain and use plaintiffs' IDEA Part B funds, and such conspiratorial conduct violates §1962(d).

263.    Each RICO conspiracy defendant intended to further the schemes to defraud, as described in Count Seven, and agreed that either they, or a co-conspirator, would commit a pattern of racketeering.

264.    The individual defendants engaged in numerous predicate racketeering acts in furtherance of the conspiracy including systemic fraudulent assurances designed to defraud plaintiffs of their procedural and substantive rights under IDEA.

265.    The nature of the above-described acts, material misrepresentations, and omissions in

furtherance of the conspiracy give rise to an inference that each individual defendant not only agreed to the objective of an 18 U.S.C. §1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c) but was aware that his or her ongoing fraudulent acts were and are part of an overall pattern of racketeering activity.

<u>PRAYER FOR RELIEF</u>

Wherefore, plaintiffs respectfully request that the Court:

1.      Assert jurisdiction over this matter;

2.      Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

3.      Issue a declaratory judgment that the class members' pendency placement is in-person instruction and services;

4.      Issue a declaratory judgment that AAPS and other similarly situated LEAs' unilateral change of placement of plaintiffs from in-person instruction and services to virtual instruction and services violated the procedural safeguards of IDEA and discriminated against plaintiffs under IDEA, MARSE, § 504, the ADA, the Michigan Act and § 1983;

5.      Issue a declaratory judgment that the MDE failed to monitor and provide proper oversight and resources to AAPS and other similarly situated LEAs during the COVID-19 pandemic as required under IDEA and MARSE;

6.       Order the MDE, WISD, AAPS and other similarly situated LEAs to comply with the procedural safeguards guaranteed by IDEA for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers;

7.      Assign a Special Monitor to:  a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings

within thirty days of the completion of the IEEs;  b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents;

8.    Require the MDE and its LEAs to comply with IDEA, MARSE, the ADA, § 504, the Michigan Act and § 1983 in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers;

9.    Assign a RICO Special Monitor to:  a) oversee the completion of an independent audit of defendants' expenditures of their IDEA Part B Funds from March of 2020 to the present;  b) oversee the defendants' expenditures of their IDEA Part B Funds for the 2021-2022 school year to ensure defendants spend IDEA Part B Funds for instruction and/or services for students with disabilities under IDEA;  c) ensure any IDEA Part B Funds that defendants spent on items other than instruction and/or services for students with disabilities under IDEA from March of 2020 through the present are reimbursed to a monitored account to be spent only upon review and approval by the RICO Special Monitor;

10.    Declare plaintiffs to be the "substantially prevailing party" (for purposes of IDEA's fee shifting provision);

11.    Grant leave to plaintiffs to submit a statutory fee application;

12.    Direct defendants to pay for the costs and expenses for maintaining this action, including reasonable attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B);

13.    Award attorneys' fees pursuant to the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. § 1988 and the Michigan Persons with Disabilities Civil Rights Act;

14.    Retain jurisdiction over this action until such time as this Court is satisfied that the systemic

violations of the laws and regulations complained of herein have been rectified; and

15.     Grant such other or further relief that the Court may deem just and proper.


                              Respectfully submitted,

                              *s/Charlotte G. Carne*
                              Charlotte G. Carne (P61153)
                              Attorney for Plaintiffs
                              Brain Injury Rights Group
                              300 East 95th Street, Suite 130
                              New York, NY 10128
                              (646) 850-5035
                              charlotte@pabilaw.org

**EXHIBITS**

| A | 10/28/19 A.S. IEP |
|---|---|
| B | 2/20/20 M.S. IEP |
| C | 4/4/19 C.P. IEP |
| D | 12/12/19 H.P. IEP |
| E | 3/12/20 Supplemental Fact Sheet by the United States Department of Education |
| F | March 2020 Questions and Answers for Providing Services to Children with Disabilities during the Coronavirus Disease 2019 Outbreak |
| G | April 10, 2020 Guidance from the MDE |
| H | August 8, 2019 IDEA Award |
| I | July 1, 2020 Letter from U.S. DOE |