UNITED STATES DISTRICT COURT
EASTERN DISTRICT MICHIGAN

RITA C. SIMPSON-VLACH,
ALAN SIMPSON-VLACH,
on behalf of A.S. and M.S., and
individually, KATHY BISHOP,
CHRISTOPHER PLACE,
on behalf of C.P. and H.P, and
individually,

|                | Plaintiffs, | Civil Action No. 21-cv-11532 |
|----------------|-------------|------------------------------|
| v.             |             | Honorable Judith E. Levy     |

MICHIGAN DEPARTMENT OF EDUCATION,
ANN ARBOR PUBLIC SCHOOLS,
WASHTENAW INTERMEDIATE SCHOOL DISTRICT,
DR. JEANICE SWIFT, in her official capacity,
DR. MARIANNE FIDISHIN, in her official capacity,
SCOTT MENZEL, in his official capacity,
NAOMI NORMAN, in her official capacity,
MICHAEL F. RICE, Ph.D., in his official capacity,

Defendants.
_____/

| | |
|---|---|
| Charlotte G. Carne (P61153)<br>Rory J. Bellantoni<br>Brain Injury Rights Group<br>Attorneys for Plaintiffs<br>300 East 95th Street, Suite 130<br>New York, New York 10128<br>646-850-5035<br>charlotte@pabilaw.org | Neil Giovanatti (P82305)<br>Assistant Attorney General<br>Attorney for State Defendants<br>Michigan Department of Attorney General<br>Health, Education & Family Services<br>P.P. Box 30758<br>Lansing, MI 48909<br>(517) 335-7603<br>giovanattin@michigan.gov |
| Richard J. Landau (P42223)<br>Attorney for AAPS Defendants | Timothy J. Mullins (P28021)<br>John L Miller (P71913) |

| | |
|---|---|
| 5340 Plymouth Rd.<br>Suite 200<br>Ann Arbor, MI 48105<br>734-865-1585<br>rjlandau@rjlps.com | Travis M. Comstock (P72025)<br>Giarmarco, Mullins & Horton, P,C.<br>Attorneys for WISD Defendants<br>Troy, MI 48084<br>(248) 457-7020<br>tmullins@gmhlaw.com<br>jmiller@gmhlaw.com<br>tcomstock@gmhlaw.com |

## PLAINTIFFS' MOTION FOR AUTOMATIC AND PRELIMINARY INJUNCTION

Plaintiffs, Rita C. Simpson-Vlach, Alan Simpson-Vlach, Kathy Bishop, and Christopher Place, individually and on behalf of their special needs children (collectively referred to as "Plaintiffs"), for their putative class, request both an Automatic and Preliminary Injunction against the Michigan Department of Education ("MDE"), the Ann Arbor Public Schools ("AAPS"), the Washtenaw Intermediate School District ("WISD"), Dr. Jeanice Swift, Dr. Marianne Fidishin, Scott Menzel, Naomi Norman, and Michael F. Rice, Ph.D.

This motion is brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, *et seq* ("IDEA"), the Michigan Administrative Rules for Special Education, § 341.1717 *et seq*. ("MARSE"), Section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; 28 C.F.R. § 35.104, the Michigan Persons with Disabilities Civil Rights Act ("MPDCRA or the Michigan Act"), Mich. Comp. Laws § 37.1101, 42 U.S.C. § 1983 and the Equal

ii

Protection Clause of the Fourteenth Amendment, the Racketeer Influenced and Corrupt Organizations ("RICO") Act of 1970, 28 U.S.C. § 1961-1968, and the concomitant implementing regulations, case law, and public policy.

Plaintiffs are Parents of children with disabilities, as well as the children themselves, whose rights under IDEA, MARSE, the ADA, § 504, the Michigan Act, and the Equal Protection Clause of the Fourteenth Amendment, have been violated by the Defendants for the 2019-2020 school year, the 2020-2021 school year and continuing.  Plaintiffs seek declaratory and injunctive relief enjoining Defendants from further violations of Plaintiffs' rights. All of the children with disabilities referred to herein are students with disabilities ("Students") as set forth in the IDEA.

All class members seek injunctive relief requesting that the Court:  1)  Issue a declaratory judgment that the class members' pendency placement is in-person instruction and services; 2) Issue a declaratory judgment that AAPS, and other similarly situated LEAs', unilateral change of Plaintiffs placement from in-person instruction and services to virtual instruction and services violated the procedural safeguards of IDEA; 3) Issue an automatic / preliminary injunction requiring Defendants, AAPS and other similarly situated LEAs, to implement the class members' pendency placement, in person instruction and services, in the least restrictive placement/setting consistent with the IDEA; 4) Issue an automatic / preliminary injunction enjoining AAPS and other similarly situated LEAs from

unilaterally changing the class members' placement without providing the proper procedural safeguards under the IDEA unless the U.S. DOE issues waivers of such safeguards; 5) Order Defendants MDE, WISD, AAPS, and other similarly situated LEAs to comply with the procedural safeguards guaranteed by IDEA for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers; 6) Assign a Special Monitor to: a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEEs; b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents; 7) Issue an automatic / preliminary injunction enjoining Defendants from spending any IDEA funds for purposes other than those set forth in the IDEA and assigning a Special Monitor (Plaintiffs' RICO claims) to oversee Defendants' receipt, accounting, and expenditure of their IDEA Part B Funds, for the 2021-2022 school year and otherwise, to ensure that Defendants receive, maintain, and spend IDEA Part B Funds for purposes consistent with those set forth in the IDEA – instruction and/or services for students with disabilities; and

8) Provisionally certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) for the purposes of granting any and all injunctive relief requested herein.

This motion is supported by the accompanying brief in support thereof and attached exhibits.  Pursuant to Local Rule 7.1 plaintiffs conferred with defendants prior to filing this motion to seek concurrence.  Defendants did not concur to the motion.

WHEREFORE, plaintiffs respectfully request that this motion be granted.

Respectfully submitted,

**/s/Charlotte G. Carne**
Charlotte G. Carne (P61153)
Attorney for Plaintiffs
Brain Injury Rights Group
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035
charlotte@pabilaw.org

UNITED STATES DISTRICT COURT
EASTERN DISTRICT MICHIGAN

RITA C. SIMPSON-VLACH,
ALAN SIMPSON-VLACH,
on behalf of A.S. and M.S., and
individually, KATHY BISHOP,
CHRISTOPHER PLACE,
on behalf of C.P. and H.P, and
individually,

|                          | |                               |
|--------------------------|-|-------------------------------|
|             Plaintiffs,  | | Civil Action No. 21-cv-11532  |
| v.                       | | Honorable Judith E. Levy      |

MICHIGAN DEPARTMENT OF EDUCATION,
ANN ARBOR PUBLIC SCHOOLS,
WASHTENAW INTERMEDIATE SCHOOL DISTRICT,
DR. JEANICE SWIFT, in her official capacity,
DR. MARIANNE FIDISHIN, in her official capacity,
SCOTT MENZEL, in his official capacity,
NAOMI NORMAN, in her official capacity,
MICHAEL F. RICE, Ph.D., in his official capacity,

Defendants.
_____/

**PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR AUTOMATIC AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT .................................................................1

II.   BACKGROUND ...............................................................................3

III.   STATEMENT OF FACTS ..................................................................6

IV.   LEGAL STANDARDS .......................................................................6

IV.   ANALYSIS ......................................................................................29

VI.   CONCLUSION ...............................................................................57

## ISSUES PRESENTED

1.   Whether Plaintiffs are required to exhaust administrative remedies?

Plaintiffs' answer:  No.

State Defendants' answer:  Yes.

Ann Arbor Public Schools ("AAPS") Defendants' answer:  Yes.

The Washtenaw Intermediate School District ("WISD") Defendants' answer:  Yes.

2.   Whether this Court should issue an automatic injunction returning Plaintiffs to their status quo?

Plaintiffs' answer:  Yes.

State Defendants' answer:  No.

AAPS Defendants' answer:  No.

WISD Defendants' answer:  No.

3.   Whether this Court should issue a preliminary injunction enjoining MDE, WISD and AAPS from making expenditures of their IDEA Part B Funds without the oversight of a Special Monitor?

Plaintiffs' answer:  Yes.

State Defendants' answer:  No.

AAPS Defendants' answer:  No.

WISD Defendants' answer:  No.

4.   Whether this Court should Order provisional certification of the class?

Plaintiffs' answer:  Yes.

State Defendants' answer:  No.

AAPS Defendants' answer:  No.

WISD Defendants' answer:  No.

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*Aaron P. v. Hawaii, Dep't of Educ.*,
   897 F. Supp. 2d 1004 (D. Haw. 2012) ................................................................19

*Agudath Israel of Am. v. Cuomo*,
   983 F.3d 620 (2d Cir. 2020) .................................................................................47

*Araujo v. New York City Dep't of Educ.*,
   No. 20 CIV. 7032 (LGS), 2021 WL 1225503 (S.D.N.Y. Apr. 1, 2021).............19

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291, 126 S. Ct. 2455, 165 L. Ed. 2d 526 (2006) .............................7, 10

*Aronov v. Mersini*,
   No. 14-CV-7998 PKC, 2015 WL 1780164 (S.D.N.Y. Apr. 20, 2015)...............24

*Ass'n for Cmty. Living in Colorado v. Romer*,
   992 F.2d 1040 (10th Cir. 1993)..........................................................................30

*Ass'n for Retarded Citizens in Colorado v. Frazier*,
   517 F. Supp. 105 (D. Colo. 1981) ......................................................................35

*Avaras v. Clarkstown Cent. Sch. Dist.*,
   No. 15 CV 9679 (NSR), 2018 WL 4103494 (S.D.N.Y. Aug. 28, 2018) ............19

*AW ex rel. Wilson v. Fairfax Cty. Sch. Bd.*,
   372 F.3d 674 (4th Cir. 2004) ..............................................................................39

*Bd. of Educ. of Cmty. High Sch. Dist. No. 218, Cook Cty., Ill. v. Illinois State Bd. of Educ.*,
   103 F.3d 545 (7th Cir. 1996) ..............................................................................18

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*,
   458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982) ........................... passim

*Bd. of Educ. of Jacksonville Sch. Dist. v. C.P. & O.P.*,
   No. 3:15-CV-3228, 2016 WL 164987 (C.D. Ill. 2016).......................................48

*Beattie v. CenturyTel, Inc.*,
    511 F.3d 554 (6th Cir. 2007) ................................................................53

*Beth V. by Yvonne V. v. Carroll*,
    87 F.3d 80 (3d Cir. 1996) ...................................................... 30, 32, 33

*Blackman v. D.C.*,
    185 F.R.D. 4 (D.D.C. 1999) ................................................................13

*Blackman v. D.C.*,
    277 F. Supp. 2d 71 (D.D.C. 2003)................................................ 13, 47

*Briggs v. Ohio Elections Comm'n*,
    61 F.3d 487 (6th Cir. 1995) ................................................................55

*Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*,
    208 F.3d 560 (6th Cir. 2000) ................................................................7

*C.H. v. Cape Henlopen Sch. Dist.*,
    606 F.3d 59 (3d Cir. 2010) ................................................................17

*Carpenter v. United States*,
    484 U.S. 19, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987) ................................ 25, 29

*Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302*,
    400 F.3d 508 (7th Cir. 2005) ................................................................18

*Charles H. v. D.C.*,
    No. 1:21-CV-00997 (CJN), 2021 WL 2946127 (D.D.C. June 16, 2021) ..... 46, 55

*Chevron Corp. v. Donziger*,
    833 F.3d 74 (2d Cir. 2016) ................................................................23

*City of Newport v. Fact Concerts, Inc.*,
    453 U.S. 247, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981) ....................................45

*Clark v. Banks*,
    193 F. App'x 510 (6th Cir. 2006) ........................................................27

*Cochran v. D.C.*,
    660 F. Supp. 314 (D.D.C. 1987)...........................................................19

*Cole v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*,

954 F. Supp. 1214 (M.D. Tenn. 1997) ...................................................8

*Cornetta v. Town of Highlands*,
434 F. Supp. 3d 171 (S.D.N.Y. 2020) ......................................... 24, 29

*Coronel v. Decker*,
449 F. Supp. 3d 274 (S.D.N.Y. 2020) .................................................48

*Covington v. Knox Cty. Sch. Sys.*,
205 F.3d 912 (6th Cir. 2000), amended on denial of reh'g .................35

*Cox v. Brown*,
498 F. Supp. 823 (D.D.C. 1980)..........................................................12

*Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.*,
689 F. Supp. 197 (S.D.N.Y. 1988) ......................................... 10, 11, 19

*D.C. v. Vinyard*,
901 F. Supp. 2d 77 (D.D.C. 2012)........................................................19

*D.K. v. D.C.*,
983 F. Supp. 2d 138 (D.D.C. 2013) ....................................................15

*D.M. v. New Jersey Dep't of Educ.*,
801 F.3d 205 (3d Cir. 2015) ........................................................ 18, 20

*D.M. v. New Jersey Dep't of Educ.*,
No. CIV.A. 14-4620 ES, 2014 WL 4271646 (D.N.J. Aug. 28, 2014)................20

*D.R. v. Michigan Dep't of Ed.*,
No. 16-13694, 2017 WL 4348818 (E.D. Mich. Sept. 29, 2017)............. 31, 32, 33

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) ....................................................57

*Davidson v. Henkel Corp.*,
302 F.R.D. 427 (E.D. Mich. 2014).......................................................51

*Deal v. Hamilton Cty. Bd. of Educ.*,
392 F.3d 840 (6th Cir. 2004) ...................................................... 7, 8, 11

*DL v. D.C.*,
450 F. Supp. 2d 11 (D.D.C. 2006)........................................................30

*Doe By & Through Brockhuis v. Arizona Dep't of Educ.*,
   111 F.3d 678 (9th Cir. 1997) ...............................................................30

*Doe v. E. Lyme Bd. of Educ.*,
   790 F.3d 440 (2d Cir. 2015) ................................................................19

*Doug C. v. Hawaii Dep't of Educ.*,
   720 F.3d 1038 (9th Cir. 2013) .............................................................12

*Drinker by Drinker v. Colonial Sch. Dist.*,
   78 F.3d 859 (3d Cir. 1996) ............................................... 14, 18, 36, 37

*Ellenberg v. New Mexico Mil. Inst.*,
   478 F.3d 1262 (10th Cir. 2007) ...........................................................32

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*,
   137 S. Ct. 988, 197 L. Ed. 2d 335 (2017) .............................. 7, 8, 9, 10

*Evans v. Evans*,
   818 F. Supp. 1215 (N.D. Ind. 1993) ....................................................35

*Fertitta v. Knoedler Gallery, LLC*,
   No. 14-CV-2259 JPO, 2015 WL 374968 (S.D.N.Y. Jan. 29, 2015) ...................23

*Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*,
   510 U.S. 7, 114 S. Ct. 361, 126 L. Ed. 2d 284 (1993) ........................36

*Frazier v. Fairhaven Sch. Comm.*,
   276 F.3d 52 (1st Cir. 2002) ........................................................ 10, 22

*Freeman v. Cavazos*,
   923 F.2d 1434 (11th Cir. 1991) ...........................................................22

*Garner Properties & Mgmt., LLC v. City of Inkster*,
   333 F.R.D. 614 (E.D. Mich. 2020) ............................................... 51, 54

*Gaskin v. Com. of Pa.*,
   No. CIV. A. 94-4048, 1995 WL 154801 (E.D. Pa. Mar. 30, 1995) ...................32

*Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*,
   446 U.S. 318, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980) .....................51

*Genty v. Resol. Tr. Corp.*,

937 F.2d 899 (3d Cir. 1991) ........................................................ 44, 45

*Gingras v. Think Fin., Inc.*,
    922 F.3d 112 (2d Cir. 2019) ................................................ 23, 28, 44

*Gomez v. J. Jacobo Farm Lab. Contractor, Inc.*,
    334 F.R.D. 234 (E.D. Cal. 2019) ...................................................56

*Gore v. D.C.*,
    67 F. Supp. 3d 147 (D.D.C. 2014)..................................................15

*Grieco v. New Jersey Dep't of Educ.*,
    No. 06-CV-4077PGS, 2007 WL 1876498 (D.N.J. June 27, 2007).....................32

*Handberry v. Thompson*,
    446 F.3d 335 (2d Cir. 2006) .......................................................32

*Hoeft v. Tucson Unified Sch. Dist.*,
    967 F.2d 1298 (9th Cir. 1992) ......................................................7

*Honig v. Doe*,
    484 U.S. 305, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988) .............................. passim

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) .......................................................50

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) .......................................................54

*In re Flint Water Cases*,
    499 F. Supp. 3d 399 (E.D. Mich. 2021) ...................................... passim

*In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*,
    340 F.3d 749 (8th Cir. 2003) .......................................................48

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) .......................................................50

*J.A. v. Smith Cty. Sch. Dist.*,
    364 F. Supp. 3d 803 (M.D. Tenn. 2019) .............................................55

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
    386 F.3d 107 (2d Cir. 2004) .......................................................34

*Jackson by Thompson v. Franklin Cty. Sch. Bd.*,
    765 F.2d 535 (5th Cir. 1985) ...............................................................17

*James v. D.C.*,
    949 F. Supp. 2d 134 (D.D.C. 2013) ....................................................15

*Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*,
    896 F.2d 507 (11th Cir. 1990) ............................................................16

*Johnson ex rel. Johnson v. Special Educ. Hearing Off., State of Cal.*,
    287 F.3d 1176 (9th Cir. 2002) ...................................................... 14, 18

*Johnston-Loehner v. O'Brien*,
    859 F. Supp. 575 (M.D. Fla. 1994) .....................................................55

*K.T. ex rel. S.W. v. W. Orange Bd. of Educ.*,
    No. 01CIV.3208 (WGB), 2001 WL 1715787 (D.N.J. Oct. 23, 2001) ................20

*Knable ex rel. Knable v. Bexley City Sch. Dist.*,
    238 F.3d 755 (6th Cir. 2001) .................................................................8

*Komninos by Komninos v. Upper Saddle River Bd. of Educ.*,
    13 F.3d 775 (3d Cir. 1994) .................................................................29

*Kuszewski ex rel. Kuszewski v. Chippewa Valley Sch.*,
    131 F. Supp. 2d 926 (E.D. Mich. 2001) .............................................18

*Kuszewski v. Chippewa Valley Sch. Dist.*,
    56 F. App'x 655 (6th Cir. 2003) .........................................................18

*L.H. v. Hamilton Cty. Dep't of Educ.*,
    900 F.3d 779 (6th Cir. 2018) ............................................................8, 9

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ...............................................................24

*Lightfoot v. D.C.*,
    273 F.R.D. 314 (D.D.C. 2011) ...........................................................55

*Ligon v. City of New York*,
    925 F. Supp. 2d 478 (S.D.N.Y. 2013) ................................................48

*Lofton v. D.C.*,

7 F. Supp. 3d 117 (D.D.C. 2013) .......................................................................46

*Louisiana State Bd. of Elementary & Secondary Educ. v. U.S. Dep't of Educ.*,
   881 F.2d 204 (5th Cir. 1989) ....................................................................22

*M.G. v. New York City Dep't of Educ.*,
   15 F. Supp. 3d 296 (S.D.N.Y. 2014) ......................................................34

*M.R. v. Ridley Sch. Dist.*,
   744 F.3d 112 (3d Cir. 2014) ...................................................... 36, 37, 39

*Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist.*,
   386 F.3d 158 (2d Cir.) ...........................................................................19

*Massey v. D.C.*,
   400 F. Supp. 2d 66 (D.D.C. 2005).........................................................47

*McClain v. Smith*,
   793 F. Supp. 756 (E.D. Tenn. 1989) .....................................................16

*McClain v. Smith*,
   793 F. Supp. 761 (E.D. Tenn. 1990) .....................................................27

*Michigan State A. Philip Randolph Inst. v. Johnson*,
   No. 16-CV-11844, 2016 WL 4267828 (E.D. Mich. Aug. 15, 2016) .....................7

*Moss v. Morgan Stanley Inc.*,
   719 F.2d 5 (2d Cir. 1983) .......................................................................24

*N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*,
   600 F.3d 1104 (9th Cir. 2010) ...................................................... 18, 39, 40, 41

*New Jersey Prot. & Advoc., Inc. v. New Jersey Dep't of Educ.*,
   563 F. Supp. 2d 474 (D.N.J. 2008).............................................. passim

*New York State Ass'n for Retarded Child., Inc. v. Carey*,
   466 F. Supp. 479 (E.D.N.Y. 1978).........................................................15

*Olson v. Robbinsdale Area Sch.*,
   No. CIV.04-2707 RHK/AJB, 2004 WL 1212081 (D. Minn. May 28, 2004) ......48

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
   930 F.3d 519 (D.C. Cir. 2019).................................................................17

xvi

*Overstreet v. Lexington-Fayette Urb. Cty. Gov't,*
    305 F.3d 566 (6th Cir. 2002) ........................................................ 42, 43

*Pardini v. Allegheny Intermediate Unit,*
    420 F.3d 181 (3d Cir. 2005) ......................................................... 36, 37

*Parent/Pro. Advoc. League v. City of Springfield, Massachusetts,*
    934 F.3d 13 (1st Cir. 2019) ...............................................................57

*Parents of Student W. v. Puyallup Sch. Dist., No. 3,*
    31 F.3d 1489 (9th Cir. 1994) ....................................................... 15, 36

*Petties v. D.C.,*
    238 F. Supp. 2d 114 (D.D.C. 2002) ...................................................48

*R. E. B. v. Dep't of Educ.,*
    770 F. App'x 796 (9th Cir. 2019) .......................................................12

*R.B. v. Mastery Charter Sch.,*
    532 F. App'x 136 (3d Cir. 2013) ................................................... 16, 17

*Ridley Sch. Dist. v. M.R.,*
    575 U.S. 1008, 135 S. Ct. 2309, 191 L. Ed. 2d 977 (2015) .......................... 37, 38

*S.H. v. State-Operated Sch. Dist. of City of Newark,*
    336 F.3d 260 (3d Cir. 2003) ..............................................................16

*Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.,*
    471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985) ...................................36

*Senter v. Gen. Motors Corp.,*
    532 F.2d 511 (6th Cir. 1976) .............................................................54

*Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist. No. 69,*
    317 F.3d 1072 (9th Cir. 2003) ...........................................................12

*Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,*
    119 F.3d 393 (6th Cir. 1997) .............................................................43

*Smith v. Robinson,*
    468 U.S. 992, 104 S. Ct. 3457, 82 L. Ed. 2d 746 (1984) .............................. 26, 30

*Spiegler v. D.C.,*

866 F.2d 461 (D.C. Cir. 1989)..............................................................................13

*Sprague v. Gen. Motors Corp.*,
 133 F.3d 388 (6th Cir. 1998).............................................................................52

*Stooksbury v. Ross*,
 528 F. App'x 547 (6th Cir. 2013) ......................................................................43

*Susquenita Sch. Dist. v. Raelee S. By & Through Heidi S.*,
 96 F.3d 78 (3d Cir. 1996) ...................................................................... 17, 35, 36

*T.S. v. Utica Cmty. Sch.*,
 No. 14-10216, 2017 WL 242842 (E.D. Mich. Jan. 20, 2017).............................34

*Tennessee Dep't of Mental Health & Mental Retardation v. Paul B.*,
 88 F.3d 1466 (6th Cir. 1996) .................................................................... 18, 35

*V.D. v. State*,
 403 F. Supp. 3d 76 (E.D.N.Y. 2019) ........................................................ 20, 35

*V.W. by & through Williams v. Conway*,
 236 F. Supp. 3d 554 (N.D.N.Y. 2017) ..............................................................48

*Ventura de Paulino v. New York City Dep't of Educ.*,
 959 F.3d 519 (2d Cir. 2020) ................................................... 17, 18, 19, 30

*Virginia Dep't of Educ. v. Riley*,
 23 F.3d 80 (4th Cir. 1994) ................................................................................22

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*,
 550 U.S. 516, 127 S. Ct. 1994, 167 L. Ed. 2d 904 (2007) ...................... 10, 27, 28

*Woods v. Northport Pub. Sch.*,
 487 F. App'x 968 (6th Cir. 2012) ............................................................... 33, 55

*Y.S. on behalf of Y.F. v. New York City Dep't of Educ.*,
 No. 1:21-CV-00711 (MKV), 2021 WL 1164571 (S.D.N.Y. Mar. 26, 2021).... 47,
 48, 49

*Zdrowski v. Rieck*,
 119 F. Supp. 3d 643 (E.D. Mich. 2015) ..................................................... 30, 35

*Zvi D. by Shirley D. v. Ambach*,

694 F.2d 904 (2d Cir. 1982) ..................................................................37

**Federal Statutes**

18 U.S.C. § 1341 ....................................................................................28

18 U.S.C. § 1343 ....................................................................................29

18 U.S.C. § 1961(1) ................................................................................28

18 U.S.C. § 1962 ....................................................................................24

18 U.S.C. § 1962(c) ................................................................................23

18 U.S.C. § 1962, (2) ..............................................................................23

20 U.S.C. § 1400(d)(1)(A) ........................................................................8

20 U.S.C. § 1401 ......................................................................................1

20 U.S.C. § 1401(25), 1412 ......................................................................7

20 U.S.C. § 1412 ......................................................................................9

20 U.S.C. § 1412(a)(2) ..............................................................................9

20 U.S.C. § 1412(a)(6) ..............................................................................6

20 U.S.C. § 1414 ......................................................................................9

20 U.S.C. § 1414(a)(5) ..............................................................................8

20 U.S.C. § 1415 ............................................................................. passim

20 U.S.C. § 1415 (b) (3) ..........................................................................11

20 U.S.C. § 1415 (c) (1)..................................................................... 11, 17

20 U.S.C. § 1415(a) ................................................................................21

20 U.S.C. § 1415(b)(1), (2) ......................................................................11

20 U.S.C. § 1415(i)(2)(A) ........................................................................30

20 U.S.C. § 1415(j)............................................................ 14, 16, 17, 18

20 U.S.C. § 1416 ...................................................................................22

28 U.S.C. § 1961-1968 .............................................................................1

29 U.S.C. § 794(a) ...................................................................................1

42 U.S.C. § 1983 ......................................................................................1

42 U.S.C. § 12132 ....................................................................................1

§ 1412(a)(1) .............................................................................................8

§ 1414(d)(1)(B) ........................................................................................9

**State Statutes**

Mich. Comp. Laws § 37.1101 ....................................................................1

**Federal Rules**

at 5, U.S.Code Cong. & Admin.News .......................................................26

at 6, U.S.Code Cong. & Admin.News .......................................................26

Fed. R. Civ. P. 23 ............................................................................... 56, 57

Fed. R. Civ. P. 23 (b) ..............................................................................49

Fed. R. Civ. P. 23(a) .......................................................................... 49, 50

Fed. R. Civ. P. 23(a) and 23(b) ................................................................56

Fed. R. Civ. P. 23(a) and (b)(2) ...............................................................59

Fed. R. Civ. P. 23(a)(1) ....................................................................... 50, 51

Fed. R. Civ. P. 23(a)(2) ....................................................................... 51, 53

Fed. R. Civ. P. 23(a)(3) ............................................................................53

Fed. R. Civ. P. 23(a)(4) ....................................................................... 54, 55

Fed. R. Civ. P. 23(b)(2) .........................................................................3, 55

Fed. R. Civ. P. 23(c)(4) ............................................................................56

Fed. R. Civ. P. 23(d) ...................................................................56

Fed. R. Civ. P. 65 .......................................................................19

Fed. R. Civ. P. 65 (a) And (d) ...................................................6, 7

Fed. R. Civ. P. 65(d) ....................................................................7

## **Federal Regulations**

28 C.F.R. § 35.104 ........................................................................1

34 C.F.R. § 76.104 ......................................................................21

34 C.F.R. § 104.4(a) ......................................................................1

34 C.F.R. § 300.110 ......................................................................9

34 C.F.R. § 300.121 ......................................................................6

34 C.F.R. § 300.502 (a) ...............................................................58

34 C.F.R. § 300.502 (b) ...............................................................58

34 C.F.R. § 300.518 .....................................................................17

34 CFR §§ 300.400 through 300.536 ...........................................6

## **Other Authorities**

3 Newberg on Class Actions § 7:29 (5th ed.) ..............................56

3 Newberg on Class Actions § 7:30 (5th ed.) ..............................56

7AA Fed. Prac. & Proc. Civ. § 1790 (3d ed.) ..............................56

*Enforcing the Right to an "Appropriate" Education: The Education for All
Handicapped Children Act of 1975,*
92 Harv. L. Rev. 1103 (1979) .....................................................25

*Idea Class Actions After WalMart v. Dukes,*
45 U. Tol. L. Rev. 471 (2014) .....................................................57

*Scott Dodson Subclassing,*
27 Cardozo L. Rev. 2351 (2006) .................................................56

## I.    PRELIMINARY STATEMENT

Plaintiffs, Rita C. Simpson-Vlach, Alan Simpson-Vlach, Kathy Bishop, and Christopher Place, individually and on behalf of their special needs children (collectively referred to as "Plaintiffs"), for their putative class, request both an Automatic and Preliminary Injunction against the Michigan Department of Education ("MDE"), the Ann Arbor Public Schools ("AAPS"), the Washtenaw Intermediate School District ("WISD"), Dr. Jeanice Swift, Dr. Marianne Fidishin, Scott Menzel, Naomi Norman, and Michael F. Rice, Ph.D.

This motion is brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401, *et seq.,* the Michigan Administrative Rules for Special Education, § 341.1717 *et seq.* ("MARSE"), Section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; 28 C.F.R. § 35.104, the Michigan Persons with Disabilities Civil Rights Act ("MPDCRA or the Michigan Act"), Mich. Comp. Laws § 37.1101, 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment, the Racketeer Influenced and Corrupt Organizations ("RICO") Act of 1970, 28 U.S.C. § 1961-1968, and the concomitant implementing regulations, case law, and public policy.

Plaintiffs are Parents of children with disabilities, as well as the children themselves, whose rights under IDEA, MARSE, the ADA, § 504, the Michigan Act,

1

and the Equal Protection Clause of the Fourteenth Amendment, have been violated by the Defendants for the 2019-2020 school year, the 2020-2021 school year and continuing.  Plaintiffs seek declaratory and injunctive relief enjoining Defendants from further violations of Plaintiffs' rights. All of the children with disabilities referred to herein are students with disabilities ("Students") as set forth in the IDEA.

All class members seek injunctive relief requesting that the Court:  1)  Issue a declaratory judgment finding that the class members' pendency placement is in-person instruction and services; 2) Issue a declaratory judgment that AAPS, and other similarly situated LEAs', unilateral change of Plaintiffs' placement from in-person instruction and services to virtual instruction and services violated the procedural safeguards of IDEA; 3) Issue an automatic / preliminary injunction requiring Defendants, AAPS and other similarly situated LEAs, to implement the class members' pendency placement, in person instruction and services, in the least restrictive placement/setting consistent with the IDEA; 4) Issue an automatic / preliminary injunction enjoining AAPS and other similarly situated LEAs from unilaterally changing the class members' placement without providing the proper procedural safeguards under the IDEA unless the U.S. DOE issues waivers of such safeguards; 5)  Order Defendants MDE, WISD, AAPS, and other similarly situated LEAs to comply with the procedural safeguards guaranteed by IDEA for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers;

2

6) Assign a Special Monitor to: a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEEs; b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents; 7) Issue an automatic / preliminary injunction enjoining Defendants from spending any IDEA funds for purposes other than those set forth in the IDEA and assigning a Special Monitor (Plaintiffs' RICO claims) to oversee Defendants' receipt, accounting, and expenditure of their IDEA Part B Funds, for the 2021-2022 school year and otherwise, to ensure that Defendants receive, maintain, and spend IDEA Part B Funds for purposes consistent with those set forth in the IDEA – instruction and/or services for students with disabilities; and 8) Provisionally certify this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2) for the purposes of granting any and all injunctive relief requested herein.

## II.      BACKGROUND

Like many schools around the country, AAPS closed its schools on March 16, 2020, and ceased all in-person instruction and services due to the COVID-19 pandemic.  As the pandemic continued to proliferate across the United States, the

United States Department of Education published two guidance documents to school

districts to address the needs of disabled children:  a Supplemental Fact Sheet and a

Questions and Answers document.  (ECF No. 1-5 and ECF No. 1-6).  The Fact Sheet

stated:

> "To be clear:  ensuring compliance with the Individuals with
> Disabilities Education Act (IDEA), Section 504 of the Rehabilitation
> Act (Section § 504), and Title II of the Americans with Disabilities
> Act should not prevent any school from offering educational
> programs through distance instruction."

(ECF No. 1-5).

The Questions and Answers sheet stated that each school would have to "make

an individualized determination whether and to what extent compensatory services

may be needed, consistent with applicable requirements, including to make up for

any skills that may have been lost." (ECF No. 1-6).  The U.S. DOE did not provide

any waivers of IDEA to any state.  Id.

On April 10, 2020, MDE Office of Special Education (OSE) issued a memo

titled "Guidance for Compliance with IDEA and MARSE During the COVID-19

Pandemic." (ECF No. 1-7). The Memo stated:

> "The MDE has requested flexibilities from US Department of
> Education for certain requirements of the Individuals with
> Disabilities in Education Act pertaining to initial evaluation
> timelines, re-evaluation due dates, annual individualized education
> program (IEP) review timelines, state complaint timelines, and Part
> C and Part B transition timelines."

Id.

The MDE did not provide any more guidance to its local education agencies ("LEAs"), including AAPS, regarding how to comply with IDEA, MARSE, § 504, the ADA, the Michigan Act, or the Equal Protection Clause through "distance" or virtual instruction. Moreover, the MDE, the WISD, and AAPS continued collecting and spending IDEA Part B funds from the U.S. DOE during the COVID-19 pandemic. (ECF No. 1-9).

Indeed, before the closure of AAPS's in-person instruction, on August 8, 2019, Michael F. Rice, Ph.D., State Superintendent for MDE, sent all Michigan Intermediate School Districts and State Agency Directors of Special Education a Memo that provided "notice of grant awards to the Intermediate School Districts and State Agencies under the Individuals with Disabilities Education Act (IDEA), Part B, Section 611." (ECF No. 1-8).  Exhibit A attached to the memo shows that MDE received over $377 million from the U.S. DOE. Id. Exhibit A also shows that the WISD received $10,813,290.00 in "Flowthrough" IDEA funds for the 2019-2020 school year and $143,000.00 in "General Supervision" funds from the U.S. DOE. Id. In addition, after the closure of in-person instruction at AAPS, on July 1, 2020, the U.S. DOE approved the MDE's "application for Federal Fiscal Year (FFY) funds under Part B of the Individuals with Disabilities Act (IDEA Part B)." (ECF No. 1-9).

Attached to the July 1, 2020 letter are the assurances made by the Michigan

Department of Education regarding its "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." Id.  MDE assured the U.S. DOE that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 C.F.R. § 300.121." Id.  MDE assured the U.S. DOE that "[t]he Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 § CFR 300.154 and the State education agency, to ensure that the services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, include the provision of such services during the *pendency* of any dispute under § 300.154(a)(3)." Id. Defendants Swift, Fidishin, Menzel, Norman, and Rice did not, in fact, uphold these assurances on behalf of their respective enterprises – AAPS, WISD, and the MDE.  As such, they defrauded Plaintiffs of millions of dollars of IDEA Part B funding.

## III.   STATEMENT OF FACTS

Plaintiffs incorporate by reference the facts as stated in their Compliant.  (ECF No. 1.).

## IV.   LEGAL STANDARDS

## A.     Fed. R. Civ. P. 65 (a) And (d)

Fed. R. Civ. P. 65 (a) and (d) give this Court the right to issue a preliminary

injunction that: "(A) state the reasons why it issued; (B) state its terms specifically,

and (C) describe in reasonable detail – not by referring to the complaint or other

document – the act or acts restrained or required." Fed. R. Civ. P. 65(d). *Michigan*

*State A. Philip Randolph Inst. v. Johnson*, No. 16-CV-11844, 2016 WL 4267828

(E.D. Mich. Aug. 15, 2016).

## B.     IDEA Overview

The purpose of the IDEA is to give children with disabilities a free appropriate

public education ("FAPE") designed to meet their unique needs. *Deal v. Hamilton*

*Cty. Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004); *Burilovich v. Bd. of Educ. of*

*Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir. 2000)    (citing    20    U.S.C.    §

1401(25), 1412). The IDEA is a comprehensive statutory scheme, conferring on

disabled students a substantive right to public education and providing financial

assistance to enable states to meet their educational needs. *Hoeft v. Tucson Unified*

*Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992), *citing Honig v. Doe*, 484 U.S. 305,

310, 108 S. Ct. 592, 597, 98 L. Ed. 2d 686 (1988).

The IDEA offers States federal funds to assist in educating children with

disabilities. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct.

988, 993, 197, 197 L. Ed. 2d 335 (2017); *Arlington Cent. Sch. Dist. Bd. of Educ. v.*

*Murphy*, 548 U.S. 291, 295, 126 S. Ct. 2455, 165 L. Ed. 2d 526 (2006). In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a FAPE to all eligible children. § 1412(a)(1). *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 993.

More specifically, the State must ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]." 20 U.S.C. § 1400(d)(1)(A). According to the Supreme Court, a FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982); *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004).

As part of providing a FAPE, school districts receiving funds under the IDEA must establish an IEP for each child with a disability. *Deal*, 392 F.3d at 853; *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762 (6th Cir. 2001) (citing 20 U.S.C. § 1414(a)(5)). *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 788 (6th Cir. 2018). As noted above, IDEA provides substantial federal financial assistance to states that establish "a policy that assures all children with disabilities the right to

a free appropriate public education." *See Cole v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 954 F. Supp. 1214, 1217–1218 (M.D. Tenn. 1997) (citing 20 U.S.C. § 1412). IDEA requires state educational agencies ("SEAs") like the MDE to ensure that each local education agency ("LEA") in Michigan, including AAPS, takes steps to ensure that children with disabilities within its jurisdiction have access to the same educational opportunities as their non-disabled peers. 20 U.S.C. § 1412(a)(2); §1413(a)(1); 34 C.F.R. § 300.110. To provide a FAPE in compliance with the IDEA, a State Educational Agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP. *See* generally 20 U.S.C. § 1414.

The IEP is "the centerpiece of the [IDEA]'s education delivery system for disabled children." *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 993; *L.H.*, 900 F.3d at 788 *quoting Honig*, 484 U.S. at 311. An IEP is a comprehensive plan prepared by a child's "IEP Team" (including teachers, school officials, and the child's parents), which must be drafted to comply with a detailed set of procedures. § 1414(d)(1)(B) (internal quotation marks omitted). *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 994. These procedures emphasize collaboration among parents and educators. § 1414. *Honig*, 108 S. Ct. at 598. Because Congress envisioned such a significant parental role in the preparation of the IEP, the Act establishes a variety of procedural protections that ensure parents have an opportunity for meaningful input into all

9

decisions affecting their child's education and the right to seek review of decisions with which they disagree. *Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.*, 689 F. Supp. 197, 200–01 (S.D.N.Y. 1988), *citing Honig*, 108 S. Ct. at 598.

### C.    The IDEA Requires States to Establish Procedural Safeguards

Because the IDEA offers States federal funds to assist in educating children with disabilities, participating states must impose procedural safeguards for the general welfare of the children and their parents who seek to obtain the IDEA's guaranteed services. *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 993; *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295, 126 S. Ct. 2455, 165 L. Ed. 2d 526 (2006); 20 U.S.C. § 1415. Congress envisioned such a significant parental role in the preparation of the IEP, the Act establishes a variety of procedural protections that ensure parents have an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of decisions with which they disagree. *Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.*, 689 F. Supp. 197, 200–01 (S.D.N.Y. 1988), *citing Honig*, 108 S. Ct. at 598. The IDEA requires participating states to impose procedural safeguards for the general welfare of the children and their parents who seek to obtain IDEA's guaranteed services. 20 U.S.C. § 1415. *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 533, 127 S. Ct. 1994, 167 L. Ed. 2d 904 (2007); *Honig*, 484 U.S. at 318–20; *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 58 (1st Cir. 2002).

The Supreme Court has emphasized the importance Congress attached to the IDEA's procedural safeguards:

> [T]he congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Deal*, 392 F.3d at 854.

The IDEA includes a number of procedural safeguards "that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311–12. For example, 20 U.S.C. § 1415 (b) (3) requires prior written notice to the parents of the child whenever the local educational agency proposes to initiate or change.  20 U.S.C. § 1415 (c) (1) describes what is required in that notice.

Procedural safeguards also include a parent's right to examine all relevant records with respect to the identification, evaluation, and educational placement of their handicapped child, prior written notice when an educational agency either initiates or refuses to initiate a change in the child's placement, and an opportunity to have an impartial due process hearing with respect to any complaints parents might have concerning their child's education. 20 U.S.C. § 1415(b)(1), (2). *See*

*Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.*, 689 F. Supp. 197, 200–01 (S.D.N.Y. 1988).

Procedural inadequacies that result in the loss of educational opportunity or seriously infringe the parents' opportunity to participate in the IEP formulation process clearly result in the denial of a FAPE. *R. E. B. v. Dep't of Educ.*, 770 F. App'x 796 (9th Cir. 2019)(unpublished); *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013); *see also Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 317 F.3d 1072, 1078 (9th Cir. 2003).

In the case at bar, Plaintiffs do not challenge the sufficiency of their IEPs at the time that Defendants changed their educational placements; to the contrary, the gravamen of Plaintiffs' claims is that for more than a year, Defendants have not implemented Plaintiffs' IEPs as they were created and developed for each Student – Defendants unilaterally changed each Student's IEP by changing each Student's educational placement – the educational status quo of the Plaintiff-Students, in violation of IDEA's procedural safeguards. By changing the manner in which the Plaintiffs received their educational services during the 2019-2020 and the 2020-2021 school years without regard to IDEA's procedural safeguards, Defendants denied Plaintiffs the education guaranteed to them under the IDEA – the FAPE guaranteed to them by the IDEA.

Each day a child is denied a FAPE by such procedural dereliction of a school

system, he or she is harmed yet again. *See Cox v. Brown*, 498 F. Supp. 823, 828–29 (D.D.C. 1980) (irreparable harm results when students "[lack] each day of their young lives an appropriate education, one that is sensitive to their particular disabilities, commensurate to their levels of understanding, and fulfilling their immediate needs").  As the Court in *Blackman v. D.C.*, 277 F. Supp. 2d 71, 79–80 (D.D.C. 2003) held:

> "[T]he failure of the District to comply with its statutory obligations and provide appropriate educational placements can have a devastating impact on a child's well-being. "Any agency whose appointed mission is to provide for the education and welfare of children fails that mission when it loses sight of the fact that, to a young, growing person, time is critical. While a month in the life of an adult may be insignificant, at \*80 the rate at which a child develops and changes, especially one at the onset of biological adolescence with or without special needs like those of our plaintiff, a few months can make a world of difference in the life of that child."

*Blackman v. D.C.*, 185 F.R.D. 4, 7–8 (D.D.C. 1999) (quoting *Foster v. District of Columbia,* Civil Action No. 82–0095, Memorandum Opinion and Order of February 22, 1982, at 4 (D.D.C. Feb. 22, 1982)); *see also Spiegler v. D.C.*, 866 F.2d 461, 466–67 (D.C. Cir. 1989) (Act's procedural requirement for periodic and individualized assessments of each special education child "evinces a recognition that children, particularly young children, develop quickly and that a placement decision that may have been appropriate a year ago may no longer be appropriate today.").

During the month of March 2020, Defendants unilaterally closed its schools and required students and staff to remain home, thereby altering the educational

13

program status quo of the Plaintiff-Students in violation of the IDEA. By doing so, the Defendants unilaterally, substantially, and materially altered the Plaintiff-Students' "status-quo" educational program relative to the Plaintiff-Students' pendency rights. By unilaterally changing the Plaintiff-Students' placement without notice, parental consent, meaningful input, and the IDEA's other procedural safeguards, Defendants failed to provide the Plaintiff-Students with the special education and related services set forth in their IEPs. Due to the actions of Defendants, they have denied Plaintiffs a FAPE under IDEA.[1]

### D.    Change In Educational Placement

In *Honig*, the Supreme Court noted that in enacting the IDEA, Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school. *Honig*, 484 U.S. at 323; *Johnson ex rel. Johnson v. Special Educ. Hearing Off., State of Cal.*, 287 F.3d 1176, 1181 (9th Cir. 2002); *Drinker by Drinker*

---

[1] The maximum amount of time a school district can unilaterally displace a student and change the educational program without triggering a violation of 20 U.S.C. § 1415(j) is 10 school days – cumulatively during any school year. *Honig*, 484 U.S. at 325, 325–26 n.8. Such unilateral action by a school district may create a "change in placement," and by the terms of the IDEA, a change in placement can only occur with the consent of the parents, or after written notice, and the opportunity for a hearing. *Honig*, 484 U.S. 305 The ten-day limit was adopted by the Supreme Court in *Honig* from the Department of Education's Office of Civil Rights ("OCR"), which decided that "a suspension of up to 10 school days does not amount to a 'change in placement.'" *Honig*, 484 U.S. at 325 n. 8.

14

*v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996).

A school district's removal of a disabled student from their educational program, or alteration of the student's educational program, for more than ten days in a school year, constitutes a "change in placement," which must be undertaken only within the protective framework of the IDEA. *Honig*, 484 U.S. at 323; *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1495 (9th Cir. 1994). By the terms of the IDEA, a change in placement may only occur with the parents' consent or after written notice and the opportunity for a hearing. *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1495 (9th Cir. 1994). Determining whether there has been a change requires examining the child's IEP. *Gore v. D.C.*, 67 F. Supp. 3d 147 (D.D.C. 2014). Changing the location where a student receives services does not amount to a change in educational placement ***if the new setting replicates*** the educational program contemplated by the student's original assignment. *D.K. v. D.C.*, 983 F. Supp. 2d 138 (D.D.C. 2013); *James v. D.C.*, 949 F. Supp. 2d 134 (D.D.C. 2013).

In *New York State Ass'n for Retarded Child., Inc. v. Carey*, the Court found that the exclusion of mentally retarded children who were hepatitis B carriers from public school programs for which they were otherwise qualified because there was a danger of communication of hepatitis B among mentally disabled children, which did not exist for normal children, constituted a change in educational placement.

*New York State Ass'n for Retarded Child., Inc. v. Carey*, 466 F. Supp. 479 (E.D.N.Y. 1978), *aff'd,* 612 F.2d 644 (2d Cir. 1979); *see also Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 510 (11th Cir. 1990).

Likewise, a charter school's unilateral disenrollment of a disabled student was contrary to her existing IEP and thus constituted a change in placement that violated IDEA's stay-put provision, despite the school's disenrollment of the student before she filed a due process complaint. *R.B. v. Mastery Charter Sch.*, 532 F. App'x 136 (3d Cir. 2013). The student's IEP unequivocally provided that her local education agency was the charter school and that her IEP would be implemented there -- unilateral removal of the student from her school would significantly affect her learning experience. *R.B. v. Mastery Charter Sch.*, 532 F. App'x 136 (3d Cir. 2013); *See also*, *McClain v. Smith*, 793 F. Supp. 756 (E.D. Tenn. 1989).

When a change in a child's IEP is sought, regardless of whether the party seeking the change is the school district or the parents, the burden of showing that the placement is appropriate rests with the school district.  *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260 (3d Cir. 2003).

### E.   IDEA 20 U.S.C. § 1415 (J) – Procedural Safeguard – Automatic Injunction

IDEA affords extensive procedural rights to parents who believe school districts are failing to fulfill the statutory mandate of a FAPE. For example, IDEA requires an LEA to give prior written notice of any action proposed by the LEA

regarding the provision of a FAPE, particularly where the proposed action results in a change in placement of a Student's educational program – a change in the educational status quo. 20 U.S.C. § 1415(c)(1).

20 U.S.C. § 1415(j), known as the IDEA's stay-put provision, provides in pertinent part, "during the pendency of any proceedings conducted pursuant to this section unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j), 34 C.F.R. § 300.518. The stay-put provision "protects the status quo of a child's educational placement" by preventing "school districts from effecting unilateral change in a child's educational program." *R.B. v. Mastery Charter Sch.*, 532 F. App'x 136, 139–40 (3d Cir. 2013); *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 72 (3d Cir. 2010); *Susquenita Sch. Dist. v. Raelee S. By & Through Heidi S.*, 96 F.3d 78, 83 (3d Cir. 1996); *See Honig*, *passim. See also Jackson by Thompson v. Franklin Cty. Sch. Bd.*, 765 F.2d 535, 538 (5th Cir. 1985), *abrogated by Honig v. Doe*, 484 U.S. 305, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988). A parent may invoke the stay-put provision when a school proposes a change in the child's "then-current educational placement." *Id.*; *See* 20 U.S.C. § 1415(j).

Many Courts have referred to § 1415 (j), IDEA's stay-put provision, as providing an automatic injunction. *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020), *cert. denied,* 141 S. Ct. 1075, 208 L. Ed.

2d 534 (2021), *reh'g denied,* 141 S. Ct. 1530, 209 L. Ed. 2d 262 (2021); *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519 (D.C. Cir. 2019); *D.M. v. New Jersey Dep't of Educ.*, 801 F.3d 205 (3d Cir. 2015); *N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104 (9th Cir. 2010); *Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508 (7th Cir. 2005); *Johnson ex rel. Johnson*, 287 F.3d 1176; *Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859 (3d Cir. 1996); *Bd. of Educ. of Cmty. High Sch. Dist. No. 218, Cook Cty., Ill. v. Illinois State Bd. of Educ.*, 103 F.3d 545 (7th Cir. 1996); *Kuszewski ex rel. Kuszewski v. Chippewa Valley Sch.*, 131 F. Supp. 2d 926, 928 (E.D. Mich. 2001), *aff'd sub nom. Kuszewski v. Chippewa Valley Sch. Dist.*, 56 F. App'x 655 (6th Cir. 2003); *Ridley School Dist. v. M.R.*, 2015 WL 1619420, at *4 (The U.S. Supreme Court "has emphasized that the provision's text is 'unequivocal' and 'states plainly' that the child 'shall' remain in his current educational placement 'during the pendency of any proceedings initiated under the act'"), *see Tennessee Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466, 1472 (6th Cir. 1996).

Where the IDEA's stay-put provision is implicated, the provision triggers the applicability of an automatic injunction designed to maintain the child's educational status quo while the parties' dispute is being resolved – traditional preliminary injunction standards do not apply to a request for an injunction pursuant to § 1415(j). *Ventura de Paulino*, 959 F.3d at 529. Due to the automatic nature of the remedy

18

pursuant to § 1414 (j), a Court need not apply the standard test for an injunction pursuant to Fed. R. Civ. P. 65. *Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.*, 689 F. Supp. 197, 202 (S.D.N.Y. 1988), s*ee Cochran v. D.C.*, 660 F. Supp. 314, 319 (D.D.C. 1987)(although traditional preliminary injunction standards were not met, district court found that injunction under stay-put provision would nonetheless issue).

Claims brought pursuant to the stay-put provision of the IDEA are evaluated independently from claims brought challenging the inadequacy of an IEP. *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440 (2d Cir. 2015); *Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist.*, 386 F.3d 158 (2d Cir.), *supplemented sub nom. Mackey v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 112 F. App'x 89 (2d Cir. 2004)unpublished); *Araujo v. New York City Dep't of Educ.*, No. 20 CIV. 7032 (LGS), 2021 WL 1225503, at *2 (S.D.N.Y. Apr. 1, 2021); *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15 CV 9679 (NSR), 2018 WL 4103494 (S.D.N.Y. Aug. 28, 2018) *D.C. v. Vinyard*, 901 F. Supp. 2d 77 (D.D.C. 2012); *Aaron P. v. Hawaii, Dep't of Educ.*, 897 F. Supp. 2d 1004 (D. Haw. 2012).

Where, as here, the stay-put provision is invoked or triggered, Courts focus on identifying the student's "then-current educational placement," which typically refers to the child's last agreed-upon educational program before the parent requested a due process hearing to challenge the child's IEP, *Ventura de Paulino*, 959 F.3d at

532, or the program that was in effect before a school district unilaterally changed the student's educational placement – the educational status quo. Under the provision, as long as a parent has initiated a proceeding pursuant to § 1415, a child is entitled to an injunction against any district-proposed change that would move her from her "then-current educational placement." *V.D. v. State*, 403 F. Supp. 3d 76 (E.D.N.Y. 2019); *citing D.M. v. N.J. Dep't of Educ.,* 801 F.3d 205, 211 (3d Cir. 2015).

An automatic injunction may issue under the IDEA's stay-put provision in the absence of administrative proceedings. Requiring plaintiffs, such as the Plaintiffs herein, to go through the administrative proceedings simply to obtain a stay in proceedings would be putting form over substance. *D.M. v. New Jersey Dep't of Educ.*, No. CIV.A. 14-4620 ES, 2014 WL 4271646, at *6 (D.N.J. Aug. 28, 2014).

As the Court in *D.M.* recognized, the "language of 1415(j) is unequivocal and admits of no exceptions ... stay-put provision is designed to ensure stability and consistency in a disabled child's education when that consistency may otherwise be elusive." *D.M.*, 2014 WL 4271646, at *6; *K.T. ex rel. S.W. v. W. Orange Bd. of Educ.*, No. 01CIV.3208 (WGB), 2001 WL 1715787, at *2 (D.N.J. Oct. 23, 2001) (internal quotations and citations omitted). *D.M.*, 2014 WL 4271646, at *6.

## F.    IDEA, Part B

The IDEA is a hybrid of a grant statute and a statute creating substantive rights. It provides that state educational agencies are eligible for federal financial assistance under the IDEA if they establish and implement a program of special education meeting the requirements described above. To receive federal funding for providing instruction and services for children with disabilities under IDEA, each State must submit an "IDEA Part B application" that includes assurances that the state "will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104." (ECF No. 1-9, PageID.129, 132-36).

Additionally, each State waives any Eleventh Amendment immunity by accepting IDEA Part B funds: "Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." (*Id*. at PageID.131). All State and local educational agencies that receive assistance under the IDEA must maintain procedures to ensure that disabled children and their parents "are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a). *New Jersey Prot. & Advoc., Inc. v. New Jersey Dep't of Educ.*, 563 F. Supp. 2d 474, 484 (D.N.J. 2008).

Private rights of action against a State or local education agency exist under the IDEA.[2] The IDEA does not preclude private rights of action against the State for failure to comply with any IDEA provision by statewide advocacy organizations and agencies acting on behalf of children with disabilities and their parents. *New Jersey Prot. & Advoc., Inc. v. New Jersey Dep't of Educ.*, 563 F. Supp. 2d 474 (D.N.J. 2008).

If a violation of the IDEA is found, termination of federal funds is a specific remedy. 20 U.S.C. § 1416. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52 (1st Cir. 2002); *See also Virginia Dep't of Educ. v. Riley*, 23 F.3d 80 (4th Cir. 1994); *Louisiana State Bd. of Elementary & Secondary Educ. v. U.S. Dep't of Educ.*, 881 F.2d 204 (5th Cir. 1989) (Department of Education not estopped from seeking $700,000 refund in IDEA grant money from State Education Agency found guilty of misappropriation); *Freeman v. Cavazos*, 923 F.2d 1434 (11th Cir. 1991) (funds were terminated due to district's refusal to cooperate with an investigation into compliance with IDEA).[3]

---

[2] In *New Jersey Protection & Advocacy, Inc.*, 563 F. Supp. 2d 474, the Court held that, "Section of the IDEA directing Secretary to, *inter alia*, monitor New Jersey's implementation of the IDEA, ensure that New Jersey monitors its local educational agencies, and approve and review New Jersey's IDEA performance plan does not preclude private rights of action against the state for failure to comply with any IDEA provision, including the monitoring obligations imposed on each state."

[3] As noted by the authors in *Termination of funds and injunctive relief*, Rothstein, Disabilities and the Law (4th ed), § 2:47, "The value of this remedy is obviously subject to question. If a state's federal funds are cut for violation of the IDEA

## G.     The Racketeering Influenced And Corrupt Organizations Act – 18 § U.S.C. 1962 (C)

Under 18 U.S.C. § 1962(c), it shall be unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such 'enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."

In the case at bar, individual Defendants employed by AAPS, the WISD, and MDE did not uphold the assurances they made to the U.S. DOE in order to receive IDEA Part B funds during the COVID-19 pandemic. Moreover, the IDEA funds Defendants received were diverted from their statutorily mandated purpose(s) and used for purposes not authorized by the IDEA.

RICO authorizes private rights of action for injunctive relief. *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 124 (2d Cir. 2019), *cert. denied sub nom. Sequoia Cap. Operations, LLC v. Gingras*, 140 S. Ct. 856, 205 L. Ed. 2d 458 (2020); *Chevron*

---

requirements for failure to implement appropriate placements for a certain group of children, the result would be that the children in need of appropriate placements would not be served. In addition, no federal money would be available to subsidize programming for any children with disabilities. For this reason, termination of federal funds is not generally viewed as a viable means of obtaining appropriate educational placement for primary and secondary school age children under the IDEA."

*Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016) (holding that a federal court is authorized to grant equitable relief to a private plaintiff).

"A private cause of action under RICO requires that the plaintiff allege: '(1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.' " *Fertitta v. Knoedler Gallery, LLC*, No. 14-CV-2259 JPO, 2015 WL 374968, at *5 (S.D.N.Y. Jan. 29, 2015) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006)). *Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 179 (S.D.N.Y. 2020).

To establish a defendant's violation of 18 U.S.C. § 1962, a plaintiff must allege "the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 179–80 (S.D.N.Y. 2020); *citing Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983); *see also Aronov v. Mersini*, No. 14-CV-7998 PKC, 2015 WL 1780164, at *3 (S.D.N.Y. Apr. 20, 2015).

The Supreme Court has held that mail and wire fraud may cover intangible property rights. *Carpenter v. United States*, 484 U.S. 19, 25, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987)(intangible items of value, such as confidential business

information).

Under the IDEA, it is undeniable that disabled students have substantive and procedural rights – intangible rights, considered property rights. In order to qualify for federal financial assistance under the Act as discussed above, a State must demonstrate that it "has in effect a policy that assures all handicapped children the **right** to a free appropriate public education." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 180–81, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).

In enacting the IDEA and its predecessor statute, Congress created a right to education for disabled students, even when and if such a right may not exist for non-disabled students. The Act's legislative history demonstrates that both House and Senate Reports attribute the impetus for the Act and its predecessors to two federal-court judgments rendered in 1971 and 1972. *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County*, 458 U.S. at 192.[4] As the Senate Report states, the passage of the Act "followed a series of landmark court cases ***establishing in law the right to education for all handicapped children***." S.Rep., at 6, U.S.Code Cong. & Admin.News 1975, p. 1430. *Id.* Similarly, the Senate Report states that it was an "[i]ncreased awareness of the educational needs of handicapped children and

---

[4] *See also, Note, Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975*, 92 Harv. L. Rev. 1103 (1979) for extensive discussions as to the legislative history and background of the Act.

25

landmark court decisions establishing the right to education for handicapped children [that] pointed to the necessity of an expanded federal fiscal role." S.Rep., at 5, U.S.Code Cong. & Admin.News 1975, p. 1429. See also H.R.Rep., at 2–3. *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County*, 458 U.S. at 192.

In *Smith v. Robinson*, 468 U.S. 992, 1010, 104 S. Ct. 3457, 82 L. Ed. 2d 746 (1984), the Supreme Court acknowledged that in creating Act, Congress intended to "establish and protect the right to education for all handicapped children and to provide assistance to the States in carrying out their responsibilities under State law and the Constitution of the United States to provide equal protection of the laws." U.S.Code Cong. & Admin. News 1975, p. 1437. *Id.. See also* 121 Cong. Rec. 37417 (1975) (statement of Sen. Schweiker: "It can no longer be the policy of the Government to merely establish an unenforceable goal requiring all children to be in school. [The bill] takes positive necessary steps to insure that the rights of children and their families are protected"). *Smith*, 468 U.S. at 1010.

In explaining the need for federal legislation, the House Report noted that "no congressional legislation has required a precise guarantee for handicapped children, i.e., a basic floor of opportunity that would bring into compliance ***all school districts with the constitutional right of equal protection with respect to handicapped children.***" H.R.Rep., at 14. *Board of Educ. of Hendrick Hudson Central School*

*Dist., Westchester County*, 458 U.S. at 200.

A disabled student's right to a free appropriate public education necessarily exists concomitantly with the student's right to the federal funds accepted by the state to provide the student with a FAPE. *See McClain v. Smith*, 793 F. Supp. 761 (E.D. Tenn. 1990) (Parent of severely retarded 19-year-old woman did not waive woman's **rights** to Education for All Handicapped Children Act **funds** by agreeing to have woman placed in an adult group home, even though mother understood that group home was not a school, since experts told the mother that there was no other opening for the woman in the vicinity and that group home would give the same kind of training which had previously been received. (emphasis added)).[5]

The Supreme Court went even further in *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 516, 127 S. Ct. 1994, 167 L. Ed. 2d 904 (2007), when it held that IDEA grants parents independent, enforceable rights, which are not limited to procedural and reimbursement-related matters but encompass the entitlement to a free appropriate public education for their child. *Id.*[6]

---

[5] IDEA Part B funds are provided to local school districts based, in part, on a "per-student" analysis. *See Clark v. Banks*, 193 F. App'x 510, 517 (6th Cir. 2006)(unpublished). As such, each diabled student receiving a FAPE has a right to, or property interest in, the IDEA Part B funds given to the state or local school district to implement his/her IEP and provide him/her with a FAPE. In essence, the IDEA funds received by the state, and in turn local school districts, are earmarked for each student.

[6] "The text and structure of IDEA create in parents an independent stake not only in the procedures and costs implicated by the process but also in the substantive

Finally, applying the reasoning of the Second Circuit in *Gingras*, supra, Plaintiffs are not precluded from bringing this case because they are not seeking treble damages from the State Defendants, but rather declaratory and injunctive relief. Plaintiffs have standing to seek the relief requested because it serves to preserve the IDEA Part B funds for use consistent with state and federal law. Plaintiffs have raised issues about the individual Defendant's handling/mishandling of IDEA Part B funds, which present a fair ground for litigation and more deliberate investigation and are not barred by lack of standing.

Concerning the racketeering activity requirement, the statute lists criminal acts that can constitute predicate acts of racketeering. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity"). Notably, mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 are predicate acts of racketeering activity, but crimes related to state election fraud are not. *Cornetta*, 434 F. Supp. 3d at 179–80. The Supreme Court has indicated that mail and wire fraud may cover intangible property rights. *Carpenter v. United States*, 484 U.S. 19, 25, 108 S. Ct. 316, 98 L.

---

decision to be made. . . . It is difficult to disentangle the Act's procedural and reimbursement-related rights from its substantive ones, and attempting to do so would impose upon parties a confusing and onerous legal regime, one worsened by the absence of any express guidance in IDEA concerning how a court might differentiate between these matters." *Winkelman ex rel. Winkelman*, 550 U.S. at 517–18.

Ed. 2d 275 (1987)(intangible items of value, such as confidential business information).

Plaintiffs in this action request injunctive relief against Defendants under the IDEA and RICO statutes. While the IDEA provides for private rights of action regarding the misuse of IDEA funds, the remedy the IDEA provides is the termination of federal funds to the state and/or local educational agency. Plaintiffs are not interested in having the U.S. DOE terminate Defendants' IDEA funding under the IDEA, nor do Plaintiffs seek money damages under RICO – treble or otherwise. Plaintiffs seek injunctive relief, which would compel Defendants to do that which they are legally obligated to do under the IDEA.

## IV.   ANALYSIS

### A.   Plaintiffs are not required to Exhaust Administrative Remedies

IDEA generally requires a party to exhaust administrative remedies before bringing a claim in federal court. 20 U.S.C. § 1415. Although the policy of requiring exhaustion of the IDEA's administrative remedies is a strong one, the courts have recognized certain exceptions. *Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994). *New Jersey Protection & Advocacy, Inc.*, 563 F. Supp. 2d at 485–86. Exhaustion of administrative remedies under IDEA is not necessary if: (1) it would be futile to resort to the IDEA's due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that

29

is contrary to the law; or (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies. 20 U.S.C. § 1415(i)(2)(A). *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519 (2d Cir. 2020), *cert. denied,* 141 S. Ct. 1075, 208 L. Ed. 2d 534 (2021), *reh'g denied,* 141 S. Ct. 1530, 209 L. Ed. 2d 262 (2021); *Doe By & Through Brockhuis v. Arizona Dep't of Educ.*, 111 F.3d 678 (9th Cir. 1997); *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80 (3d Cir. 1996); *Ass'n for Cmty. Living in Colorado v. Romer*, 992 F.2d 1040 (10th Cir. 1993); *DL v. D.C.*, 450 F. Supp. 2d 11 (D.D.C. 2006).

Parents may bypass the administrative process where exhaustion would be futile or inadequate. *Honig*, 484 U.S. at 326–27; *see Smith v. Robinson*, 468 U.S. 992, 1014, 104 S. Ct. 3457, 82 L. Ed. 2d 746 (1984), n. 17, (citing cases); *see also* 121 Cong. Rec. 37416 (1975)(remarks of Sen. Williams)("[E]xhaustion ... should not be required ... in cases where such exhaustion would be futile either as a legal or practical matter"); *Zdrowski v. Rieck*, 119 F. Supp. 3d 643, 664 (E.D. Mich. 2015)(Exhaustion not required if it would be futile or inadequate to protect the plaintiff's rights).

This Court addressed these exceptions in *D.R. v. Michigan Dep't of Ed.*, No. 16-13694, 2017 WL 4348818 (E.D. Mich. Sept. 29, 2017). In *D.R.*, plaintiffs brought a class action "made up of approximately 30,000 school-age children in Flint, Michigan, at risk of developing a disability as a result of the elevated levels of lead

in the drinking water"." *D.R.*, 2017 WL 4348818, at *1.  In *D.R.*, the Honorable Arthur J. Tarnow wrote the following regarding the duty to exhaust administrative remedies:

> "The two principle exceptions to this requirement of exhaustion of administrative remedies "would be futile or inadequate to protect the "plaintiff's rights" or where "plaintiffs were not given full notice of their procedural rights under the IDEA. "Courts have applied the futile or inadequate exceptions to exhaustion when plaintiffs seek relief that is not otherwise available through the administrative process, i.e., allegations of "structural or systemic failure."

Id. at 3.

Judge Tarnow acknowledged that the Sixth Circuit had not expressly adopted these exceptions, but other district courts in the Second and the Ninth had addressed them in cases remarkably similar to *D.R.* Id. at 3–4.  Thus, the Court adopted the futility exception because plaintiffs sought injunctive relief for a large class harmed by "structural or systemic failures." Id. at 4.

The Plaintiffs herein did not exhaust their administrative remedies before commencing the instant action.  However, like the Plaintiffs in *D.R,* they were not required to do so.  *D.R., supra.* Nonetheless, Plaintiffs initiated administrative proceedings shortly before filing this action, thereby placing Defendants on notice of Plaintiffs' allegations.  (ECF No. 38-3.) As such, Defendants have notice of Plaintiffs' allegations.  Id.  Where a claim of systemic failure is made, administrative remedies are generally inadequate or futile, for purposes of the IDEA's

administrative exhaustion requirement. *Ellenberg v. New Mexico Mil. Inst.*, 478 F.3d 1262 (10th Cir. 2007); *Handberry v. Thompson*, 446 F.3d 335 (2d Cir. 2006).

Plaintiffs in this action seek relief from Defendants' systemic violations of the IDEA on behalf of a large class, which the administrative due process system cannot provide. *See, D.R.*, 2017 WL 4348818. Plaintiffs are excused from the 20 U.S.C. § 1415 exhaustion requirement "where they allege systematic legal deficiencies and, correspondingly, request system-wide relief that cannot be provided (or even addressed) through the administrative process." *New Jersey Protection & Advocacy, Inc.*, 563 F. Supp. 2d at 486; *Beth V. by Yvonne V.*, 87 F.3d at 89; *see Grieco v. New Jersey Dep't of Educ.*, No. 06-CV-4077PGS, 2007 WL 1876498 (D.N.J. June 27, 2007) (stating that exhaustion is excused when the plaintiff alleges a structural or systematic failure and requests system-wide reforms); *Gaskin v. Com. of Pa.*, No. CIV. A. 94-4048, 1995 WL 154801, at *4 (E.D. Pa. Mar. 30, 1995) (explaining that exhaustion is not necessary where "an agency has adopted a policy or pursued a practice of general applicability that is contrary to law [, or] it is improbable that adequate relief can be obtained by pursuing administrative remedies" (alteration added)). *New Jersey Protection & Advocacy, Inc.*, 563 F. Supp. 2d at 486. These types of system-wide allegations are among the traditional bases for waiving the 20 U.S.C. § 1415 exhaustion requirement.  *Beth V. by Yvonne V.*, 87 F.3d at 89. *Id.*

The Plaintiffs herein are not required to exhaust any administrative remedies under the IDEA because their claims are not premised on the individual needs of particular students but rather on the needs of all Plaintiffs and the proposed class. *New Jersey Protection & Advocacy, Inc.*, 563 F. Supp. 2d at 486. Plaintiffs' class action Complaint is a challenge to the very framework and processes that the Defendants have undertaken for every disabled child in their district. *Id.* Moreover, Plaintiffs are not contesting individual IEPs; instead, Plaintiffs seek injunctive relief from this Court, returning them to their educational status quo, and enjoining Defendants from systemically violating Plaintiffs' rights, as well the rights of similarly situated disabled children, under the IDEA in the future – particularly in the upcoming school year. *Id.*[7]   Based upon the precedent established in *D.R.*, exhaustion is not required in the case at bar.  *D.R.*, 2017 WL 4348818.

Furthermore, challenges like the Plaintiffs' are "incapable of correction in the individual administrative exhaustion procedure" because "[i]f each plaintiff [is] forced to take his or her claim before a hearing officer and appeal to another state official, there [will be] a high probability of inconsistent results." Id. at 4 (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 114 (2d Cir. 2004)).  All of the

---

[7] "If there is a reasonable likelihood that [plaintiffs] will again suffer the deprivation of ... rights that gave rise to this suit," the court may exercise jurisdiction and resolve the issue." *Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 980 (6th Cir. 2012)(unpublished) citing *Honig*, 484 U.S. at 318.

33

Plaintiffs' claims have their genesis in the "across-the-board" school closings that caused students to go from in-person learning in the classroom to remote learning at home. Plaintiffs contend that the Defendants' actions as set forth herein resulted in a change in their educational placement in violation of the IDEA. There is a high probability that if Plaintiffs' claims are heard separately in administrative or judicial proceedings, there will be inconsistent rulings concerning the same event.

Moreover, as proven time and again in Michigan, the administrative process is inefficient and ineffectual. *See, e.g., T.S. v. Utica Cmty. Sch.*, No. 14-10216, 2017 WL 242842, at *12 (E.D. Mich. Jan. 20, 2017) (Remanding a due process complaint back to the administrative law judge after three years of tireless litigation by T.S.'s mother on his behalf due to multiple failures and errors on the part of the ALJ). *See also*, *M.G. v. New York City Dep't of Educ.*, 15 F. Supp. 3d 296 (S.D.N.Y. 2014) (Exhaustion of administrative remedies excused for systemic claims where, although hearing officers had the authority to order wide-ranging relief for individual children in specific school year, they had no power to alter city's policies or general practices and could not issue prospective relief – exhaustion would be inadequate or futile).

Class action Plaintiffs need not exhaust administrative remedies where IDEA does not provide remedies for such class. *Evans v. Evans*, 818 F. Supp. 1215 (N.D. Ind. 1993); *Ass'n for Retarded Citizens in Colorado v. Frazier*, 517 F. Supp. 105 (D. Colo. 1981).

34

Finally, where Plaintiffs are not given the full notice of their procedural rights under the IDEA, they need not exhaust administrative remedies. *Zdrowski v. Rieck*, 119 F. Supp. 3d 643, 664 (E.D. Mich. 2015), citing *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000), *amended on denial of reh'g* (May 2, 2000). At the very heart of Plaintiffs' claims is the fact that they were not given full notice of their procedural rights as guaranteed by the IDEA.

Given the foregoing, Plaintiffs' claims are exempt from the Statute's exhaustion requirement.

**B.    This Court Should Issue an Automatic Injunction returning Plaintiffs to their educational status quo**

The stay-put provision is one of those procedural safeguards that "protect[s] handicapped children and their parents" by "block[ing] school districts from effecting unilateral change in a child's educational program." *Susquenita School Dist.*, 96 F.3d 78; *Tennessee Dept. of Mental Health and Mental Retardation*, 88 F.3d 1466; *V.D. v. State*, 403 F. Supp. 3d 76 (E.D.N.Y. 2019).

As noted above, a school district's removal of a disabled student from their educational program, or alteration of the student's educational program, for more than ten days in a school year constitutes a "change in placement," which must be undertaken only within the protective framework of the IDEA. *Honig*, 484 U.S. at 323; *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1495 (9th Cir. 1994). In *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112 (3d Cir. 2014). The Court of

Appeals for the Third Circuit provided a valuable and comprehensive discussion of

the concept of pendency placement:

> To determine [pendency] placement, this court has looked to the IEP
> "actually functioning when the 'stay 'put' is invoked." *Drinker by
> Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 867 (3d Cir. 1996); *see
> Susquenita Sch. Dist. v. Raelee S. By & Through Heidi S.*, 96 F.3d
> 78, 83 (3d Cir. 1996) ("*Raelee S.*"). The operative placement could
> be either a public school or a private school that the local district was
> financing to satisfy the requirement that every child be given a *free,*
> appropriate education. *See, e.g., Florence Cty. Sch. Dist. Four v.
> Carter By & Through Carter*, 510 U.S. 7, 12, 114 S. Ct. 361, 126 L.
> Ed. 2d 284 (1993) ("Congress intended that IDEA's promise of a 'free
> appropriate public 'education' for disabled children would normally
> be met by an IEP's provision for education in the regular public
> schools or in private schools chosen jointly by school officials and
> parents."); *Susquenita School Dist.*, 96 F.3d at 86 (noting that
> providing a FAPE may involve "'placement in private schools at
> public expense" (quoting *Sch. Comm. of Town of Burlington, Mass.
> v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369, 105 S. Ct. 1996, 85 L.
> Ed. 2d 385 (1985)).

The Third Circuit also provided a valuable discussion of the automatic

preliminary injunction included in IDEA's "stay-put" rule:

> IDEA's "stay-put rule" serves "in essence, as an automatic
> preliminary injunction," *Drinker by Drinker*, 78 F.3d at 864,
> reflecting Congress's conclusion that a child with a disability is best
> served by maintaining her educational status quo until the
> disagreement over her IEP is resolved, *Pardini v. Allegheny
> Intermediate Unit*, 420 F.3d 181, 190 (3d Cir. 2005); *Drinker by
> Drinker*, 78 F.3d at 864 ***"'Once a court ascertains the student's
> current educational placement, the movants are entitled to an order
> [maintaining that placement] without satisfaction of the usual
> prerequisites to injunctive relief.'"*** *Drinker by Drinker*, 78 F.3d at
> 864 (quoting *Woods v. N.J. Dep't of Educ.,* No. 93–5123, 20 Indiv.
> Disabilities Educ. L. Rep. (LRP Publications) 439, 440 (3d Cir. Sept.
> 17, 1993)); *see Pardini*, 420 F.3d at 188 ("Congress has already

balanced the competing harms as well as the competing equities");
*Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982) (
"The statute substitutes an absolute rule in favor of the status quo for
the court's discretionary consideration of the factors....").

*Id.* at 118–119 (footnotes omitted; emphasis added).

When the Ridley School District petitioned for certiorari, the U.S. Supreme

Court requested an amicus brief from the United States Solicitor General. *Ridley*

*School Dist. v. M.R.*, 2015 WL 1619420. The Solicitor General stated, "in practice,

the stay-put provision serves as a sort of automatic preliminary injunction,

preventing a unilateral change of placement by a school district." *Ridley School*

*Dist. v. M.R.*, 2015 WL 1619420, at *4. The Solicitor General stated that the case

did not warrant review, noting that the Supreme Court "has emphasized that the

provision's text is 'unequivocal' and 'states plainly' that the child 'shall' remain in

his current educational placement 'during the pendency of any proceedings initiated

under the act.'" *Ridley School Dist. v. M.R.*, 2015 WL 1619420 (citing *Honig v. Doe*,

484 U.S. 305, 323, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988)). Consequently, the

United States Supreme Court denied the school district's certiorari petition. *Ridley*

*Sch. Dist. v. M.R.*, 575 U.S. 1008, 135 S. Ct. 2309, 191 L. Ed. 2d 977 (2015).

Applying this case law to the case at bar, this Court should grant an automatic

injunction declaring that the putative class members' status quo educational setting

is in-person instruction, returning the Plaintiffs to said educational placements and

directing that the Plaintiffs remain in said placements pending the outcome of any proceedings properly commenced under IDEA.

Under *Ridley*, the Court should look to Plaintiffs' IEPs "actually functioning when the 'stay put' provision was "triggered" or "invoked." *Ridley School Dist.*, 575 U.S. 1008. The common factor in each Plaintiff's IEP and each potential class member's IEP is that none of the IEPs contain language about virtual instruction or services. (ECF Nos. 1-1, 1-2, 1-3, 1-4.) None of the Plaintiffs' IEPs from the 2019-2020 school year or the 2020-2021 school year contain language stating that AAPS would provide instruction and/or services virtually. Id. Each Plaintiff's IEP specified that instruction would be in a general education classroom or a special education classroom. Id. However, there was no specification regarding whether the instruction would be in-person or virtual. Likewise, regarding services, all Plaintiffs' IEPs indicated that the services would be direct or consultative. *Id*. There was no specification regarding whether the instruction would be in-person or virtual. *Id*. Indeed, AAPS unilaterally changed Plaintiffs' IEPs to virtual instruction and services on March 16, 2020. Before this unilateral change, each Plaintiff's operative placement was in-person instruction and in-person services. *See N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104 (9th Cir. 2010).

The operative educational placement refers to "the overall instructional setting in which the student receives his education." *See AW ex rel. Wilson v. Fairfax Cty.*

*Sch. Bd.*, 372 F.3d 674, 675 (4th Cir. 2004).   In *N.D. ex rel. parents acting as guardians ad litem*, 600 F.3d 1104, the Court of Appeals for the Ninth Circuit discussed whether Hawaii's decision to shut down public schools on seventeen Fridays during the school year to save money constituted a change in educational placement.   *Id.*   The Court held that the "furlough Fridays" did not constitute a change in educational placement.   *Id.* at 1115–1117.   However, the Court's reasoning is instructive for this case.   *See Id.*   The Court stated:

> Based on Supreme Court case law, Congress's express intent in the statute, the agency's implementing regulations, and sister circuits' decisions, we hold that "educational placement" means the general educational program of the student.   ***More specifically we conclude that under the IDEA, a change in educational placement relates to whether the student is moved from one type of program – i.e., regular class – to another type – i.e., home instruction.***   A change in the educational placement can also result when there is significant change in the student's program even if the student remains in the same setting.   This determination is made in light of Congress's intent to prevent the singling out of disabled children and to "mainstream" them with non-disabled children.

*Id.* at 116 (emphasis added).

Since "furlough Fridays" did not move the disabled student from one type of program, "regular classroom setting,"  to another, "home instruction," it was not a change in educational placement. *Id.*  Moreover, "the cut in the number of days [did] not change the model of education, and the educational setting and program pre- and post-furlough [were] comparable."   *N.D. ex rel. parents acting as guardians ad*

*litem*, 600 F.3d at 1117.  Thus, the Court held that the § 1415(j) stay-put provision was not triggered by the "furlough Fridays."  *Id.*

The Court in *N.D.* found that the school district's administrative policy **<u>affected</u>** all school children equally – disabled and non-disabled alike. The instant case differs from *N.D.* in that the Michigan / AAPS closures may have **applied** to all students equally (disabled and non-disabled), but such closures **<u>affected</u>** disabled and non-disabled students very differently.

Based on the Ninth Circuit's holding in *N.D.*, moving special education students out of their regular classrooms and putting them at home in their bedrooms or living rooms to learn remotely unquestionably constitutes a change in their educational placement. The only question to be answered is, "What is the remedy for such a change?" The remedy comes in the form of the relief requested by the Plaintiffs herein.

While fashioning a remedy for the Plaintiffs herein may be complicated, problematic, or even complex, it is no reason to deny that Plaintiffs' unprecedented exile from their educational programs and placements under their IEPs constituted a change in placement for each Plaintiff warranting an automatic / preliminary injunction under the IDEA's stay-put provision, returning the Plaintiffs to their educational status quo placement.

AAPS and the Defendants changed the Plaintiffs' educational placements /operative placements when they closed their schools in March 2020. AAPS moved Plaintiffs "from one type of program – i,e., regular class – to another type – i.e., home instruction." *Id.* at 1116. Moreover, considering AAPS remained closed for over a year before it offered a hybrid option, the programs pre and post COVID were in no way comparable. *Id.* at 1117. Even the hybrid option did not return Plaintiffs to their pre-pandemic status quo but created another changed educational placement in violation of the IDEA. The IDEA's stay-put provision, § 1415 (j), was triggered at the time of the school closings on March 16, 2020. *Id.* Therefore, the Court must look to the IEP "actually functioning" when the stay-put provision was triggered to determine the pendency placement. *Id.* In all cases, the IEPs that were "actually functioning" at the time of the March 16, 2020 closing did not state AAPS could provide virtual instruction and services but rather stated that AAPS provided instruction and/or services in-person – in the "regular classroom." (ECF Nos. 1-1, 1-2, 1-3, 1-4.).

Unlike most litigated matters, this case is not about who was right and wrong, nor is it about how we punish those who committed the wrong. Instead, this case focuses only on the disabled students who have been so adversely affected by the change in their educational placements that, for whatever reason, violated the

procedural safeguards of the IDEA and how to help them return to the educational

placements they were or should be, in.

Consequently, this Court should issue an automatic injunction declaring

Plaintiffs' pendency placement is in-person instruction.[8]

### C. This Court should issue a Preliminary Injunction Enjoining MDE, WISD, and AAPS from making expenditures of their IDEA Part B Funds without the oversight of a RICO Special Monitor

A Court's decision to award preliminary injunctive relief is governed by the

following traditional four-part test:  1) whether the moving party has a strong

likelihood of success on the merits; 2) whether the moving party would suffer

irreparable injury in the absence of injunctive relief; 3) whether an award of

---

[8] Even if § 1415 (j)'s automatic injunction does not apply to some or part of the Plaintiffs' requested relief, Plaintiffs satisfy the traditional standards required for a preliminary injunction. A Court's decision to award preliminary injunctive relief is governed by the following traditional four-part test:  1) whether the moving party has a strong likelihood of success on the merits; 2) whether the moving party would suffer irreparable injury in the absence of injunctive relief; 3) whether an award of preliminary injunctive relief would cause substantial harm to others, and 4) whether the public interest would be served by the requested award. *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Applying *D.R.* to the case at bar, Plaintiffs are likely to succeed on the merits.  The Court in *D.R.* denied the school district's motions to dismiss under both Rules 12(b)(6) and 12(b)(1). *D.R., supra* at *2. As Judge Tarnow acknowledged in *D.R.*, students with disabilities presumptively suffer punitive harm when time elapses due to administrative or court proceedings after a unilateral change in placement. *D.R., supra*, at *5. Declaring that AAPS, the WISD, and the MDE violated procedural safeguards and requiring in-person instruction unless the U.S. DOE issues IDEA waivers, while a substantial blow to the reputations of AAPS, WISD, and the MDE, does not harm others.  An injunction serves the public interest in providing education to children with disabilities.

preliminary injunctive relief would cause substantial harm to others, and 4) whether the public interest would be served by the requested award.  *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

Plaintiffs are not asking for money damages under RICO. Instead, Plaintiffs are requesting that the Court appoint a RICO Special Monitor to ensure that the Defendants comply with the law in spending their IDEA Part B Funds.  As such, applying the traditional four-part test, Plaintiffs are entitled to a preliminary injunction for Defendants' RICO violations.

### 1.      *Plaintiffs are likely to succeed on the merits.*

In the Sixth Circuit, the likelihood of success on the merits "weighs in favor of granting the motion if the Plaintiff 'shows more than a mere possibility of success' and, instead, 'raise[s] questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *See Stooksbury v. Ross*, 528 F. App'x 547, 558–559 (6th Cir. 2013)(finding that the transfer of assets in a RICO case raised a "strong inference" of collaboration sufficient to weigh in favor of granting a preliminary injunction)(citing *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)).  The questions raised by the Defendants' spending of IDEA Part B Funds here are substantial.  Defendants made assurances to the U.S. DOE regarding their compliance with IDEA and their use of IDEA funds, which they

undisputedly violated.  The issues raised by the Plaintiffs present a fair ground for litigation and more deliberate investigation. As such, Plaintiffs are likely to succeed on the merits, and an injunction simply asking for oversight of their IDEA Part B funds is appropriate. Moreover, while some district courts (and at least one treatise) endorse a rule that government entities and their officers sued in their official capacities cannot ordinarily be sued under RICO, the Second and Third Circuits have held that where, as here, Plaintiffs seek prospective, injunctive relief, the rationale for such a rule is not persuasive, and such suits may proceed. *Gingras*, 922 F.3d 112. Given the foregoing, Plaintiffs' RICO claim, while novel, applies substantively to the individual Defendants in their official capacities and is likely to succeed. *Id.*

In *Gingras,* the Second Circuit, agreeing with the third Circuit, found that courts exempting municipalities from RICO liability on the ground that they are incapable of forming a RICO *mens rea* failed to furnish a defensible explanation for their conclusion, *see Genty v. Resol. Tr. Corp.*, 937 F.2d 899, 909 (3d Cir. 1991), particularly given that private corporations are routinely held liable for damages under RICO. *Gingras*, 922 F.3d at 125. The Second Circuit observed that such reasoning had less to do with the inability of a public entity to form a criminal intent than with concern over the appropriateness of imposing the burden of punitive damages on taxpayers based on the misconduct of a public official. A punitive damages award against a municipality "punishes" only the general public who

ordinarily did not participate in the commission of the offense. *Genty*, 937 F.2d at 911, *citing City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267, 101 S. Ct. 2748, 2759, 69 L. Ed. 2d 616 (1981).

The relief sought herein is declaratory and injunctive; thus, any concern about saddling the taxpayers with the financial burden of punitive damages is not implicated. To the contrary, Plaintiffs relief would preserve the IDEA Part B funds for use consistent with state and federal law.  Plaintiffs have raised issues about the individual Defendant's handling/mishandling of IDEA Part B funds, which present a fair ground for litigation and more deliberate investigation, and demonstrate a likelihood of success on the merits" weighing in favor of granting Plaintiffs' motion.

## 2.   *Plaintiffs will suffer irreparable injury without injunctive relief.*

In March of 2020, the U.S. DOE emphasized the importance of spending IDEA Part B funds only for special education and related services for children with disabilities during the COVID-19 pandemic:

> IDEA Part B funds may be used for activities that directly relate to providing, and ensuring the continuity of, special education and related services to children with disabilities.  For example, an LEA may use IDEA Part B funds to disseminate health and COVID-19 information that is specifically related to children with disabilities, to develop emergency plans for children with disabilities, or to provide other information (e.g., guidance on coordination of the provision of services in alternate locations as described in Question A-5) to parties who may need such information, including school staff responsible for implementing IEPs, parents of eligible children, and staff in alternate locations where special education and related

services may be provided.  LEAs, however, may not use IDEA Part B funds to develop or distribute general COVID-19 guidance or to carry out activities that are not specific to children with disabilities (e.g., general COVD-19 activities for all children and staff). Additionally, LEAs may not use IDEA Part B funds to administer future COVID-19 vaccinations to any children, including children with disabilities.

(ECF No. 1-6, PageID.120-21.)

AAPS did not comply with this directive.  Upon information and belief, AAPS used IDEA Part B funds for unlawful purposes, including but not limited to purchasing personal protective equipment for all staff and students.  Plaintiffs, therefore, have already suffered irreparable harm and will continue to suffer irreparable harm if a Special RICO monitor is not appointed to oversee the Defendants' expenditures of their IDEA Part B Funds for the 2021-2022 school year to ensure Defendants spend IDEA Part B Funds for instruction and/or services for students with disabilities under IDEA.

Funding for disabled students is hard enough to come by even with IDEA Part B funds. If IDEA funds are, and continue to be, used for purposes other than educating disabled students, Michigan's disabled students will suffer irreparable harm in the form of regression and massive learning gaps. A failure to provide a FAPE constitutes irreparable injury. *Charles H. v. D.C.*, No. 1:21-CV-00997 (CJN), 2021 WL 2946127, at *10 (D.D.C. June 16, 2021); *See Lofton v. D.C.*, 7 F. Supp. 3d 117, 124 (D.D.C. 2013) (citing *Massey v. D.C.*, 400 F. Supp. 2d 66, 75 (D.D.C.

2005)). "Where there is a denial of a free appropriate [public] education ... there results a per se harm to the student, and the irreparable injury requirement for a preliminary injunction has been satisfied." *Blackman v. D.C.*, 277 F. Supp. 2d 71, 79 (D.D.C. 2003).

### 3. *An award of preliminary injunctive relief will not cause substantial harm to others.*

Requiring oversight of the Defendants' IDEA Part B expenditures, while inconvenient, does not harm others.  Such an injunction does not limit the Defendants' spending on staff and services to provide for disabled children but rather ensures that the spending is for their benefit as required by law.  As such, an injunction only serves to ensure compliance with IDEA.

### 4. *The public interest would be served by the requested award.*

As stated above, the plight of children with special needs has come to the forefront in this nation's discussion of public policy because of the COVID-19 pandemic. The public interest in ensuring that federal funds are spent in accordance with the law is served by an injunction.

When a preliminary injunction is sought to "affect government action taken in the public interest pursuant to a statute or regulatory scheme," the Court inquires whether the injunction is in the public interest rather than balancing the equities. *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020); *Y.S. on behalf of Y.F. v. New York City Dep't of Educ.*, No. 1:21-CV-00711 (MKV), 2021 WL

47

1164571, at *3 (S.D.N.Y. Mar. 26, 2021). Where Congress has created a special enforcement system, as with the IDEA, the public interest is on the side of maintaining that system's integrity. *Bd. of Educ. of Jacksonville Sch. Dist. v. C.P. & O.P.*, No. 3:15-CV-3228, 2016 WL 164987 (C.D. Ill. 2016); *Olson v. Robbinsdale Area Sch.*, No. CIV.04-2707 RHK/AJB, 2004 WL 1212081 (D. Minn. May 28, 2004); *Cf In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 760 (8th Cir. 2003). "The public interest lies in the proper enforcement of ... the IDEA and in securing the due process rights of special education students and their parents provided by statute." *In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litigation*, 340 F.3d 749, citing Petties v. D.C.*, 238 F. Supp. 2d 114, 125 (D.D.C. 2002).

Finally, in this case, an injunction is appropriate because the equities strongly favor the Plaintiffs, and an injunction is in the public interest. *Y.S. on behalf of Y.F.*, 2021 WL 1164571, at *5. The public interest is always "best-served" by ensuring constitutional and civil rights are upheld after a plaintiff has shown a likelihood of success on the merits. *Id.*; *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020). "This interest is particularly strong where the rights to be vindicated are constitutional in nature." *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 589 (N.D.N.Y. 2017) (citing *Ligon v. City of New York*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013)).

The protections of the IDEA are derived from the Constitution's Equal Protection Clause. *Y.S. on behalf of Y.F.*, 2021 WL 1164571, at \*5; *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 198, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982) (IDEA was passed "to provide assistance to the States in carrying out their responsibilities under ... the Constitution of the United States to provide equal protection of the laws." (citing S. REP. 94-168, 5 (1975))). As noted above, each State waives any Eleventh Amendment immunity by accepting IDEA Part B funds: "Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Even if Michigan had not waived its Eleventh Amendment Immunity by accepting IDEA funds, injunctive relief here would be appropriate under the *Ex Parte Young* doctrine.  Plaintiffs incorporate by reference the arguments regarding Eleventh Amendment Immunity discussed in their Response to the State Defendants'' Motion to Dismiss. (ECF No. 41.)

###    D.    This Court Should Order Provisional Certification of the Class

Fed. R. Civ. P. 23 (b) provides in pertinent part that a class action may be maintained if Fed. R. Civ. P. 23(a) is satisfied and if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:

> **(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> **(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

To obtain class certification under Fed. R. Civ. P. 23(a), the plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class Fed. R. Civ. P. 23(a). *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). Plaintiffs submit that this action may be adequately maintained as a class action and that provisional certification pursuant to the Fed. R. Civ. P. 23 (a) is appropriate.

This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. 23(a). To satisfy the numerosity requirement, Plaintiffs must demonstrate that the settlement class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). *In re Flint Water Cases*, 499 F. Supp. 3d 399, 420 (E.D. Mich. 2021). There are "no strict numerical test[s] for determining

impracticability of joinder." *Id.* Instead, numerosity "requires examination of the specific facts of each case and imposes no absolute limitations .... When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *Id.* (quoting *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980)). A class of 40 or more members is sufficient to satisfy the numerosity requirement. *In re Flint Water Cases*, 499 F. Supp. 3d 399, 421 (E.D. Mich. 2021); *Garner Properties & Mgmt., LLC v. City of Inkster*, 333 F.R.D. 614, 621 (E.D. Mich. 2020); *Davidson v. Henkel Corp.*, 302 F.R.D. 427, 436 (E.D. Mich. 2014).

Here, all the putative class members are Michigan parents and their children who have IEPs that require specialized instruction and/or related services under IDEA. There are approximately 202,475 special education students in Michigan statewide. There are approximately 6,495 special education students in the Washtenaw ISD and approximately 2,288 students in the Ann Arbor PS.[9] Given the preceding, Plaintiffs satisfy the numerosity requirement of Fed. R. Civ. P. 23(a)(1).

Plaintiffs submit that they have made a provisional showing of commonality under Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, Plaintiffs must demonstrate that there are "questions of law or fact common to the classFed. R. Civ. P. 23(a)(2). *In re Flint Water Cases*, 499 F. Supp. 3d 399, 421 (E.D. Mich.

---

[9]2020-21 Special Education Data Portraits : Disability Snapshot Ann Arbor Public Schools (81010): All Disabilities.

2021). Though the rule "speaks of 'questions' in the plural, [the Sixth Circuit has] said that there need only be one question common to the class." *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (emphasis added). *In re Flint Water Cases*, 499 F. Supp. 3d 399, 421 (E.D. Mich. 2021). However, this one question must represent "a common issue the resolution of which will advance the litigation." *In re Flint Water Cases*, 499 F. Supp. 3d at 421.

All class members seek relief on the common legal question of whether the Defendants and other similarly situated LEAs violated the IDEA, MARSE, the ADA, § 504, the Michigan Act, § 1983, and RICO by changing the Plaintiffs' Students' educational placements and altering their IEPS, following the regulations promulgated under the statutes.

All class members also present common factual questions regarding closures of schools and the putative class members' concomitant educational placement; whether false assurances were made to the U.S. DOE regarding IDEA Part B funding, and whether such funding was used for purposes other than those outlined in the IDEA; and whether the MDE failed to appropriately monitor AAPS and similarly situated LEAs in Michigan and provide the LEAs with the resources and expertise necessary to protect its disabled students' procedural safeguards guaranteed by IDEA. Plaintiffs submit that there are issues common to the proposed class, the resolution of which will advance the litigation, and as such, they have met the

commonality requirement of Fed. R. Civ. P. 23(a)(2).

To satisfy the typicality requirement, Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). *In re Flint Water Cases*, 499 F. Supp. 3d 399, 422 (E.D. Mich. 2021). A claim is "typical" if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007). *In re Flint Water Cases*, 499 F. Supp. 3d 399, 422 (E.D. Mich. 2021).

Plaintiffs' claims are typical of the claims of the class. All class members are Michigan parents and their children who have IEPs requiring specialized instruction and/or related services under IDEA. They were denied the procedural due process and/or substantive rights provided by IDEA, MARSE, the ADA, § 504, the Michigan Act, and § 1983.

All class members, including named Plaintiffs, seek a declaratory judgment finding that Defendants' actions were unlawful and an injunction returning Plaintiffs to their educational status quo and restraining Defendants from committing such actions in the future. There is nothing about the named Plaintiffs' claims or requests for relief that is distinct from the other members; indeed, the representative Plaintiffs' claims are typical of the claims of the class.  The named Plaintiffs' claims parallel

53

the putative class because those claims arise from a shared status as disabled students with IEPs that mandate specialized education and/or related services.

To satisfy the adequacy requirement, Plaintiffs must demonstrate that the class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). *In re Flint Water Cases*, 499 F. Supp. 3d 399, 423 (E.D. Mich. 2021). "There are two criteria for determining whether the representation of the class will be adequate: 1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Flint Water Cases*, 499 F. Supp. 3d at 423, citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524–25 (6th Cir. 1976). The linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class. *In re Flint Water Cases*, 499 F. Supp. 3d 399, 423 (E.D. Mich. 2021), *citing Garner Properties & Management, LLC*, 333 F.R.D. at 624 (*quoting In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013)).

The named Plaintiffs in this action all seek a declaratory judgment finding that the Defendants violated the Plaintiffs' procedural and substantive rights under the IDEA and other statutes outlined in Plaintiffs' complaint, and an injunction returning Plaintiffs to their educational status quo and restraining Defendants from violating Plaintiffs' procedural and substantive rights as set forth herein in the future –

particularly in the upcoming school year.[10]  Plaintiffs are represented by attorneys from the Brain Injury Rights Group, Ltd. who have experience litigating complex civil rights matters in federal court and detailed knowledge of the IDEA and related statutes.  Class counsel has developed and continues to develop relationships with plaintiffs and others similarly situated, will continue to prosecute the interests of the class vigorously.

Finally, Fed. R. Civ. P. 23(b)(2) requires that (1) the party opposing the class must have "acted or refused to act on grounds that apply generally to the class," and (2) "final relief of an injunctive nature ... must be appropriate." *Charles H.*, 2021 WL 2946127, at *14; *Lightfoot v. D.C.*, 273 F.R.D. 314, 329 (D.D.C. 2011). In short, Fed. R. Civ. P. 23(b)(2) establishes the "presumption that the interests of the class members are cohesive." *Id.* Based upon the preceding arguments, Plaintiffs submit that they meet Fed. R. Civ. P. 23(b)(2) requirements.

Finally, any difficulties managing Plaintiffs' action as a class action in the future may be adequately addressed using other mechanisms under Fed. R. Civ. P.

---

[10] "If there is a reasonable likelihood that [plaintiffs] will again suffer the deprivation of ... rights that gave rise to this suit," the court may exercise jurisdiction and resolve the issue. *Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 980 (6th Cir. 2012)(unpublished) *citing Honig v. Doe*, 484 U.S. 305, 318, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988); *Briggs v. Ohio Elections Comm'n*, 61 F.3d 487 (6th Cir. 1995); *J.A. v. Smith Cty. Sch. Dist.*, 364 F. Supp. 3d 803 (M.D. Tenn. 2019), *case dismissed,* No. 19-5343, 2019 WL 4943763 (6th Cir. Apr. 18, 2019); *Johnston-Loehner v. O'Brien*, 859 F. Supp. 575 (M.D. Fla. 1994).

23.[11] For example, should any issues arise after the Court provisionally certifies this matter as a class action, Plaintiffs may subdivide the class in their complaint or their certification motion as subclassing "may be undertaken at any time." Generating subclasses, 3 Newberg on Class Actions § 7:30 (5th ed.).

Fed. R. Civ. P. 23(c)(4), which was added to the rule in 1966, authorizes the Court (A) to allow a class action to be maintained with respect to particular issues or (B) to divide the class into appropriate subclasses.  § 1790 Partial Class Actions and Subclasses, 7AA Fed. Prac. & Proc. Civ. § 1790 (3d ed.). There is even authority that suggests subclasses may be created in the absence of a valid general class. *See* 3 Newberg on Class Actions § 7:29 (5th ed.), citing Scott Dodson, *Subclassing*, 27 Cardozo L. Rev. 2351, 2389 (2006) (concluding that "the best interpretation" of Fed. R. Civ. P. 23 allows subclasses to be certified in the absence of a valid general class).

The First Circuit recently suggested that "[t]he commonality standard might also be satisfied in some cases by certifying sub-classes. *Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 29 n.15 (1st Cir. 2019) *citing*

---

[11] *Gomez v. J. Jacobo Farm Lab. Contractor, Inc.*, 334 F.R.D. 234 (E.D. Cal. 2019), *modified on reconsideration,* No. 115CV01489AWIBAM, 2020 WL 1911544 (E.D. Cal. Apr. 20, 2020), and *modified,* No. 115CV01489AWIBAM, 2021 WL 431402 (E.D. Cal. Feb. 8, 2021) (citing Newberg on Class Actions) ("[T]he Court views the proposed subclasses as 'case management' subclasses under Fed. R. Civ. P. 23(d) that are treated informally and need not independently satisfy the certification requirements of Fed. R. Civ. P. 23(a) and 23(b), including the implied ascertainability requirement."). § 7:29. Subclasses—Overview of types, 3 Newberg on Class Actions § 7:29 (5th ed.).

Mark C. Weber, *Idea Class Actions After WalMart v. Dukes*, 45 U. Tol. L. Rev. 471, 498–500 (2014)). Although a plaintiff requesting provisional certification must still demonstrate that Fed. R. Civ. P. 23's requirements are met, the Court's normally rigorous analysis is calibrated by the reality that such certifications may be altered or amended before the decision on the merits. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018) (internal quotation marks omitted) (collecting cases).

Plaintiffs request this Court provisionally certify this matter as a class action as Plaintiffs meet the requirements necessary under Fed. R. Civ. P. 23 for such certification.

## VI.   CONCLUSION

For the reasons stated above, Plaintiffs most respectfully request an Order 1) Declaring that AAPS's, and/or other similarly situated LEAs', unilateral change of each Plaintiff's educational placement from in-person instruction and services to virtual instruction and services, as described herein, violated the procedural safeguards of the IDEA, and that each Plaintiff's "status-quo educational placement" – Pendency placement – was, is, and will continue to be in-person instruction and services in the least restrictive placement/setting consistent with the IDEA; 2) Directing AAPS and other similarly situated LEAs, to implement each Plaintiff's, each class member's, pendency placement – in-person instruction and services as set forth in each Student's IEP – in the least restrictive placement/setting consistent with

the IDEA; 3) Enjoining AAPS and other similarly situated LEAs from unilaterally changing the Plaintiffs', class members', placement without providing the proper procedural safeguards under the IDEA unless the U.S. DOE issues waivers of such safeguards; 4) Directing AAPS, and other similarly situated LEAs, to a) arrange, authorize and/or complete Independent Educational Evaluations[12] ("IEE") of each Plaintiff, each class member, to i) determine the extent of each student's regression and/or loss of competency due to the Defendants' unilateral change of each Plaintiff's educational placement as set forth in each Plaintiff's IEP, and ii) recommend, to the Court and/or otherwise, the compensatory education and/or pendency services[13] each Plaintiff, class member, needs to address any regression and/or loss of competency and/or prevent any such further loss; b) reconvene IEP Team meetings for each Plaintiff, class member, within thirty days of the completion of each IEE; and, c) ensure each independent examiner's written evaluations and/or

---

[12] The parents of a child with a disability have the right under the IDEA to obtain an independent educational evaluation of such child at public expense. Independent educational evaluation means an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question; and public expense means that the public agency either pays for the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent. *See* 34 C.F.R. § 300.502 (a). If the parent obtains an independent educational evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation must be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child. *See* 34 C.F.R. § 300.502 (b).
[13] Whether provided directly, directly funded or provide via pendency voucher.

recommendations are incorporated in, and/or included with, each Plaintiff's, each class member's IEP and/or IEP documents; 5) Directing AAPS and other similarly situated LEAs, to comply with the procedural safeguards guaranteed by IDEA for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers; 6) Selecting, appointing, and assigning a Special Monitor to oversee and help implement the foregoing, and to provide reports and recommendations to the parties and to the Court as the Court directs; 7) Enjoining Defendants MDE, WISD, AAPS, and other similarly situated LEAs from spending any IDEA funds for purposes other than those set forth in the IDEA, and assigning a Special Monitor, relative to Plaintiffs' RICO claims, to i) oversee Defendants' receipt, accounting, and expenditure of IDEA Part B Funds, for the 2019-2020, 2020-2021, 2021-2022 school years and otherwise, and ii) ensure that Defendants receive, maintain, and spend IDEA Part B Funds for purposes consistent with those set forth in the IDEA for students with disabilities – including but not limited to in person instruction and services for each Plaintiff, class member; 8) Provisionally certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) for the purposes of granting any and all injunctive relief requested herein.

Respectfully submitted,
Brain Injury Rights Group
*Attorney for Plaintiffs*


By: ___ /S/ Charlotte G. Carne

59

Charlotte G. Carne (P61153)
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035
charlotte@pabilaw.org

**PLAINTIFFS' CERTIFICATE OF SERVICE FOR**
**MOTION FOR PRELIMINARY INJUNCTION**

I hereby certify that on September 2, 2021, I electronically filed Plaintiffs'

Motion for Preliminary Injunction with the Clerk of the Court using the ECF System,

which will provide electronic copies to all attorneys of record in this matter.

By: ____/S/ Charlotte G. Carne____
Charlotte G. Carne (P61153)
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035
charlotte@pabilaw.org

61