# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Rita C. Simpson-Vlach, *et al.*,

                    Plaintiffs,          Case No. 21-cv-11532

v.                                       Judith E. Levy
                                         United States District Judge
Michigan Department of
Education, *et al.*,                     Mag. Judge Anthony P. Patti

                    Defendants.

_____/

## OPINION AND ORDER DISMISSING THIS CASE WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION AND DENYING AS MOOT DEFENDANTS' MOTIONS TO DISMISS [20, 34, 38] AND PLAINTIFFS' MOTION FOR AN AUTOMATIC AND PRELIMINARY INJUNCTION [42]

Before the Court are three motions to dismiss filed by the Defendants in this case. (ECF Nos. 20, 34, 38.) The Defendants include a state educational agency, local educational agencies ("LEA"), and individuals affiliated with these agencies who are being sued in their official capacities. The Plaintiffs are parents of children with disabilities, who bring this action "individually and on behalf of their . . . children." (ECF No. 1, PageID.1.) The Defendants' motions are fully

briefed. On January 27, 2022, the Court held a hearing by video conference and heard oral argument.

For the reasons set forth below, the Court finds that the Plaintiffs fail to establish that they have Article III standing as to the remaining counts in this case: Counts 1, 2, 4, 5, and 7. The Plaintiffs' allegations are insufficient to demonstrate that they have standing to pursue the relief they seek in Counts 1, 2, 4, and 5, and to pursue their claim in Count 7. Because the Plaintiffs do not show that they have standing to proceed, the case is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction. Accordingly, the Defendants' motions to dismiss (ECF Nos. 20, 34, 38) are DENIED AS MOOT. The Plaintiffs' motion for an automatic and preliminary injunction (ECF No. 42)— which was "held in abeyance pending disposition of [the] Defendants' motions to dismiss" (ECF No. 43, PageID.1013)—is also DENIED AS MOOT.

## I.    Background

### A. The Complaint Filed on June 30, 2021

On June 30, 2021, the complaint in this case was filed by Plaintiffs Rita C. Simpson-Vlach, Alan Simpson-Vlach, Kathy Bishop,

and Christopher Place. (ECF No. 1.) Plaintiffs are parents and residents of Ann Arbor, Michigan, who bring this putative statewide class action on behalf of themselves and their children with disabilities: A.S., M.S., C.P., and H.P.[1] (*See id.* at PageID.1, 3–5.)

Defendants are the Michigan Department of Education ("MDE"), the Ann Arbor Public Schools ("AAPS" or "District"), the Washtenaw Intermediate School District ("WISD"), Jeanice Swift (the Superintendent of the AAPS), Marianne Fidishin (the Executive Director of Student Intervention and Support Services for the AAPS), Scott Menzel (the former Interim Superintendent of the WISD), Naomi Norman (the current Interim Superintendent of the WISD), and Michael F. Rice (the State Superintendent for the MDE). (*See id.* at PageID.1, 5.) Defendants divide themselves into three groups: (1) the State Defendants, which consist of the MDE and Rice; (2) the AAPS Defendants, which consist of the AAPS, Swift, and Fidishin; and (3) the WISD Defendants, which consist of the WISD, Menzel, and Norman. Each group of Defendants filed a motion to dismiss.

---

[1] Rita and Alan Simpson-Vlach are the parents and natural guardians of A.S. and M.S. (*See* ECF No. 1, PageID.3.) Kathy Bishop and Christopher Place are the parents and natural guardians of C.P. and H.P. (*See id.* at PageID.4.)

3

In their complaint, Plaintiffs allege that Defendants violated their rights when the AAPS closed in March 2020[2] due to the COVID-19 public health crisis and improperly switched from providing in-person instruction and services to providing virtual instruction and services. Plaintiffs allege violations of various state and federal laws, including the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*

Plaintiffs state that under the IDEA, the student Plaintiffs are "children with disabilities"[3] who "are entitled to receive a free and appropriate public education ('FAPE') and related services from the MDE, the WISD and AAPS."[4] (ECF No. 1, PageID.4.) Each student

---

[2] During the hearing on January 27, 2022, Plaintiffs' counsel stated that the AAPS "made the decision to close the Ann Arbor Public Schools . . . based on the orders by the governor of Michigan" involving "[t]he closure of all non essential industries." (ECF No. 62, PageID.1809–1810.) Plaintiffs' counsel stated that the governor "gave the first executive order" on "March 10," which was to take effect on "March 13." (*Id.* at PageID.1810.)

[3] Plaintiffs indicate that "in March of 2020 when AAPS ceased in-person instruction and services due to the COVID-19 pandemic," A.S. was twelve years old, M.S. was nine years old, C.P. was ten years old, and H.P. was seven years old. (ECF No. 1, PageID.3–4.)

[4] In the complaint, Plaintiffs include the following information regarding the student Plaintiffs' eligibility "for special education *from AAPS*" (ECF No. 1, PageID.8, 10–11, 13 (emphasis added)):

4

Plaintiff has an Individualized Education Plan ("IEP"), which is the "primary mechanism" for ensuring that students with disabilities receive a FAPE.[5] (*Id.* at PageID.5; *see id.* at PageID.8, 10, 12, 14.) The

---

- "A.S. is eligible for special education from AAPS due to a specific learning disability. . . . A.S. struggles with focus, generally, and math calculations, specifically, and requires a high degree of individualized attention and instruction." (*Id.* at PageID.8.)

- "M.S. is eligible for special education from AAPS due to a health impairment arising from her medical diagnosis of attention deficit hyperactivity disorder ('ADHD') and her 'limited alertness to education.' . . . M.S. struggles with focus, generally, and reading, specifically . . . ." (*Id.* at PageID.10.)

- "C.P. is eligible for special education from AAPS due to a health impairment resulting in limited alertness to education. . . . C.P. struggles with reading, writing, perception, fine motor and gross motor skills, mobility, visual motor integration, receptive and expressive speech, and anxiety." (*Id.* at PageID.11–12.)

- "H.P. is eligible for special education from AAPS due to a health impairment arising from her medical diagnosis of [ADHD] and 'limited alertness to education.' . . . H.P. struggles with inattention, hyperactivity, impulsivity, learning and executive functioning problems, reading, writing, math, visual motor integration, social-emotional/behavioral skills, and sensory processing." (*Id.* at PageID.13.)

[5] Plaintiffs indicate in the complaint that

[a]n IEP is a written statement, prepared for every child with a disability, that sets forth the special education and related services, supplementary aids and services, and program modifications or supports to be provided to the child, or on behalf of the child, to enable that child to achieve a comprehensive set of annual goals and short-term objectives.

(ECF No. 1, PageID.5.)

student Plaintiffs' IEPs from 2019 or 2020 "state[ ] that 'the primary mode of service is directly working with the student'" but "do[ ] not state whether this mode will be in-person or virtual."[6] (*Id.* at PageID.8, 10, 12, 14.)

---

[6] The complaint provides the following details regarding each student Plaintiff's IEP and the services necessary to receive a FAPE:

- "According to A.S.'s October 28, 2019 IEP, A.S. received between fifty-three minutes and an hour and six minutes of resource room instruction per week. . . . A.S. requires direct resource room services to accommodate his disabilities so he can receive a FAPE." (ECF No. 1, PageID.8.)

- "According to M.S.'s February 12, 2020[ ] IEP, M.S. received twenty-thirty minutes of social work services three or four times a month, and one and a half to two and a half hours of resource room instruction for reading a week. . . . M.S. requires direct resource room services and direct social work services to accommodate her disability so she can receive a FAPE." (*Id.* at PageID.10.)

- "According to C.P.'s April 4, 2019 IEP, C.P. received three to four thirty-minute direct teacher consultant sessions a week, three thirty-minute direct occupational therapy sessions a month, three thirty-minute direct speech and language therapy sessions a month, and three thirty-minute direct social work sessions a month. . . . C.P.'s April 4, 2019 IEP requires direct teacher consultant services, occupational therapy, speech and language therapy, and social work services to accommodate his disability so he can receive a FAPE." (*Id.* at PageID.12.)

- "According to H.P.'s December 9, 2020 IEP, H.P. received three to four twenty-five-to-thirty-minute sessions of occupational therapy a month, three to four twenty-five-to-thirty-minute sessions of social work services a month, and seven and a half hours of resource room instruction per week. . . . H.P.'s December 9, 2020 IEP requires direct occupational therapy, direct social work services and direct resource room instruction to accommodate her disability so she can receive a FAPE." (*Id.* at PageID.13–14.)

6

With respect to the four student Plaintiffs, the complaint alleges:

61. On March 16, 2020, AAPS ceased all in-person education due to the COVID-19 pandemic.

62. As a result of the March 16, 2020 closure of AAPS schools, AAPS altered A.S.'s[, M.S.'s, C.P.'s, and H.P.'s] IEP[s] for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or the proper participation of parents.

63. The alterations and concomitant placement of A.S.[, M.S., C.P., and H.P.] at home receiving virtual instruction and services was procedurally defective because AAPS:

> a. Altered A.S.'s[, M.S.'s, C.P.'s, and H.P.'s] IEP[s] to complete virtual instruction without prior written notice or any written notice;
>
> b. Altered A.S.'s[, M.S.'s, C.P.'s, and H.P.'s] IEP[s] without the meaningful participation of [their] parents;
>
> c. Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing A.S.'s[, M.S.'s, C.P.'s, and H.P.'s] placement from in-person instruction and services to home placement with virtual instruction and services;
>
> d. Failed to ensure that A.S.[, M.S., C.P., and H.P.] could access a free and appropriate public education on the same level as [their] non-disabled peers.

64. During the 2019-2020 school year, from March 16, 2020 through June 12, 2020, A.S.[, M.S., C.P., and H.P.] attended school at home with virtual instruction and services.

7

65. During the 2020-2021 school year, A.S.[, M.S., and C.P.] attended school at home with virtual instruction [and/or services] until May of 2021 when AAPS offered a hybrid option.

* * *

107. During the 2020-2021 school year, H.P. attended school at home receiving virtual instruction and services until January of 2021 when her mother placed her in a private school.

(*Id.* at PageID.8–9, 15; *see id.* at PageID.10–14.)

In other words, Plaintiffs allege that the AAPS unilaterally changed the location and mechanism of the delivery of instruction and related services from at school/in person to at home/virtual during the 2019–2020 and 2020–2021 school years. Plaintiffs believe this change altered the student Plaintiffs' IEPs and educational placements and affected the student Plaintiffs' access to a FAPE.

Plaintiffs' complaint contains eight counts.[7] In Count 1, Plaintiffs allege that the WISD, AAPS, and MDE committed four "systemic violations" of the IDEA. (*Id.* at PageID.19–22.) In Count 2, Plaintiffs

---

[7] The complaint also contains "Class Action Allegations." (ECF No. 1, PageID.15.) Plaintiffs indicate that they "bring this action on behalf of themselves and all other similarly situated school aged children with disabilities covered by IDEA in Michigan and their parents, for the purpose of asserting the claims alleged in this complaint on a common basis." (*Id.*) Plaintiffs have not filed a motion for class certification, and this case has not been certified as a class action.

8

allege that "Defendants" violated Rules 300.324 and 300.518 of the Michigan Administrative Rules for Special Education ("MARSE"). (*Id.* at PageID.22–23.) In Count 3, Plaintiffs allege that the AAPS (and possibly the MDE) violated § 504 of the Rehabilitation Act. (*See id.* at PageID.23–25.) In Count 4, Plaintiffs allege that the AAPS (and possibly the MDE) violated Title II of the Americans with Disabilities Act ("ADA"). (*See id.* at PageID.25–27.) In Count 5, Plaintiffs allege that the AAPS (and possibly the MDE) violated the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"). (*See id.* at PageID.27.) In Count 6, Plaintiffs assert a claim under 42 U.S.C. § 1983 against "Defendants," alleging a Fourteenth Amendment equal protection violation. (*Id.* at PageID.28–29.) In Count 7, Plaintiffs allege that the individual Defendants (Swift, Fidishin, Menzel, Norman, and Rice) violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). (*See id.* at PageID.29–40.) In Count 8, Plaintiffs assert a RICO conspiracy claim against the individual Defendants. (*See id.* at PageID.40–41.) Plaintiffs allege that Defendants' actions caused them to suffer "damages, including regressions in skills and loss of

9

competencies regarding the goals and objectives outlined in their IEPs." (*Id.* at PageID.22; *see id.* at PageID.29, 40.)

Plaintiffs seek declaratory and injunctive relief. (*See id.* at PageID.2, 5, 41–43.) Plaintiffs also seek fees, costs, and expenses (including attorney fees). (*See id.* at PageID.42.) In the complaint's "Prayer for Relief," Plaintiffs ask that the Court:

1. Assert jurisdiction over this matter;

2. Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2)[;]

3. Issue a declaratory judgment that the class members' pendency placement is in-person instruction and services;

4. Issue a declaratory judgment that AAPS and other similarly situated LEAs' unilateral change of placement of plaintiffs from in-person instruction and services to virtual instruction and services violated the procedural safeguards of IDEA and discriminated against plaintiffs under IDEA, MARSE, § 504, the ADA, the [PWDCRA] and § 1983;

5. Issue a declaratory judgment that the MDE failed to monitor and provide proper oversight and resources to AAPS and other similarly situated LEAs during the COVID-19 pandemic as required under IDEA and MARSE;

6. Order the MDE, WISD, AAPS and other similarly situated LEAs to comply with the procedural safeguards guaranteed by IDEA for the 2021-2022 school year for the class members

unless the U.S. DOE [Department of Education] issues IDEA waivers;

7. Assign a Special Monitor to: a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEEs; b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents;

8. Require the MDE and its LEAs to comply with IDEA, MARSE, the ADA, § 504, the [PWDCRA] and § 1983 in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers;

9. Assign a RICO Special Monitor to: a) oversee the completion of an independent audit of defendants' expenditures of their IDEA Part B Funds from March of 2020 to the present; b) oversee the defendants' expenditures of their IDEA Part B Funds for the 2021-2022 school year to ensure defendants spend IDEA Part B Funds for instruction and/or services for students with disabilities under IDEA; c) ensure any IDEA Part B Funds that defendants spent on items other than instruction and/or services for students with disabilities under IDEA from March of 2020 through the present are reimbursed to a monitored account to be spent only upon review and approval by the RICO Special Monitor;

10. Declare plaintiffs to be the "substantially prevailing party" (for purposes of IDEA's fee shifting provision);

11. Grant leave to plaintiffs to submit a statutory fee application;

12. Direct defendants to pay for the costs and expenses for maintaining this action, including reasonable attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B);

13. Award attorneys' fees pursuant to the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. § 1988 and the Michigan Persons with Disabilities Civil Rights Act;

14. Retain jurisdiction over this action until such time as this Court is satisfied that the systemic violations of the laws and regulations complained of herein have been rectified; and

15. Grant such other or further relief that the Court may deem just and proper.

(*Id.* at PageID.41–43.)

During the January 27, 2022 hearing, Plaintiffs' counsel informed the Court that Plaintiffs are no longer pursuing Count 8. (*See* ECF No. 62, PageID.1831.) Following the hearing, the Court ordered Plaintiffs to indicate to the Court which counts remain in the case, given "Plaintiffs' counsel's acknowledgement at the oral argument that certain claims cannot be maintained in the Sixth Circuit, as well as counsel's indication that the Release and Settlement Agreements [discussed

below] fully redress Plaintiffs' injuries." (ECF No. 64, PageID.1857; *see* ECF No. 69, PageID.1873 & n.1 (stating that Plaintiffs' counsel indicated during the January 27, 2022 hearing "that the Release and Settlement Agreements fully redress Plaintiffs' injuries" and quoting relevant portions of the hearing transcript).) In a document filed on February 17, 2022, Plaintiffs provided the following information regarding the status of each count:

> **1. Count I:** The IDEA cause of action remains as to the systemic violations for named Plaintiffs and both the systemic and FAPE violations for putative class members. Plaintiffs continue to seek prospective, injunctive relief to prevent further systemic violations as set forth in Plaintiffs' Complaint.
>
> **2. Count II:** Plaintiffs voluntarily dismiss the MARSE Cause of Action in Count II as to State Defendants only.
>
> **3. Count III:** Plaintiffs voluntarily dismiss the Section 504 claim in Count III as to all Defendants.
>
> **4. Count IV:** The cause of action under the ADA remains as to the disparate impact of the COVID school closings.
>
> **5. Count V:** Plaintiffs voluntarily dismiss the PWDCRA claim under Count V as to State Defendants only.
>
> **6. Count VI:** Plaintiffs voluntarily dismiss the Section 1983 claim in Count VI as to all Defendants.

**7. Count VII:** Plaintiffs continue to seek prospective, injunctive relief for RICO violations outlined in Count VII.

**8. Count VIII:** Plaintiffs voluntarily dismiss Count VIII as to all Defendants.

(ECF No. 68, PageID.1868–1869 (emphasis in original).) Thus, the remaining counts in this case are Counts 1, 2, 4, 5, and 7 (but the claims in Counts 2 and 5 are no longer asserted against the State Defendants).

In addition to asking Plaintiffs to clarify which claims they continue to pursue, the Court gave Plaintiffs an opportunity—both during the hearing and after it had concluded—to address issues regarding the justiciability of this case under Article III. Plaintiffs had a chance to make arguments related to Article III justiciability orally (during the hearing) (*see* ECF No. 62, PageID.1800–1801, 1829–1830) as well as in writing (in a supplemental brief). (*See* ECF Nos. 69, 72.)

### B. Administrative Proceedings

The complaint states that the parent Plaintiffs "filed . . . administrative due process complaint[s] against defendants but did not exhaust their administrative due process remedies under 20 U.S.C. § 1415(i)(2), on behalf of A.S.[, M.S., C.P., and H.P.], because their claims

fall within the exceptions specified by law." (ECF No. 1, PageID.9, 11, 13, 15.)

Regarding the administrative due process complaints, the State Defendants indicate that Plaintiffs initially failed to comply with the requirement in MARSE Rule 340.1724f that a due process complaint (at the administrative level) be served on both the MDE and the school district because Plaintiffs served four letters that they "intended to be treated as due process complaints" on only the AAPS. (ECF No. 34, PageID.511.) The MDE received Plaintiffs' four proposed due process complaints on August 6, 2021. (*See id.*)

On January 11, 2022, the parties filed a joint update in this case regarding the outcome of the administrative proceedings. (ECF No. 54.) The parties indicate in their filing that

> [o]n August 9, 2021, Plaintiffs filed four due process complaints with the State of Michigan Office of Administrative Hearings and Rules against the Ann Arbor Public Schools ("AAPS"): *In the Matter of R.S.V*[.] *obo M.S.V. v. Ann Arbor Public Schools*, Docket No. 21-017885; *In the Matter of R.S.V. obo A.S.V. v. Ann Arbor Public Schools*, Docket No. 21-017893; *In the Matter of K.B. obo H.P. v. Ann Arbor Public Schools*, Docket No. 21-017895; and *In the Matter of K.B. obo C.P. v. Ann Arbor Public Schools*, Docket No. 21-017897. In November 2021, Plaintiffs and AAPS

15

entered into Release and Settlement Agreements in each of these matters. . . . Pursuant to these Release and Settlement Agreements, Administrative Law Judge Michael J. St. John entered Orders of Dismissal dismissing each matter with prejudice in November 2021.

(*Id.* at PageID.1427–1428.) Plaintiffs note in the parties' filing that each Release and Settlement Agreement contains the following language:

This Agreement does not set forth any understanding or settlement of any of the Student's allegations regarding procedural and systemic violations under IDEA, discrimination under the Americans with Disabilities Act, the Michigan Persons With Disabilities Civil Rights Act, Section 504 of the Rehabilitation Act or 42 U.S.C. [§] 1983, or violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").[8]

(*Id.* at PageID.1428.)

Copies of the four Release and Settlement Agreements and the four Orders of Dismissal are attached to the parties' filing as exhibits. (ECF Nos. 54-2, 54-3.) All four Agreements state: "[T]he Parents and the District voluntarily enter into this Agreement to resolve the disputes alleged in the Due Process Complaint regarding the Student's right to a FAPE under IDEA." (ECF No. 54-2, PageID.1433, 1439, 1446,

---

[8] This language does not mention Plaintiffs' MARSE claim, which they assert in Count 2 of the complaint against "Defendants." (ECF No. 1, PageID.22.)

16

1451.) Three of the Agreements address the provision of compensatory services.[9] (*See id*. at PageID.1434, 1440, 1446–1447.) Out of these three Agreements, two of them also provide that the AAPS will pay a certain sum[10] to the parents "as unrestricted funds for the benefit of the Student" and "to compensate Parents for out-of-pocket costs they have incurred for the Student's tutoring during the period when the Student was participating in virtual instruction." (*Id*. at PageID.1434, 1440.) The fourth Agreement—which does not address compensatory services—provides that the AAPS will pay $3,500 to the parents "as unrestricted funds for the benefit of the Student" and "to compensate

---

[9] Regarding the provision of compensatory services, the three Agreements provide that (1) the AAPS will evaluate the student to determine whether they need compensatory services to "address possible educational deficits sustained by the Student as a result of the District's transition to virtual instruction on and after March 2020," (2) the AAPS will convene an IEP to provide the results of its evaluation and will offer compensatory services if they are found to be necessary, (3) parents who disagree with the AAPS's evaluation may request an Independent Educational Evaluation ("IEE") at the AAPS's expense, (4) the AAPS will grant any request for an IEE and will reimburse parents for up to $3,000 for the IEE, (5) an IEP will be convened "as soon as possible after the IEE is concluded," and (6) parents reserve the right to file a new due process complaint if the IEE recommends compensatory services but that recommendation is not implemented by the IEP team that meets after the IEE is completed. (ECF No. 54-2, PageID.1434, 1440, 1446–1447.)

[10] One Agreement provides that the AAPS will pay $500 to the parents. (*See* ECF No. 54-2, PageID.1434.) The second Agreement provides that the AAPS will pay $1,000 to the parents. (*See id*. at PageID.1440.)

Parents for tuition expenses incurred by the Parents as a result of the Student's enrollment in private school."[11] (*Id.* at PageID.1452.)

In his November 2021 orders dismissing with prejudice the four administrative matters identified above, Administrative Law Judge St. John notes that the parties "requested that the hearing in . . . [each] matter be dismissed." (ECF No. 54-3, PageID.1457, 1459, 1461, 1463.) The order issued in each matter states that because of the dismissal with prejudice, "we have removed this case from our formal hearing docket, cancelled the prehearing . . . and the hearing . . . and are closing our file in this matter." (*Id.*)

## II.   Legal Standard

"Under Article III of the Federal Constitution, [federal courts] can only decide 'Cases' or 'Controversies.'" *Thompson v. DeWine*, 7 F.4th 521, 523 (6th Cir. 2021) (alteration added) (quoting U.S. Const. art. III, § 2). "Courts have explained the 'case or controversy' requirement

---

[11] During the hearing on January 27, 2022, Plaintiffs' counsel agreed with counsel for the AAPS Defendants that the "four plaintiffs have gotten compensatory services" and monetary compensation as part of the settlement of the administrative proceedings. (ECF No. 62, PageID.1797; *see id.* at PageID.1801, 1815, 1818, 1830.) Plaintiffs' counsel indicated that "[t]he FAPE for the named clients is resolved now for the closures that occurred prior to this year." (*Id.* at PageID.1815; *see id.* at PageID.1817–1818, 1830.) Plaintiffs' counsel also indicated that there have been no "compliance problems" with the Release and Settlement Agreements. (*See id.* at PageID.1778.)

through a series of 'justiciability doctrines,' including, 'perhaps the most important,' that a litigant must have 'standing' to invoke the jurisdiction of the federal courts." *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). "Standing 'goes to [a c]ourt's subject matter jurisdiction.'" *Marks v. Schafer & Weiner, PLLC*, No. 20-11059, 2022 WL 866836, at *5 (E.D. Mich. Mar. 23, 2022) (alteration in original) (quoting *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007)). "If a plaintiff cannot establish constitutional standing, his or her claim must be dismissed for lack of subject matter jurisdiction." *Id.* (citing *Loren*, 505 F.3d at 607); *see Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) (stating that "whether a party lacks 'Article III standing is jurisdictional and not subject to waiver'" (quoting *LPP Mortg., Ltd. v. Brinley*, 547 F.3d 643, 647 (6th Cir. 2008))).

The Sixth Circuit states that

[t]o establish standing, [the plaintiff] must meet three requirements: (1) "injury in fact—a harm that is both [(a)] concrete [and particularized,] and [(b)] actual or imminent, not conjectural or hypothetical," (2) causation—a "fairly traceable connection between the alleged injury in fact and

19

the alleged conduct of the defendant," and (3) "redressability—a substantial likelihood that the requested relief will remedy the alleged injury in fact."

*Babcock v. Michigan*, 812 F.3d 531, 539 (6th Cir. 2016) (alterations added) (quoting *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020); *see Sullivan v. Benningfield*, 920 F.3d 401, 407–08 (6th Cir. 2019) ("'In the context of claims for injunctive or declaratory relief,' the threatened injury in fact must be 'concrete and particularized,' as well as 'actual and imminent, not conjectural or hypothetical[.]'" (alteration in original) (quoting *Sumpter v. Wayne Cty.*, 868 F.3d 473, 491 (6th Cir. 2017))). "Each requirement is 'an indispensable part of the plaintiff's case' and 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof.'" *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 461 (6th Cir. 2007) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Whether a plaintiff has standing to sue is 'determined as of the time the complaint is filed.'" *Sullivan*, 920 F.3d at 407 (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001)).

Regarding the first standing requirement of an injury in fact, "[a] concrete injury is . . . 'real and not abstract,'" *Buchholz*, 946 F.3d 861 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)), and "must actually exist." *Spokeo, Inc.*, 578 U.S. at 340 (internal citation omitted). "To qualify as particularized, an injury 'must affect the plaintiff in a personal and individual way,' *Lujan*, 504 U.S. at 560 n.1, . . . not in a general manner that affects the entire citizenry, *Lance v. Coffman*, 549 U.S. 437, 439 . . . (2007)."[12] *Gerber v. Herskovitz*, 14 F.4th 500, 506 (6th Cir. 2021), *cert. denied sub nom. Brysk v. Herskovitz*, 142 S. Ct. 1369 (2022), and *cert. denied*, No. 21-1263, 2022 WL 1528419 (U.S. May 16, 2022). "Standing can exist even if the alleged injury 'may be difficult to prove or measure.'" *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 886 (E.D. Mich. 2019) (quoting *Spokeo, Inc.*, 578 U.S. at 341–42).

---

[12] That Plaintiffs bring this case as a putative class action does not excuse them from the requirement to allege a particularized injury for purposes of Article III standing. "A potential class representative must demonstrate individual standing." *Thompson v. Love's Travel Stops & Country Stores, Inc.*, 748 F. App'x 6, 10 (6th Cir. 2018) (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)). And "'named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011) (quoting *Lewis v. Casey*, 518 U.S. 343, 347 (1996)).

"The threat of future harm can satisfy th[e injury-in-fact] requirement as long as there is a 'substantial risk' that the harm will occur," but "'[a]llegations of *possible* future injury' are not sufficient." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (second alteration in original) (emphasis in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). "[A] yet-to-happen 'injury must be *certainly impending* to constitute injury in fact[.]'" *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 545 (6th Cir. 2021) (emphasis in original) (quoting *Clapper*, 568 U.S. at 409). "The Supreme Court has noted that 'a highly attenuated chain of possibilities [ ] does not satisfy the requirement that threatened injury must be certainly impending.'" *Kanuszewski*, 927 F.3d at 405–06 (alteration in original) (quoting *Clapper*, 568 U.S. at 410).

The type of harm alleged—(1) past harm or (2) ongoing or future harm—"affects the type of relief available," so "[t]he distinction between [these] harms is significant." *Id.* at 406. The Sixth Circuit instructs that

> [p]ast harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief. This is because the fact that a harm occurred in the past "does nothing to establish a real and immediate threat that"

22

> it will occur in the future, as is required for injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 106, 103 S. Ct. 1660, 75 L.Ed.2d 675 (1983). Obtaining standing for declaratory relief has the same requirements as obtaining standing for injunctive relief. *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("When seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review.").

*Id.*; *see Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 540 (stating that "a completed injury may give a plaintiff the right to seek damages, [but] it does not alone give the plaintiff the right to seek an injunction" (citing *Lyons*, 461 U.S. at 109)); *Sullivan*, 920 F.3d at 408 ("'Past exposure to illegal conduct' is insufficient to demonstrate an injury in fact that warrants declaratory or injunctive relief unless the past injury is accompanied by 'continuing, present adverse effects.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *Grendell v. Ohio Sup. Ct.*, 252 F.3d 828, 832 (6th Cir. 2001))).

As for the second requirement of standing, "[c]ausation exists if the injury is one 'that fairly can be traced to the challenged action of the defendant.'" *Gamboa*, 381 F. Supp. 3d at 886 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976)). Causation in this context is

"'not focused on whether the defendant "caused" the plaintiff's injury in the liability sense; the plaintiff need only allege "injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'"' *Id.* (quoting *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009)).

To meet the third requirement of standing involving redressability, "it must be *likely*, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Amiri v. Nielsen*, 328 F. Supp. 3d 761, 767 (E.D. Mich. 2018) (emphasis in original) (quoting *Lujan*, 504 U.S. at 561). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Glennborough Homeowners Ass'n*, 21 F.4th at 417 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)). "[A] 'remedy must be "limited to the inadequacy that produced [a plaintiff's] injury in fact."'" *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 540 (second alteration in original) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018)). To demonstrate redressability for purposes of Article III standing,

24

[t]he plaintiff must show that each requested remedy will redress some portion of the plaintiff's injury. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53, 126 S. Ct. 1854, 164 L.Ed.2d 589 (2006). Conversely, the plaintiff cannot seek a remedy that has no ameliorative effects on that injury. *See California*, 141 S. Ct. at 2116. While, for example, a completed injury may give a plaintiff the right to seek damages, it does not alone give the plaintiff the right to seek an injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S. Ct. 1660, 75 L.Ed.2d 675 (1983). Likewise, a plaintiff cannot "combin[e] a request for injunctive relief for which he *has* standing with a request for injunctive relief for which he *lacks* standing." *Salazar v. Buono*, 559 U.S. 700, 731, 130 S. Ct. 1803, 176 L.Ed.2d 634 (2010) (Scalia, J., concurring in the judgment); *see Lewis*, 518 U.S. at 357, 116 S. Ct. 2174.

*Id.* (second alteration in original) (emphasis in original).

"The plaintiff carries the burden of establishing th[e] three elements" of standing, *Buchholz*, 946 F.3d at 861, as "the part[y] invoking federal jurisdiction." *Kanuszewski*, 927 F.3d at 405 (citing *Shearson v. Holder*, 725 F.3d 588, 592 (6th Cir. 2013)). Regarding this burden, the Sixth Circuit states:

A plaintiff must demonstrate standing for each claim she seeks to press and for each form of relief she seeks. *Id.* at 2208. At the pleading stage, that burden requires a "plaintiff[ ] to clearly allege facts that demonstrate each element of standing." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (citing *Spokeo,*

25

> *Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194
> L.Ed.2d 635 (2016)); *see also Ward v. Nat'l Patient Acct.*
> *Servs. Sols., Inc.*, 9 F.4th 357, 363 (6th Cir. 2021) (requiring
> the plaintiff to "clearly assert in his complaint" the harm he
> suffered from an underlying legal violation). This standard
> aligns with the one governing motions to dismiss under
> Federal Rule of Civil Procedure 12(b)(6), meaning the
> [plaintiff] cannot rely on general or conclusory allegations in
> support of its standing, but instead must assert a plausible
> claim for why it has standing to pursue its . . . claim. *Ass'n of*
> *Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 544 (6th
> Cir. 2021).

*Glennborough Homeowners Ass'n*, 21 F.4th at 414 (first alteration in

original); *see Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016)

("Conclusory allegations do not satisfy the requirements of Article III."

(citing *Warth v. Seldin*, 422 U.S. 490, 508 (1975))).

## III.  Analysis

In their motion to dismiss, the AAPS Defendants argue that

student Plaintiff H.P. lacks standing to bring any claims because H.P.'s

parents switched her from a public school to a private school in January

2021. For the reasons set forth below, the Court finds that Plaintiffs fail

to show that they have Article III standing with respect to all of their

remaining claims (not just the ones asserted by H.P.). Plaintiffs'

allegations are insufficient to establish standing as to the relief they seek in Counts 1, 2, 4, and 5, and as to their RICO claim in Count 7.

## A. The Parties' Arguments Regarding Article III Standing

The AAPS Defendants argue that H.P.'s claims should be dismissed because H.P. does not have standing to bring a claim for compensatory services given that she is "no longer enrolled in the District." (ECF No. 34, PageID.523; *see id.* at PageID.524.) The AAPS Defendants indicate that since January 2021, H.P. has been "attend[ing] the Daycroft Montessori School, a private program located within the Dexter Community School District." (*Id.* at PageID.509, 523 (citing ECF No. 36, PageID.598, Fidishin Decl., ¶ 28).) The AAPS Defendants state that "students who have been voluntarily placed in a private program do not have an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." (*Id.* at PageID.523 (citing 34 C.F.R. § 300.137).) The AAPS Defendants also state that "[a] student with a disability parentally placed in a non-public school is not entitled to

FAPE, ESY [Extended School Year[13]] services or compensatory education services." (*Id.* (citing ECF No. 36, PageID.598, Fidishin Decl., ¶ 30).) The AAPS Defendants note that H.P. "has not been re-enrolled in the District." (*Id.* at PageID.524 (citing ECF No. 36, PageID.599, Fidishin Decl., ¶ 32).)

In their response to the AAPS Defendants' motion to dismiss, Plaintiffs argue that "H.P. has standing to pursue compensatory services for the AAPS[ ] Defendants['] violation of IDEA procedural safeguards." (ECF No. 46, PageID.1146.) Plaintiffs reference a United States Supreme Court case called *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 367 (1985), and a Second Circuit case called *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 531 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1075 (2021), *reh'g denied*, 141 S. Ct. 1530 (2021). (*See* ECF No. 46, PageID.1146.) But Plaintiffs do not explain how these cases apply. (*See id.*)

From what the Court can tell from its own review of the cases, neither case cited by Plaintiffs addresses the issue of standing. In *Sch.*

---

[13] According to the AAPS Defendants, Extended School Year "is a service offered to students who may regress in their educational skills without additional education during the summer." (ECF No. 34, PageID.502; *see* ECF No. 36, PageID.594–595.)

*Comm. of Town of Burlington, Mass.*, the Supreme Court considered the retroactive reimbursement to parents for private school tuition and related expenses when a court determines that the parents' private school placement was proper and "that an IEP calling for placement in a public school was inappropriate." 471 U.S. at 370. In *Ventura de Paulino*, the Second Circuit considered (1) "whether under the 'stay-put' provision of the IDEA parents [of a child enrolled in a private school] who unilaterally enroll their child in a new private school and challenge the child's IEP are entitled to public funding for the new school during the pendency of the IEP dispute" if "the educational program being offered at the new school is substantially similar to the program that was last agreed upon by the parents and the school district and was offered at the previous school"; and (2) "whether the fact that the school district has authority to decide how the child's agreed-upon educational program is to be provided during the pendency of an IEP dispute means that the parents also have such authority." 959 F.3d at 524–25.

In their reply, the AAPS Defendants argue that because Plaintiffs' counsel "concede that HP is no longer enrolled in the District," counsel "are forced to pivot and state that they are now seeking the previously

unpled remedy of reimbursement for private school tuition for this student." (ECF No. 49, PageID.1230 (citing ECF No. 46, PageID.1146).) The AAPS Defendants indicate that Plaintiffs filed an amended due process complaint (at the administrative level) on September 21, 2021 that "sought tuition reimbursement rather than the remedies set forth in HP's original due process complaint."[14] (*Id.* at PageID.1231 n.7 (citing ECF No. 50, PageID.1236, Fidishin Supplemental Decl., ¶ 9; ECF No. 50-8).) The AAPS Defendants state that "[n]o leave to amend has been sought here." (*Id.*) The AAPS Defendants are correct that Plaintiffs have not requested permission to amend the complaint in this case to seek tuition reimbursement.

### B. Plaintiffs' Standing Under Article III

In their filings, Plaintiffs and the AAPS Defendants do not address the requirements for standing under Article III. "Because standing doctrine comes from Article III's case-or-controversy requirement, it is jurisdictional and must be addressed as a threshold

---

[14] One of the Release and Settlement Agreements discussed above provides that the AAPS will pay the parents of a student $3,500 "to compensate Parents for tuition expenses incurred by the Parents as a result of the Student's enrollment in private school." (ECF No. 54-2, PageID.1452.) During the January 27, 2022 hearing, Plaintiffs' counsel agreed that H.P.'s parents received "some tuition reimbursement" through the settlement at the administrative level. (ECF No. 62, PageID.1830.)

matter." *Kanuszewski*, 927 F.3d at 405 (citing *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017)). In light of this guidance from the Sixth Circuit, the Court considers whether Plaintiffs—not just student Plaintiff H.P.—have standing to pursue their remaining claims and the relief they seek as to each claim.

As noted, Plaintiffs in this case seek declaratory and injunctive relief. (*See* ECF No. 1, PageID.2, 5, 41–43.) Plaintiffs state in their complaint filed on June 30, 2021 that they "were denied their rights under [certain state and federal laws] for the 2019-2020 and 2020-2021 school years by defendants" and that they "seek declaratory and injunctive relief to enjoin defendants from violating their procedural and substantive rights under [these laws]." (*Id.* at PageID.2.) The Court now considers whether each of Plaintiffs' claims independently meets the requirements of standing and "whether the alleged harm [in each claim] affords Plaintiffs standing to seek injunctive and declaratory relief[.]" *Kanuszewski*, 927 F.3d at 406.

### i. Count 1: Systemic Violations of the Individuals with Disabilities Education Act ("IDEA")

In Count 1, Plaintiffs allege that the WISD, AAPS, and MDE committed "systemic violations" of the IDEA. (ECF No. 1, PageID.19–

31

22.) The alleged systemic violations involve (1) the WISD's and AAPS's failure to give Plaintiffs prior written notice of school closures and alterations of the student Plaintiffs' IEPs and school placements, (2) the WISD's and AAPS's failure to maintain the student Plaintiffs' pendency placements and to ensure that "the parents of each child with a disability" were part of any IEP team that made decisions on educational placement in March 2020, (3) the AAPS's failure to "reconvene IEP Team Meetings to change [the student P]laintiffs' IEP[s] to provide for complete virtual instruction and services," and (4) "Defendants[']"[15] failure to ensure that "children with disabilities had appropriate access to the same educational opportunities as their non-disabled peers." (*Id.* at PageID.20–22.) Plaintiffs also allege that the MDE "failed to appropriately monitor and conduct oversight of its LEAs, including the WISD and AAPS, to ensure they complied with IDEA's procedural safeguards upon the March 2020 closing of its schools." (*Id.* at PageID.20–21.)

---

[15] "Defendants" appears to refer to the WISD, AAPS, and MDE because those Defendants are mentioned in the paragraph immediately preceding the one quoted above. (*See* ECF No. 1, PageID.21–22, ¶¶ 150–151.)

Plaintiffs state in Count 1 that "Defendants' actions have caused plaintiffs' damages, including regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs." (*Id.* at PageID.22.) Plaintiffs state that they seek relief under the IDEA that includes "injunctive relief declaring that the class members' pendency placement is in-person instruction and requiring the MDE and its LEAs to comply with IDEA in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers." (*Id.* at PageID.21.)

Plaintiffs have alleged an injury in fact in Count 1 because they allege that they were deprived of their rights under the IDEA and suffered "regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs." (*Id.* at PageID.22.) But Plaintiffs lack standing to pursue a claim for declaratory or injunctive relief in Count 1 because they do not allege ongoing or future harm. There is no indication in Plaintiffs' complaint that the alleged IDEA violations or the regressions in skills and loss of competencies are an actual or continuing harm, and Plaintiffs do not allege that they face a "substantial risk" of future harm. *Kanuszewski*, 927 F.3d at 405.

Plaintiffs state that they seek relief "in the event of any future school closures" (ECF No. 1, PageID.21); however, Plaintiffs do not allege that future school closures are a real or immediate threat.

Instead of relating to actual or future harm, Plaintiffs' allegations relate to past violations and injuries from the two school years that preceded the filing of their complaint. Plaintiffs' allegations involve the AAPS's closure in March 2020 and the "alteration of [the student P]laintiffs' IEPs and school placements from in-person instruction and services to virtual instruction or [sic] services," among other challenged acts (or failures to act) related to the March 2020 closure. (*Id.* at PageID.20; *see id.* at PageID.21–22.) Moreover, Plaintiffs do not allege that the student Plaintiffs were receiving solely virtual instruction and services when the complaint was filed on June 30, 2021. Instead, Plaintiffs indicate in the complaint that A.S., M.S., and C.P. received virtual instruction and/or services at home *until May 2021*, when the AAPS offered a hybrid option (*see id.* at PageID.9, 11, 13), and that H.P. received virtual instruction and services at home "*until January of 2021 when her mother placed her in a private school.*" (*Id.* at PageID.15 (emphasis added).) Because Plaintiffs allege past harm in Count 1, they

do not have standing to pursue declaratory or injunctive relief with respect to their IDEA claim in this count.

> ## ii. Count 2: Rules 300.324 and 300.518 of the Michigan Administrative Rules for Special Education ("MARSE")

In Count 2, titled "Violation of MARSE § 300.324," Plaintiffs allege that "defendants[16] failed to provide plaintiffs procedural safeguards upon the termination of in-person instruction in March of 2020." (*Id.* at PageID.22.) Plaintiffs allege that "Defendants" violated "§ 300.518 of MARSE"[17] by "fail[ing] to comply with the procedural

---

[16] Plaintiffs voluntarily dismissed their MARSE claim in Count 2 as to the State Defendants. (*See* ECF No. 68, PageID.1868.) As for the AAPS, the Release and Settlement Agreements between Plaintiffs and the AAPS do not indicate that the Agreements have no impact on Plaintiffs' MARSE claim (*see* ECF No. 54), so it is unclear whether Plaintiffs continue to assert this claim against the AAPS.

[17] The Court notes that Plaintiffs fail to reference an existing MARSE Rule in the complaint. The MARSE's first rule is "MARSE R 340.1701 Assurance of compliance." *Michigan Administrative Rules for Special Education (MARSE) With Related IDEA Federal Regulations*, Michigan Department of Education Office of Special Education (July 19, 2022), https://www.michigan.gov/documents/mde/MARSE_Supplemented_with_IDEA_Regs_379598_7.pdf; *see Perez, Next Friend of Perez v. Sturgis Pub. Schs.*, No. 1:18-cv-1134, 2019 WL 8105854, at *2 (W.D. Mich. June 20, 2019) (citing the MARSE as "MARSE Rules 340.1701, [ ]*et seq.*"), *report and recommendation adopted sub nom. Perez, next friend of Perez v. Sturgis Pub. Schs.*, No. 1:18-cv-1134, 2019 WL 6907138 (W.D. Mich. Dec. 19, 2019), *aff'd sub nom. Perez v. Sturgis Pub. Schs.*, 3 F.4th 236 (6th Cir. 2021). Therefore, it appears that the portions of the MARSE that Plaintiffs cite—Rules 300.324 and 300.518—do not exist.

requirements for prior written notice, educational placements, pendency placements, IEP Team Meetings and equal access to instruction and services for plaintiffs." (*Id.*) Plaintiffs state that "Defendants' actions caused plaintiffs' damages, including regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs."

---

In their response to the WISD Defendants' motion to dismiss, Plaintiffs do not contest that their references to the MARSE are incorrect. (*See* ECF No. 44, PageID.1023 n.1.) Plaintiffs state in footnote 1 of their response that the

> WISD points out that Plaintiffs mistakenly cited MARSE 300.324 and 300.518 in its heading for Count Two of their Complaint. Plaintiffs will file an Amended Complaint to correct the heading and any other incorrect citations to MARSE after the hearing on all defendants' motions to dismiss if granted leave to do so by Judge Levy.

(*Id.*) During the hearing on January 27, 2022, Plaintiffs' counsel indicated that Count 2 involves "MARSE Rule 340.1701, MARSE Rule 340.1701 A, B, C." (ECF No. 62, PageID.1825.) But as of the date of this opinion and order, Plaintiffs have not sought leave to amend the complaint to correct their references to the MARSE in Count 2.

Despite this defect in Plaintiffs' complaint, the Court conducts a standing analysis as to Plaintiffs' MARSE claim in Count 2 as if Plaintiffs had referenced an actual MARSE rule because the "standing analysis does not consider the merits of Plaintiffs' claims." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 407 (6th Cir. 2019); *see Warth v. Seldin*, 422 U.S. 490, 500 (1975) (stating that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal" (citing *Flast v. Cohen*, 392 U.S. 83, 99 (1968))); *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) ("[O]ne must not 'confus[e] weakness on the merits with absence of Article III standing.'" (second alteration in original) (quoting *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011); citing *Warth*, 422 U.S. at 500)). Even if Plaintiffs had referenced existing portions of the MARSE, their allegations in Count 2 do not give them standing to seek declaratory or injunctive relief as to their MARSE claim, as discussed above.

36

(*Id.*) Plaintiffs indicate in Count 2 that they seek various forms of declaratory and injunctive relief.[18] (*See id.* at PageID.22–23.)

Plaintiffs do not have standing to pursue declaratory or injunctive relief with respect to their MARSE claim in Count 2. Plaintiffs have alleged an injury: violations of their rights under the MARSE, *see supra*

---

[18] Plaintiffs' request for relief in Count 2 is as follows:

All class members seek injunctive relief requesting that the Court: 1) Issue a declaratory judgment that the class members' pendency placement is in-person instruction and services; 2) Issue a declaratory judgment that AAPS and other similarly situated LEAs' unilateral change of placement of plaintiffs from in-person instruction and services to virtual instruction and services violated the procedural safeguards of MARSE; 3) Issue a declaratory judgment that the MDE failed to monitor and provide proper oversight and resources to AAPS and other similarly situated LEAs during the COVID-19 pandemic as required under IDEA and MARSE; 4) Order the MDE and AAPS and other similarly situated LEAs to comply with the procedural safeguards guaranteed by MARSE for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers; 5) Assign a Special Monitor to: a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEEs; b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents; and 6) Require the MDE and AAPS and other similarly situated LEAs to comply with MARSE in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers.

(ECF No. 1, PageID.22–23.)

note 17, and regressions in skills and loss of competencies regarding the goals and objectives in their IEPs. "However, [Plaintiffs] cannot seek prospective relief because they do not allege a real or immediate threat that [Defendants] will repeat the alleged violation." *Kanuszewski*, 927 F.3d at 408. Plaintiffs also cannot seek prospective relief because they do not allege an ongoing or continuing harm. Because the injury alleged in Count 2 took place in the past (i.e., "upon the termination of in-person instruction in March of 2020" (ECF No. 1, PageID.22)), Plaintiffs do not have standing to seek declaratory or injunctive relief as to their MARSE claim in Count 2.

### iii. Count 4: Title II of the Americans with Disabilities Act ("ADA")

In Count 4, Plaintiffs allege that the AAPS (and possibly the MDE) violated Title II of the ADA. Plaintiffs state that "[t]he MDE and its LEAs are public entities forbidden to discriminate based on disability." (*Id.* at PageID.26 (citing 42 U.S.C. § 12132).) Plaintiffs state that the AAPS's

> closure of in-person instruction in March of 2020 discriminated against plaintiffs as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource

38

room services, by denying them equal access and otherwise limiting their access to education, programs, and services as compared to their non-disabled peers. 34 C.F.R. §§ 104.4(a), 104.4(b)(ii) and (iv).

(*Id.* at PageID.26–27.) The last sentence in Count 4 states that "[a]s a proximate cause of these violations of Title II of the Americans with Disabilities Act, plaintiffs have suffered harm as set forth above."[19] (*Id.* at PageID.27.) Plaintiffs allege in Count 6 (their now-voluntarily-dismissed equal protection claim brought under § 1983) that "Defendants' closure of schools in March of 2020 resulted in a disparate impact on plaintiffs due to their disabilities in violation of the ADA." (*Id.* at PageID.29.)

Plaintiffs do not specify an injury in Count 4. Nor do they specify the relief they seek in this count. To the extent Plaintiffs' allegation of "harm as set forth above" intends to reference their prior allegation that

---

[19] Plaintiffs' general allegation in Count 4 that they suffered "harm as set forth above" lacks the specificity required for Plaintiffs to show that the first requirement of standing—injury in fact—is met. *See Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021); *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016); *Warth v. Seldin*, 422 U.S. 490, 508 (1975). This allegation of "harm as set forth above" appears in Count 5 as well. (*See* ECF No. 1, PageID.27.) Even if the Court considers the possible harms "set forth above" that Plaintiffs may be referring to in Counts 4 and 5 and finds that Plaintiffs have alleged an injury in fact, Plaintiffs lack standing to seek declaratory and injunctive relief as to their claims in Counts 4 and 5, as discussed above.

Plaintiffs suffered "regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs" (*id.* at PageID.22), this allegation of harm does not give Plaintiffs standing to pursue declaratory or injunctive relief for their ADA claim in Count 4 for the reasons discussed above. To the extent Plaintiffs' reference to "harm as set forth above" intends to reference Plaintiffs' allegations of discrimination or disparate impact[20] resulting from a violation of the ADA, those allegations do not give Plaintiffs standing to pursue declaratory or injunctive relief as to their claim in Count 4 either because the allegations of discrimination and disparate impact relate to the AAPS's closure in March 2020, which took place over two years ago. Plaintiffs make no allegation of ongoing or future harm in Count 4, so they lack standing to pursue declaratory or injunctive relief as to their ADA claim in that count.

---

[20] In Count 4, Plaintiffs allege that they "suffered harm as set forth *above*." (ECF No. 1, PageID.27 (emphasis added).) Plaintiffs' allegation regarding disparate impact appears in a *later* portion of the complaint and in a *subsequent* count. (*See id.* at PageID.29.) Even if the Court considers disparate impact as an alleged harm in Count 4, Plaintiffs lack standing to pursue declaratory or injunctive relief for their ADA claim in that count, as set forth above.

> ### iv. Count 5: Michigan Persons with Disabilities Civil Rights Act ("PWDCRA")

In Count 5, Plaintiffs allege that the AAPS (and possibly the MDE) violated the PWDCRA. Plaintiffs state that under the PWDCRA, "the MDE and its LEAs" are "educational institutions" that are prohibited from discriminating against people with disabilities. (*Id.* at PageID.27 (internal citation omitted).) Plaintiffs state that the AAPS's

> closure of in-person instruction in March of 2020 discriminated against plaintiffs as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource room services, by denying them equal access and otherwise limiting their access to education, programs and services as compared to their non-disabled peers. M.C.L. § 37.1402.

(*Id.*) Plaintiffs state that "[a]s a proximate cause of these violations of the Michigan Persons with Disabilities Act [sic], plaintiffs have suffered harm as set forth above." (*Id.*) *See supra* note 19.

In Count 5, Plaintiffs do not clearly allege an injury or the relief they seek as to their PWDCRA claim. Plaintiffs' injury in Count 5 is potentially them suffering unlawful discrimination under the PWDCRA, as well as the regressions in skills and loss of competencies alleged in their previous counts. These injuries (assuming Plaintiffs

41

intended to allege them) do not give Plaintiffs standing to seek the declaratory and injunctive relief they request in the complaint. Plaintiffs state that the PWDCRA violation took place in March 2020, and the regressions in skills and loss of competencies from the prior two school years are not alleged to be an actual or future harm. Therefore, Plaintiffs do not have standing to pursue declaratory or injunctive relief as to their PWDCRA claim in Count 5.

### v. *Count 7: Racketeer Influenced and Corrupt Organizations Act ("RICO")*

In Count 7, Plaintiffs allege a RICO violation. Plaintiffs indicate in the complaint that Count 7 is "[a]gainst [the] Individual Defendants." (ECF No. 1, PageID.29.) Plaintiffs state that their RICO claim

> arises from a scheme by individual defendants Swift, Fidishin, Menzel, Norman and Rice, in their official capacities, to fraudulently use their enterprises—AAPS, WISD and MDE respectively—to defraud plaintiffs, the beneficiaries of IDEA Part B [funds], of millions of dollars by making false assurances that the MDE and its LEAs complied with IDEA during the COVID-19 pandemic.

(*Id.* at PageID.29, 31; *see id.* at PageID.30.) Beneath a heading titled "The Racketeering Violation," Plaintiffs allege that

> [f]rom March of 2020 through the present, each individual RICO defendant knowingly and intentionally engaged in an

42

ongoing pattern of racketeering activity under 18 U.S.C. § 1962(c) by committing the predicate acts of wire fraud and mail fraud . . . . The fraudulent schemes involved using the interstate wires to defraud plaintiffs, the beneficiaries of IDEA Part B Funds, of their procedural and substantive rights.

(*Id.* at PageID.32.) The "interstate wires" consist of "electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343." (*Id.* at PageID.33–35, 38.)

Regarding the "false assurances" referenced above, Plaintiffs allege that Swift, Fidishin, Menzel, Norman, and Rice made assurances in 2019 and/or 2020 to the WISD, MDE, or U.S. DOE indicating that (1) the AAPS, WISD, or MDE had "policies and procedures in place as required by Part B of the [IDEA]," and (2) "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR[ ]§ 300.121."[21] (*Id.* at PageID.32–37.) Plaintiffs

---

[21] Plaintiffs allege that Swift and Fidishin (from the AAPS) made these assurances to the WISD (*see* ECF No. 1, PageID.32–33), that Menzel and Norman (from the WISD) made these assurances to the MDE (*see id.* at PageID.34), and that Rice (from the MDE) made these assurances to the U.S. DOE. (*See id.* at PageID.35–37.) Plaintiffs do not specify how Swift, Fidishin, Menzel, and Norman

further allege that in 2019 and 2020, Rice "assured the U.S. DOE, via

mail fraud through interstate commerce," that

> [t]he Chief Executive Officer of a State or designee of the
> officer shall ensure that an interagency agreement or other
> mechanism for interagency coordination is in effect between
> each public agency described in subparagraph (b) of 34 CFR
> § 300.154 and the State education agency, in order to ensure
> that the services described in paragraph (b)(1)(i) that are
> needed to ensure a free appropriate public education are
> provided, include the provision of such services during the
> *pendency* of any dispute under § 300.154(a)(3).

(*Id.* at PageID.36–37 (emphasis in original) (internal citation and

quotation marks omitted).)

Plaintiffs state that the individual Defendants' assurances were

false because "[c]ontrary to the[ir] . . . assurances, the MDE, the WISD

and AAPS did not":[22] (1) "give plaintiffs prior written notice of its

closure of schools and alteration of plaintiffs' IEPs and school

placements from in-person instruction and services to virtual

---

communicated the assurances, but Plaintiffs state that the "interstate wires" used
by these Defendants include "electronic messages." (*Id.* at PageID.32–35.) Plaintiffs
allege that Rice made the assurances "via mail fraud through interstate commerce."
(*Id.* at PageID.35–37.)

[22] The Court notes that the allegations that follow relate to the failure of the
MDE, WISD, and AAPS to do certain things; Plaintiffs do not mention the
individual Defendants in making these allegations.

instruction or [sic] services during the COVID-19 pandemic," (2) "ensure that the parents of each child with a disability were included as members of any IEP Team that made decisions on the educational placement of their children during the COVID-19 pandemic," (3) "maintain plaintiffs' pendency placement through in-person instruction during the COVID-19 pandemic," and (4) "reconvene IEP Team Meetings to change plaintiffs' IEPs to provide for complete virtual instruction and services during the COVID-19 pandemic." (*Id.* at PageID.38–39.)

Plaintiffs allege that the MDE collected IDEA Part B funds from the U.S. DOE "via wire fraud through interstate commerce." (*Id.* at PageID.36–37.) Plaintiffs allege that Rice "collected" "interstate wires" (i.e., "electronic messages" and "federal funds through the interstate banking system") in 2019 and 2020 and that he continues to collect them "to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by the MDE." (*Id.* at PageID.38.) Plaintiffs allege that IDEA Part B funds traveled "via wire fraud through interstate commerce" from the U.S. DOE to the MDE, "by wire" from the MDE to

the WISD, and "by wire" from the WISD to the AAPS. (*Id.* at PageID.36–38.) Plaintiffs allege that the AAPS then used the IDEA Part B funds "for unlawful purposes, including but not limited to purchasing personal protective equipment for all staff and students." (*Id.* at PageID.38.)

As noted, Plaintiffs state that "[f]rom March of 2020 through the present, each individual RICO defendant knowingly and intentionally engaged in an *ongoing* pattern of racketeering activity under 18 U.S.C. § 1962(c) by committing the predicate acts of wire fraud and mail fraud[.]" (*Id.* at PageID.32 (emphasis added); *see id.* at PageID.33 (stating that Swift "used the interstate wires in the years 2019 and 2020, *and is continuing to use them*, to further her objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by AAPS during its closure" (emphasis added)); *see id.* at PageID.33–34 (stating that Fidishin "used the interstate wires in 2020, *and is continuing to use them*, to further her objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by AAPS during its closure" (emphasis added)); *see id.* at

PageID.35 (stating that Norman used "interstate wires in 2020, *and is continuing to use them*, to further her objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by the WISD during the closure of AAPS" (emphasis added)); *see id.* at PageID.38 (stating that Rice "collected" interstate wires "in the years 2019, 2020 and [they] are *continuing to be collected*, to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by the MDE" (emphasis added)).) Plaintiffs state that "[t]here is a *threat of continued activity*" because (1) "each individual defendant has repeatedly engaged in the illegal and illicit activities," (2) "[e]ngaging in the pattern of racketeering activity" presented in the complaint "is the regular way the individual defendants conduct the affairs of their respective associated association in fact enterprises," and (3) "each enterprise has been in existence for many years, and the seeking of federal funding by these individual defendants on behalf of their associated association in fact enterprises *will continue indefinitely*," so "each individual defendant, through the

operation of his or her associated association in fact enterprise, *remain*[*s*] *a threat to others*." (*Id.* at PageID.39 (emphasis added).)

Plaintiffs state that the individual Defendants' conduct deprived—and continues to deprive—Plaintiffs of their procedural and substantive rights under the IDEA. (*See id.* at PageID.32, 40.) Specifically, Plaintiffs state that "[a]s a direct and proximate result of the individual defendants' predicate acts [(i.e., wire fraud and mail fraud)] in furtherance of violating 18 U.S.C. § 1962(a), plaintiffs have been and are continuing to be deprived of their rights under IDEA, as set forth more fully above."[23] (*Id.* at PageID.40; *see id.* at PageID.32.) Plaintiffs also state that the individual Defendants' acts caused Plaintiffs to "suffer[ ] harm including significant regressions in skills and loss of competencies." (*Id.* at PageID.40.) Plaintiffs do not specify the relief they seek in Count 7. Plaintiffs' request in the complaint's "Prayer for Relief" that the Court "[a]ssign a RICO Special Monitor" to carry out

---

[23] Plaintiffs do not specify which portion of the complaint the language "as set forth more fully above" refers to. The language may be referring to the MDE's, WISD's, and AAPS's alleged failure to do certain things discussed in Count 7 and/or to the alleged systemic violations of the IDEA that appear in Count 1. Even if the Court applies one or both of these possible interpretations to its analysis and finds that Plaintiffs' allegations in Count 7 sufficiently demonstrate an injury in fact, Plaintiffs' allegations do not give them standing to pursue their claim in Count 7, as discussed above.

certain tasks (*id.* at PageID.42) is possibly part or all of the relief sought to remedy the harms alleged in Count 7.

Plaintiffs do not demonstrate that they have Article III standing to bring their RICO claim in Count 7 because they do not allege facts that establish all three requirements of standing: injury in fact, causation, and redressability. Plaintiffs allege an injury in fact, but their allegations are insufficient to show causation and redressability.

Plaintiffs allege an injury in fact in Count 7 because they allege that they have been deprived of their rights under the IDEA, *see supra* note 23, and suffered regressions in skills and loss of competencies (presumably related to the goals and objectives in their IEPs). Plaintiffs allege an existing harm, as well as a "substantial risk" of future harm, *Kanuszewski*, 927 F.3d at 405, 409–10, because they state that the racketeering activity is "ongoing" and "will continue indefinitely." (ECF No. 1, PageID.32–35, 39.) Further, Plaintiffs allege that because of the individual Defendants' predicate acts, "plaintiffs have been and are continuing to be deprived of their rights under IDEA." (*Id.* at PageID.40.) Therefore, Plaintiffs allege an injury in fact, and the first requirement of standing is met.

49

However, Plaintiffs do not demonstrate that the second and third requirements of standing—causation and redressability—are satisfied. To satisfy the causation requirement, Plaintiffs must show that their injuries are "fairly traceable" to the challenged acts of the individual Defendants, who are the Defendants named in Count 7. *Buchholz*, 946 F.3d at 861. The Sixth Circuit instructs that

> [t]he standard for establishing traceability for standing purposes is *less demanding* than the standard for proving tort causation. *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990). At the pleading stage, the plaintiff's burden of "alleging that their injury is 'fairly traceable'" to the defendant's challenged conduct is "relatively modest[.]" *Bennett v. Spear*, 520 U.S. 154, 171, 117 S. Ct. 1154, 137 L.Ed.2d 281 (1997). Thus, harms that flow "indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

*Id.* at 866 (emphasis in original).

Here, Plaintiffs do not establish a fairly traceable connection between their alleged injuries (i.e., deprivation of their procedural and substantive rights under the IDEA as well as regressions in skills and loss of competencies) and the challenged acts of the individual

50

Defendants (i.e., making "false assurances" in electronic messages or by mail and/or collecting IDEA Part B funds through the interstate banking system). Plaintiffs state that the individual Defendants' assurances were false *because* the MDE, WISD, and AAPS failed to (1) provide prior written notice to Plaintiffs, (2) ensure that the parents of children with disabilities were included in IEP teams making decisions on educational placement, (3) maintain the student Plaintiffs' pendency placements, and (4) reconvene IEP team meetings to modify the student Plaintiffs' IEPs. But Plaintiffs do not allege that the individual Defendants' assurances or Rice's collection of IDEA Part B funds affected Plaintiffs' rights under the IDEA or their "skills" and "competencies." (ECF No. 1, PageID.40.)

Plaintiffs allege that they were defrauded of millions of dollars as IDEA Part B funds beneficiaries. (*See id.* at PageID.29–31.) But in their complaint, Plaintiffs do not allege facts indicating that the individual Defendants deprived Plaintiffs of IDEA Part B funds or of their rights under the IDEA. To the extent the IDEA gives Plaintiffs a right to IDEA Part B funds, Plaintiffs state that the AAPS—but not the individual Defendants—used IDEA Part B funds "for unlawful

51

purposes," such as to buy personal protective equipment for staff and students. (*Id.* at PageID.38.) And Plaintiffs allege that the MDE, WISD, and AAPS—but not the individual Defendants—failed to provide prior written notice and to take certain steps related to IEPs and educational placement following school closures, as noted above. Thus, Plaintiffs do not include factual allegations in the complaint that indicate that the individual Defendants had any involvement in the spending of IDEA Part B funds or in the alleged deprivation of Plaintiffs' rights under the IDEA.

Because Plaintiffs do not establish a direct or indirect connection between their injuries and the individual Defendants' predicate acts, Plaintiffs do not show that their injuries "flow" from the individual Defendants' challenged conduct. *Buchholz*, 946 F.3d at 861. Therefore, Plaintiffs have not met their burden of showing that the causation requirement for standing is met.

Even if Plaintiffs had established causation, they would still lack Article III standing to bring their RICO claim in Count 7 because they do not satisfy the redressability requirement. To satisfy the redressability requirement, Plaintiffs must show that it is likely, and

52

not merely speculative, that their injuries will be redressed by a favorable decision. *See Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018). As noted, Plaintiffs do not specify the relief they seek as to their RICO claim in Count 7. To the extent Plaintiffs' request for the assignment of a "RICO Special Monitor" relates to Count 7 (ECF No. 1, PageID.42), Plaintiffs do not demonstrate how this form of relief would redress *Plaintiffs'* injuries. Plaintiffs indicate that they want the RICO Special Monitor to (1) oversee an independent audit of Defendants' spending of IDEA Part B funds from March 2020 "to the present," (2) oversee Defendants' spending of IDEA Part B funds for the 2021–2022 school year "to ensure defendants spend IDEA Part B Funds for instruction and/or services for students with disabilities under IDEA," and (3) "ensure any IDEA Part B Funds that defendants spent on items other than instruction and/or services for students with disabilities under IDEA from March of 2020 through the present are reimbursed to a monitored account to be spent only upon review and approval by the RICO Special Monitor." (*Id.*) Plaintiffs do not show how this request for relief—which seeks to ensure funding "for instruction and/or services

*for students with disabilities* under IDEA" (*id.* (emphasis added))—will redress any portion of Plaintiffs' injuries.

In addition to not demonstrating that the assignment of a RICO Special Monitor will redress their injuries, Plaintiffs do not show that granting this relief will target the individual Defendants' alleged predicate acts (i.e., wire fraud and mail fraud) that allegedly caused Plaintiffs' injuries in Count 7. (*See id.* at PageID.40.) "Article III requires the remedy to be 'limited' to the plaintiff's injury." *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 540 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). And the "'remedy must be "limited to the inadequacy that produced [a plaintiff's] injury in fact."'" *Id.* (alteration in original) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018)). Here, Plaintiffs want the RICO Special Monitor to oversee the spending of IDEA Part B funds by "Defendants"—not just the individual Defendants named in Count 7. Yet the complaint does not allege that the individual Defendants were involved in the spending of IDEA Part B funds, as noted above. Therefore, instead of targeting the individual Defendants' challenged acts of wire fraud and mail fraud, the request for a RICO Special Monitor relates to all "Defendants'" spending of

54

IDEA Part B funds. Such a request for relief is not limited to Plaintiffs' injuries alleged in Count 7 or the individual Defendants' acts that are alleged to be the cause of these injuries.

Moreover, to the extent Plaintiffs seek any other remedy that appears in the complaint (other than, or in addition to, the assignment of a RICO Special Monitor), the remaining requests for relief that are listed in the complaint's "Prayer for Relief" (ECF No. 1, PageID.41–42) would not be granted by the Court if it were to issue a favorable decision on Plaintiffs' RICO claim. These requests are for declaratory and injunctive relief, and they involve the AAPS, WISD, and MDE, which are not Defendants named in Count 7. "An injury is redressable if a judicial decree can provide 'prospective relief' that will 'remove the harm.'" *DeWine*, 910 F.3d at 850 (quoting *Warth*, 422 U.S. at 505). The Sixth Circuit indicates that

> "[r]edress is sought *through* the court, but *from* the defendant. . . . The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*"

*Id.* (emphasis in original) (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)). In other words, a favorable decision on Plaintiffs' RICO claim in Count 7 would entitle Plaintiffs to relief that "affects the behavior of" the individual Defendants toward them. *Id.* Plaintiffs do not seek relief in the complaint that would alter the behavior of these Defendants and redress Plaintiffs' injuries that are alleged in Count 7. Because Plaintiffs do not show that their injuries in Count 7 are redressable by a favorable decision that will "remove the harm," *id.*, Plaintiffs do not satisfy the third requirement for standing as to their RICO claim. Accordingly, Plaintiffs fail to properly allege Article III standing with respect to their RICO claim in Count 7.

### C. Dismissal Without Prejudice for Lack of Subject Matter Jurisdiction

Given that Plaintiffs do not establish that they have standing as to the remaining counts in this case (Counts 1, 2, 4, 5, and 7), the Court dismisses this case without prejudice for lack of subject matter jurisdiction. The dismissal is without prejudice because "Article III standing is jurisdictional, and a federal court lacking subject-matter

jurisdiction is powerless to render a judgment on the merits."[24]

*Thompson v. Love's Travel Stops & Country Stores, Inc.*, 748 F. App'x 6, 11 (6th Cir. 2018) (internal citations omitted) ("[O]ur court has stated on several occasions that dismissal for lack of subject matter

---

[24] The Court dismisses this case without prejudice for lack of subject matter jurisdiction; however, the Court seriously considered a dismissal with prejudice given that Plaintiffs' claims are highly unlikely to survive Defendants' challenges to them based on other grounds. In their motions to dismiss, Defendants make various arguments for dismissal that include arguments related to mootness, Eleventh Amendment sovereign immunity, the failure to exhaust administrative remedies, and the failure to state a claim. The Court is doubtful that Plaintiffs can overcome these hurdles and come out with a viable case.

As for Plaintiffs' RICO claim in Count 7, the Court reminds Plaintiffs' counsel of Judge Colleen McMahon's admonition regarding the RICO claim asserted by the plaintiffs in *J.T. v. de Blasio*, 500 F. Supp. 3d 137 (S.D.N.Y. 2020), a case in which attorneys from Plaintiffs' counsel's office represented the plaintiffs. In *J.T.*, Judge McMahon stated:

> Frankly, the RICO allegations here asserted reek of bad faith and contrivance. Plaintiffs have baldly asserted that every school district in the country, in trying to respond to an unprecedented nationwide health crisis, has perpetrated a fraud on the federal government. They have not the slightest basis for so asserting. Their use of the phrase "on information and belief" does not save this patently defective pleading. *See First Asset Capital Mgmt.*, 385 F.3d at 179 ("Although it is true that matters peculiarly within a defendant's knowledge may be pled 'on information and belief,' this does not mean that those matters may be pled lacking any detail at all.") (internal citation and quotation marks omitted). This effort to inject racketeering into what is simply an IDEA lawsuit is bad faith pleading writ large.

*J.T.*, 500 F. Supp. 3d at 172. Judge McMahon's findings regarding the plaintiffs' RICO allegations in *J.T.* may very well apply to Plaintiffs' RICO allegations in Count 7 of the complaint filed in this case.

jurisdiction should normally be without prejudice." (collecting cases));
*see Marks*, 2022 WL 866836, at *6 (dismissing a case "without prejudice
for lack of subject matter jurisdiction" because a plaintiff did not
"sufficiently allege[ ] Article III standing").

## IV.   Conclusion

For the reasons set forth above, this case is DISMISSED
WITHOUT PREJUDICE for lack of subject matter jurisdiction.
Defendants' motions to dismiss (ECF Nos. 20, 34, 38) and Plaintiffs'
motion for an automatic and preliminary injunction (ECF No. 42) are
DENIED AS MOOT.

IT IS SO ORDERED.

Dated: July 22, 2022                    s/Judith E. Levy
Ann Arbor, Michigan                     JUDITH E. LEVY
                                        United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served
upon counsel of record and any unrepresented parties via the Court's
ECF System to their respective email or first-class U.S. mail addresses
disclosed on the Notice of Electronic Filing on July 22, 2022.

                                        s/William Barkholz
                                        WILLIAM BARKHOLZ
                                        Case Manager